UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                :

UNITED STATES OF AMERICA,           :      Index No. 17 Cr. 683 (LAP)

                                          :

                    v.                  :

                                          :

CHUCK CONNORS PERSON           :
and RASHAN MICHEL,                  :

                                          :

                          Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**DEFENDANT RASHAN MICHEL'S MEMORANDUM OF LAW
<u>IN SUPPORT OF HIS MOTION TO DISMISS THE INDICTMENT</u>**

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................... iii

PRELIMINARY STATEMENT ......................................................................1

FACTUAL BACKGROUND ..........................................................................3

    The NCAA's Code of Amateurism................................................................3

    The Government's Theories of Prosecution .................................................4

        The Alleged Bribery Scheme..................................................................5

        The Alleged Scheme to Defraud Auburn University of Money and Property ........6

ARGUMENT .................................................................................................6

I.    The Federal Program Bribery Statute Is Unconstitutionally Vague And Overbroad, On Its Face And As Applied In This Case (Counts One and Two)....................6

    A.    *McDonnell*'s Narrow Interpretation Of Quid Pro Quo Bribery..............................7

    B.    The Language Of § 666 Is Even Broader Than The Language Of § 201 And Fails Adequately To Define The "Quo" Of The Bribe ...................................9

    C.    Section 666 Is Unconstitutional On Its Face........................................................11

    D.    Section 666 Is Unconstitutionally Vague As Applied In This Case.....................13

        1.    The indictment fails to charge an official act or any analog of an official act........................................................................13

        2.    An ordinary person would be unable to discern whether § 666 prohibits the alleged scheme to influence students in their choice of future financial advisors and clothing providers ...................15

        3.    There is substantial concern that § 666 is arbitrarily applied here ...........17

II.    The Indictment Fails To Allege Breach Of An "Official or Public Duty Owed To The Government Or Public At Large"  (Counts One and Two) .............................18

III.    The Honest Services Fraud Counts Should Be Dismissed (Counts Three and Four)........19

IV.    The Indictment Fails To Allege A Valid Wire Fraud Conspiracy (Count Five) .......................................................................................23

    A.    The Indictment Fails To Allege That The Object Of The Scheme Was To Obtain Money Or Property From The University.................................................24

    B.    The Indictment Fails To Allege Fraudulent Intent To Deprive The University Of Money Or Property ............................................................................30

    C.    The Indictment Fails To Allege A Scheme To Make False Representations Of Material Fact In Order To Obtain Money Or Property....................................32

V.    The Indictment Fails To Allege A Valid Travel Act Conspiracy (Count Six) .................34

VI.     The Indictment Should Be Dismissed For Reasons Stated In Co-Defendant
        Person's Brief.................................................................................................................35

CONCLUSION.................................................................................................................................36

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abernethy v. State,*
  545 So.2d 185 (Ala. Crim. App. 1988)..................................................................35

*Broadrick v. Oklahoma,*
  413 U.S. 601 (1973)......................................................................................11

*Chabus v. United States,*
  2012 WL 601069 (S.D.N.Y. 2012)................................................................10

*City of Houston, Tex. v. Hill,*
  482 U.S. 451 (1987)......................................................................................12

*Craig v. Boren,*
  429 U.S. 190 (1976)......................................................................................12

*Farrell v. Burke,*
  449 F.3d 470 (2d Cir. 2006).....................................................................12, 17

*Kolender v. Lawson,*
  461 U.S. 352 (1983)......................................................................................17

*Lorentzen v. Curtis,*
  18 F.Supp. 2d 322 (S.D.N.Y. 1998)..............................................................25

*Mannix v. Phillips,*
  619 F.3d 187 (2d Cir. 2010).........................................................................17

*National Association for Advancement of Colored People v. Button,*
  371 U.S. 415 (1963) ......................................................................................11

*McDonnell v. United States,*
  136 S. Ct. 2355 (2016).........................................................................*passim*

*Neder v. United States,*
  527 U.S. 1 (1999)....................................................................................32, 34

*Russell v. United States,*
  369 U.S. 749 (1962)......................................................................................33

*Sabri v. United States,*
  541 U.S. 600 (2004)......................................................................................10

*Secretary of State of Md. v. Joseph H. Munson, Co.,*
  467 U.S. 947 (1984)......................................................................................12

*Skilling v. United States,*
  561 U.S. 358 (2010).....................................................................................9, 20

*United States v. Alfisi,*
  308 F.3d 144 (2d Cir. 2002).........................................................................15

*United States v. Autuori*,
  212 F.3d 105 (2d Cir. 2000)..................................................................24, 27, 32

*United States v. Bahel*,
  662 F.2d 610 (2d Cir. 2011)...............................................................................10

*United States v. Bahel*,
  662 F.3d 610 (2d Cir. 2011)...............................................................................18

*United States v. Binday*,
  804 F.3d 558 (2d Cir. 2015)........................................................................30, 31

*United States v. Botti*,
  711 F.3d 299 (2d Cir. 2013)...............................................................................10

*United States v. Boyland*,
  862 F.3d 279 (2d Cir. 2017).........................................................................13, 14

*United States v. Brennan*,
  938 F.Supp. 1111 (E.D.N.Y. 1996) ...................................................................25

*United States v. Carpenter*,
  791 F.2d 1024 (2d Cir. 1986).............................................................................23

*United States v. Cochran*,
  109 F.3d 660 (10th Cir.1997) ............................................................................22

*United States v. Czubinski*,
  106 F.3d 1069 (1st Cir.1997) .............................................................................23

*United States v. Davis*,
  13-cr-923, 2017 WL 3328240 (S.D.N.Y. 2017) ...............................................27

*United States v. Ford*,
  435 F.3d 204 (2d Cir. 2006)...............................................................................18

*United States v. Frank*,
  156 F.3d 332 (2d Cir. 1998)...............................................................................32

*United States v. Ganim*,
  510 F.3d 134 (2d Cir. 2007)........................................................................10, 15

*United States v. Gatto*,
  No. 17-cr-686 (S.D.N.Y. 2018) ...................................................................24, 30

*United States v. George*,
  477 F.3d 508 (7th Cir. 1973) .............................................................................21

*United States v. Hasenstab*,
  575 F.2d 1035 (2d Cir. 1978).............................................................................20

*United States v. Males*,
  459 F.3d 154 (2d Cir. 2006)...............................................................................27

*United States v. Miller*,
  997 F.2d 1010 (2d Cir. 1993).............................................................................27

*United States v. Paccione,*
    949 F.2d 1183 (2d Cir. 1991)...................................................................32

*United States v. Pirro,*
    212 F.3d 86 (2d Cir. 2000)......................................................................33

*United States v. Porcelli ("Porcelli I"),*
    865 F.2d 1352 (2d Cir. 1989)............................................................28, 29

*United States v. Porcelli ("Porcelli IV"),*
    404 F.3d 157 (2d Cir. 2005)..............................................................28, 29

*United States v. Price,*
    788 F.2d 234 (4th Cir. 1986) ...................................................................20

*United States v. Regan,*
    713 F.Supp 629 (S.D.N.Y. 1989)..............................................................30

*United States v. Rooney,*
    37 F.3d 847 (2d Cir 1994)..................................................................18, 19

*United States v. Rosen,*
    716 F.3d 691 (2d Cir. 2013).....................................................................10

*United States v. Rybicki,*
    354 F.3d 124 (2d Cir. 2003) (en banc).......................................................20

*United States v. Schwartz,*
    924 F.2d 410 (2d Cir. 1991).....................................................................32

*United States v. Shellef,*
    507 F.3d 82 (2d Cir. 2007).......................................................................31

*United States v. Skelos,*
    707 Fed. Appx. 733 (2d Cir. 2017)............................................................10

*United States v. Starr,*
    816 F.2d 94 (2d Cir. 1987).......................................................................25

*United States v. Sun-Diamond Growers of Calif.,*
    138 F.3d 961 (D.C. Cir. 1998)..................................................................22

*United States v. Walker,*
    191 F.3d 326 (2d Cir. 1999).....................................................................32

*United States v. Walters,*
    997 F.2d 1219 (7th Cir. 1993) .................................................25, 26, 27, 30

*United States v. Williams,*
    553 U.S. 285 (2008)................................................................................12

**Statutes**

18 U.S.C. § 666 ........................................................................... *passim*

18 U.S.C. § 1346 ...........................................................................19, 20, 23

18 USC § 201 ...........................................................................9, 11, 12, 15

Ala. Code §§ 13A-11-120, 13A-11-121 ........................................................................35

**Other Authorities**

Robert A. McCormick, Amy Christian McCormick, *Myth of the Student Athlete*,
    81 Wash. L. Rev. 71, 84 (2006).............................................................................4

## PRELIMINARY STATEMENT

Rashan Michel has been charged with a series of federal crimes based on his alleged role in a scheme that involved payments to an assistant basketball coach in violation of the code of athletic amateurism promulgated by the National Collegiate Athletics Association ("NCAA"). The NCAA is a private, self-regulatory organization, with which Michel has no affiliation. Michel owns and operates a clothing business.

The indictment alleges that Michel was a middleman or broker, who introduced another individual to the assistant coach and then facilitated payments between them.  That other individual happened to be a cooperating witness ("CW-1") who was working with federal law enforcement agents, as part of a broader effort to infiltrate the NCAA and build cases against individuals and perhaps even entities who appeared willing to violate its rules.  The indictment alleges that, over time, CW-1 discussed with Michel an arrangement in which payments would be made to the assistant coach, in return for having the coach steer some of his individual players to CW-1's financial advisory business and to Michel's clothing business in the event that those players went on to pursue lucrative professional careers in the National Basketball Association ("NBA") after leaving the NCAA.  That was the essence of the alleged scheme:  to make payments to the assistant coach so that CW-1 and Michel could cash in on the potential future income streams of promising athletes.

Throughout the alleged scheme, Michel's alleged role remained that of a go-between. Although the indictment alleges that Michel's co-defendant, Chuck Person, then Associate Head Coach of the Auburn University basketball team, paid $1,000 to the family of one of his Auburn players, the indictment does not allege that Michel took part in such payments or was present for any meetings with players' family members.

To charge Michel based on his limited role, the government relies on a variety of federal criminal statutes, stretching their vague language beyond their traditional applications and into new uncharted and unconstitutional territory.  None of the counts alleged in the indictment can survive careful scrutiny.  Even if the conduct alleged in the indictment is contrary to the values of athletic amateurism and violates the rules of the NCAA, that alone cannot make it crime.  The rules of private organizations often provide for higher standards than those required of the public at large.  Indeed, in a related context, the Supreme Court has curtailed expansive interpretations of federal criminal statutes that prohibit bribery of federal public officials – statutes that arguably protect a far greater public interest than the alleged corruption of a private sports organization at issue here.  *McDonnell v. United States*, 136 S. Ct. 2355 (2016).

The present case suffers from the same constitutional infirmities as the government's expansive interpretation of federal criminal statutes in *McDonnell*.  The federal program bribery statute, charged in Counts One and Two, is unconstitutionally vague, both on its face and as applied in this case, and fails to provide fair warning that the conduct alleged here gives rise to criminal liability.  The honest services fraud statute, as charged in Counts Three and Four, exceeds the accepted parameters of bribery and kickback prosecutions as set forth in pre-*McNally* case law, and is also vague as applied.  The wire fraud conspiracy, charged in Count Five, fails to allege a scheme in which the victim's alleged loss is the basis for the defendant's alleged gain.  The Travel Act violation charged in Count Six relies on vague Alabama misdemeanor statutes, the text of which is even broader and more constitutionally infirm than the federal statutes discussed above.  The indictment should be dismissed.

# FACTUAL BACKGROUND

**The NCAA's Code of Amateurism**

The NCAA is a private, voluntary organization of member colleges that provides a forum for inter-collegiate athletic competition.  It promulgates an elaborate set of rules based on the premise that inter-collegiate athletics are a "recreational pursuit" and "avocation" for which students should receive no compensation.  (Division I Manual 1.2, 2.9.)

The NCAA's Division I "Bylaws," governing the upper tier of its athletics programs, are set out in a 400-page manual, revised on an annual basis.  The Bylaws require a student to maintain "amateur" status for as long as he or she wishes to play for an NCAA college team. (*Id*. 12.1.2.)  In general, "amateurism" means that a student (or the student's family) may receive no benefit of any kind in recognition of his or her athletic abilities, without the risk of being declared ineligible for competition.  (*Id.* 12.01.1, 12.1.2.)  The amateurism rules regulate a wide range of ordinary lawful activities in which other university students are free to engage, from accepting the offer of a meal or transportation to practice, to arranging for insurance against injury, or electing legal representation in a contract negotiation.  (*E.g.*, *Id.* 12.1, 12.3, 12.4, 12.6, 13.2, 16.11.2.)

The indictment characterizes various NCAA rules broadly, without quotation or citation, and appears to do so inaccurately.  For example, contrary to statements in the indictment, we are not aware of NCAA "prohibitions" that generally preclude institutional staff or coaches from "(i) facilitating contact between student-athletes and agents or financial advisors; [or from] (ii) receiving compensation directly or indirectly from outside sources with respect to any actions involving the student-athletes."  (Indictment ("Ind.") ¶ 15.)  There is a narrower provision that prohibits staff or coaches from receiving benefits in exchange for facilitating contacts with agents or financial advisors.  (Division I Manual 10.1(d), 10.4 (prohibiting "[r]eceipt of benefits

by an institutional staff member for facilitating or arranging a meeting [with] an agent.").)  In other words, the NCAA would seem to allow a coach to introduce his players to financial advisors who may represent them in the future, provided the coach receives no benefit in return.

Similarly, while the NCAA Bylaws expressly prohibit agreements between student-athletes and "agents," those prohibitions, by their terms, are limited to agreements "to be represented by an agent for the purpose of marketing [the athlete's] ability in [that] sport," or "for representations in future professional sports negotiations that are to take place after the individual has completed his or her eligibility in that sport." (*Id.* 12.3.1, 12.3.1.2.)  The Bylaws do not expressly prohibit a student-athlete from entering into an agreement with an "agent" who is merely a financial advisor, a business manager, or a custom tailor. (*Id.* 12.02, 12.3.1, 12.3.1.2.)[1]  An athlete may, however, be rendered ineligible if such dealings involve the athlete's receipt of transportation or other benefits while the athlete remains enrolled in an NCAA program. (*Id.* 12.3.1.3(b).)

**The Government's Theories of Prosecution**

Five counts of the indictment are premised on a theory that Michel committed bribery offenses by participating in a scheme to pay associate coach Person "in exchange for" Person's agreement to "influence" players on Auburn's basketball team to use CW-1's financial advisory services and to order custom suits from Michel, at some point in the future, in the event that the students went on to careers as professional athletes. (Ind. ¶¶ 1-3.)  A further count alleges a wire fraud conspiracy on the theory that so-called "bribe" payments that Person and CW-1 extended to the mothers of two players defrauded Auburn University of money and property by rendering

---

[1]  We assume that the specific language of Bylaw 12.3 controls the scope and application of the more general language set forth in Bylaw 12.1.2(g) prohibiting agreements with agents.

the players ineligible for NCAA competition.  (Ind. ¶ 4.)

### *The Alleged Bribery Scheme*

The indictment alleges that, in or about 2016, CW-1 approached Michel after a mutual acquaintance indicated to Michel that CW-1 was seeking to pay college basketball coaches to "use their influence over student-athletes" to persuade those athletes to retain CW-1 as "a financial advisor and business manager" in connection with their potential NBA careers.  (Ind. ¶ 22.)  Michel allegedly facilitated discussions between CW-1 and associate coach Person about such a plan.  (Ind. ¶ 23.)  The plan contemplated that CW-1 would extend a $50,000 loan to Person, and that CW-1 would be prepared to forgive that loan to the extent Person "directed" athletes to "retain" CW-1 as a financial advisor.  (Ind. ¶¶ 23-24.)

On November 29, 2016, Person allegedly met with Michel and CW-1 and agreed to accept $50,000 "in exchange for . . . steer[ing]" players on Auburn's Division I men's basketball team "to retain the services of CW-1 and Michel."  (Ind. ¶¶ 25, 38(a).)  At the meeting, CW-1 allegedly paid Person $5,000 and agreed to make further payments in the future.  (Ind. ¶ 25.)

In December 2016, Person arranged a meeting in New York with CW-1, Michel, and Player-1, an unidentified Auburn basketball player.  At the meeting, Person allegedly introduced CW-1 to Player-1 "as a financial advisor with the ability to help Player-1 once he entered the NBA," and introduced Michel "as someone from whom Player-1 could obtain custom clothing." (Ind. ¶ 28.)

The indictment does not allege that Michel committed any additional acts in furtherance of any alleged offense, although it does allege that Michel benefitted financially from his relationship with CW-1.  (Ind. ¶ 21.)  Following the meeting with Player-1, CW-1 is alleged to have given Mr. Person an additional $15,000 in cash.  (Ind. ¶ 28.)

### *The Alleged Scheme to Defraud Auburn University of Money and Property*

The indictment alleges that, approximately a week after the meeting with Player-1, Person introduced CW-1 to Player-1's mother and stepfather and offered to pay them $1,000, which CW-1 gave to them during the meeting.  (Ind. ¶¶ 29-30.)  A month later, Person introduced CW-1 to Player-2 and Player-2's mother.  (Ind. ¶ 31.)  Person is alleged to have advised Player-2's mother that CW-1 could help her financially and to have urged her to request money from CW-1 and to retain CW-1's financial advisory services.  (Ind. ¶¶ 31-32.)

The indictment theorizes that payment to the families of student-athletes defrauded Auburn University of money or property, because Person knew that payments to "student-athletes and/or their family members" would not be disclosed to the university, and thus the university would continue to provide scholarships without knowing that certain of its athletes were actually ineligible to compete in the NCAA.  (Ind. ¶ 4.)  The indictment states that the alleged scheme "caused the university to continue to provide athletic scholarships" to ineligible athletes, and thereby deprived the university "of the right to control the use of its assets, including the decision of how to allocate . . . athletic scholarships," exposing the university to "tangible economic harm."  (Ind. ¶¶ 48-49.)

The conduct relevant to this alleged scheme appears to have taken place without Michel's participation.

## ARGUMENT

### I. THE FEDERAL PROGRAM BRIBERY STATUTE IS UNCONSTITUTIONALLY VAGUE AND OVERBROAD, ON ITS FACE AND AS APPLIED IN THIS CASE (COUNTS ONE AND TWO)

The federal program bribery statute, 18 U.S.C. § 666, prohibits *quid pro quo* bribery at state agencies that receive federal funds.  Auburn University, where associate coach Person was employed, allegedly falls within these jurisdictional parameters.  (Ind. ¶ 5.)  By its terms, § 666

subjects to criminal penalties any person who:

> corruptly gives, offers or agrees to give anything of value to any person, with
> intent to influence or reward an agent of . . . a State, local or Indian tribal
> government, or any agency thereof, in connection with any business, transaction,
> or series of transactions of such organization, government, or agency involving
> anything of value of $5000 or more.

18 U.S.C. § 666(2).

Section 666 must be read in conjunction with recent Supreme Court case law limiting the

scope and application of analogous federal bribery statutes.  In *McDonnell v. United States*, the

Supreme Court held that the government had applied an analogous federal bribery statute, 18

U.S.C. § 201, too broadly, in manner that raised serious due process concerns about fair warning

and arbitrary enforcement of federal criminal law.  136 S. Ct. 2355 (2016).  The same concerns

apply here, arguably with even greater force, because the terms of § 666 are far broader and

provide far less notice than the terms of § 201.  A reconsideration of § 666 in light of *McDonnell*

shows that the federal program bribery statute is constitutionally overbroad on its face and too

vague to support prosecution of the conduct at issue here.

### A.    *McDonnell*'s Narrow Interpretation of Quid Pro Quo Bribery

*McDonnell* was a public corruption prosecution in which the government contended that

the governor of Virginia had violated the Hobbs Act and had committed honest services fraud by

accepting substantial gifts, payments, and personal loans in return for official acts intended to

benefit the interests of one of his constituents.  136 S. Ct. at 2361-65.  The parties and the district

court looked to the federal bribery statute, 18 U.S.C. § 201 – a statute closely related to 18

U.S.C. § 666 – to define key elements of the crimes.  *Id.* at 2365.

The question presented in *McDonnell* was the scope of the statutory definition of the

"official act," which forms the "quo" that a public official provides in return for the "quid" in

public *quid pro quo* bribery.  *Id.* at 2367.  The government had prevailed in the district court by

advocating a broad interpretation of "official act," "encompass[ing] nearly any activity by a public official." *Id.* at 2367.  On appeal, McDonnell contended that the Constitution demanded a far narrower construction of the "official act" requirement, one that would provide specific and non-arbitrary standards for criminal enforcement. *Id*.  A unanimous Supreme Court rejected the government's broad interpretation, adopted a narrowing construction of the statute, and vacated McDonnell's conviction.  *Id.* at 2374-75.

The Court's decision to limit the scope of the conduct that came within the purview of the statute was driven by "significant constitutional concerns," including the "serious concern" that the statute failed to comply with strictures against due process vagueness.  *Id*. at 2372-73.  It was impossible for an ordinary person to know from the face of the statute what conduct constituted an "official act" and what conduct did not.  *Id*.  This was so even though the statute included its own definition of the term "official act."  *See* 18 U.S.C. § 201(a)(3).  The Court held that "under the government's interpretation the term 'official act' is not defined 'with sufficient definiteness that ordinary people can understand what conduct is prohibited, or 'in a manner that does not encourage arbitrary and discriminatory enforcement.'"  *McDonnell*, 136 S.Ct. at 2373 (quoting *Skilling v. United States*, 561 U.S. 358, 402-03 (2010)).  The government's "expansive interpretation of 'official act' was so shapeless that "nearly anything a public official does . . . counts as a quo," *id.* at 2372, subjecting the public to a "'standardless sweep,'" under which "officials could be subject to prosecution, without fair notice, for the most prosaic interactions," *id*. at 2373.  "Invoking so shapeless a provision to condemn someone to prison for up to 15 years raises the serious concern that the provision does not comport with the Constitution's guarantee

of due process." *Id.* (internal quotation marks and citations omitted).[2]

To preserve the constitutionality of the statute, the Court adopted a narrow construction of the "quo" of a § 201 bribe.  It construed the statute's "official act" element to require both (1) a "specific," "focused and concrete" question involving a "formal exercise of governmental power," and (2) a "decision or action" by the public official on that question.  *Id.* at 2369-70, 2371.

*McDonnell* represents a substantial change in the landscape of *quid pro quo* bribery.  In discussing a vagueness challenge to the honest-services doctrine in *Skilling v. United States,* the Supreme Court had expressed confidence that cases such as *McDonnell* – in which liability for honest-services fraud was defined by reference to existing federal bribery statutes (including expressly § 201 and § 666) – would withstand a challenge for due process vagueness.  561 U.S. 358, 412-413 (2010).  Notwithstanding the *Skilling* court's optimism, a unanimous Court held in *McDonnell* that § 201's definition of federal bribery itself required a narrowing construction to avoid a similar due process "vagueness shoal."  136 S. Ct. at 2373.  Accordingly, after *McDonnell*, any statute or theory of bribery that fails to incorporate an adequately specific and narrow definition of the prohibited "quo" – that is, of the acts that one may not lawfully undertake in exchange for having been offered a quid – is vulnerable under the due process clause.

**B.  The Language Of § 666 Is Even Broader Than The Language Of § 201 And Fails Adequately to Define The "Quo" Of The Bribe**

Far from having anything to do with preserving the regime of amateurism within a

---

[2]  The Court's analysis also identified "serious" First Amendment overbreadth concerns due to the potential chilling effect of the government's interpretation on constituent activity, as well as federalism concerns arising from the application of federal standards to state and local officials through the device of honest-services fraud.  *McDonnell*, 136 S.Ct at 2372-73.

private sports association, § 666 was enacted to protect "the integrity of the state, local, and tribal recipients of federal dollars" from "theft, fraud, and undue influence by bribery." *Sabri v. United States*, 541 U.S. 600, 605-06 (2004) (quoting S. Rep. No. 98-225, p. 370 (1983)).  In the ordinary § 666 bribery case, a state official or employee accepts or demands a bribe or kickback from persons with business before the state, in exchange for supporting legislation, awarding a contract, disbursing government funds, or engaging in similar acts that corrupt governmental functions.[3]  Here, the government pushes the envelope way beyond these typical touchstones of federal program bribery.  Its flexible use of the statute demonstrates the unacceptably elastic nature of § 666's terms.

On its face, § 666 is just as "standardless" and "shapeless" as the analogous federal bribery statute the Supreme Court condemned in *McDonnell*.  136 S. Ct. at 2373.  As the Supreme Court found with respect to § 201, nothing meaningfully limits the scope of the "quo" that may be said to give rise to § 666 bribery.  The only element of the statute that purports to limit the scope of the "quo" is the requirement that the corrupting influence prohibited by the statute be "in connection with" some "business" or "transaction" of the state agency.  18 U.S.C. § 666.  Arguably any activity of a state agency, no matter how trivial or remote, could be

---

[3] *E.g., United States v. Skelos*, 707 Fed. Appx. 733 (2d Cir. Sept. 26, 2017) (summary order) (state legislator solicited benefits from and took actions favorable to parties with business before the state); *United States v. Rosen*, 716 F.3d 691 (2d Cir. 2013) (payments made to numerous state legislators for legislative actions and exercise of influence over state's hospital funding decisions); *United States v. Botti*, 711 F.3d 299 (2d Cir. 2013) (developer made payments to city's mayor and other officials to secure planning and zoning approvals for his development projects); *United States v. Bahel*, 662 F.3d 610 (2d Cir. 2011) (contractor paid chief of United Nations commodity procurement section for help in fraudulently securing procurement contracts); *United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007) (city mayor and associates solicited benefits in return for mayor's influence over city contracts and appointments); *Chabus v. United States*, 2012 WL 601069 (S.D.N.Y. Feb. 23, 2012) (contractor paid employee of public hospital corporation to approve $4,000,000 in fraudulent invoices).

described as "business" or a "transaction" of the agency.  It is difficult to imagine broader or more generic terms.  Indeed, couched in such terms, the "quo" element of § 666 is far broader and far more indefinite than the "official act" element of § 201.  As in *McDonnell*, the "quo" element of § 666 bribery is "shapeless" and can be construed to encompass "nearly anything" a state agent might do.  *McDonnell*, 136 S. Ct. at 2372.  The statute sweeps in an undifferentiated and virtually unlimited range of prosaic and facially innocuous conduct – including all of the conduct, at the state level, that sparked the Supreme Court's concerns in *McDonnell*.

### C.     Section 666 is Unconstitutional on Its Face

Even without considering the specific conduct alleged in this case, this Court should find that § 666's bribery provisions are facially unconstitutional, because they criminalize a broad range of political and constituent activity that is protected by the First Amendment, and because they are impermissibly vague.[4]

Defendants may challenge the facial validity of a statute on First Amendment grounds even when their own conduct does not raise First Amendment concerns.  *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) ("Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.").  Such a challenge may be based on either vagueness or overbreadth.  *Farrell v. Burke*, 449 F.3d 470, 496 (2d Cir. 2006) (even in cases where the challenged statute is "neither vague, overbroad, nor otherwise invalid as applied to the conduct charged against a particular defendant, he is permitted to raise its vagueness or

---

[4] Because that vagueness implicates First Amendment-protected conduct, scrutiny of the statute must be "strict."  *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 432 (1963).

unconstitutional overbreadth as applied to others") (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 619-20 (1971)).

Michel is an appropriate party to bring this challenge under the Supreme Court's First Amendment standing doctrine because his challenge frames the constitutional issues "with the necessary adversarial zeal" for this Court to resolve them and because he has suffered an injury-in-fact through this prosecution under the statute. *Secretary of State of Md. v. Joseph H. Munson, Co.*, 467 U.S. 947, 957 (1984) (finding for-profit company had standing to bring a First Amendment overbreadth challenge to statute restricting fundraising by charities, even though a charity could have brought a First Amendment claim); *Craig v. Boren*, 429 U.S. 190, 195 (1976) (liquor vendor had standing to bring Equal Protection challenge to statute that discriminatorily restricted liquor purchase on the basis of gender because even though his rights were not impacted, enforcement of the statute would infringe the rights of his customers).

A statute is facially overbroad in violation of the First Amendment when it "criminalizes a substantial amount of protected expressive activity." *United States v. Williams*, 553 U.S. 285, 297 (2008). Statutes that criminalize "a substantial amount of constitutionally protected conduct" will be found facially invalid "even if they also have legitimate application." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 459 (1987). *McDonnell* recognized precisely these concerns in its review of § 201, finding the statute as broadly interpreted by the government to be "significantly overinclusive," and identifying a series of specific harms with clear First Amendment implications, including the potential chilling effect on interactions between federal officials and their constituents. 136 S. Ct. at 2374. With no "official act" requirement, § 666 is even broader than § 201 and sweeps in *all* of the activity that was the focus of concern in *McDonnell*, exposing almost anyone who engages in political activity, whether a lobbyist or an

engaged citizen, to potential federal criminal charges. In view of *McDonnell*, there can be no question that § 666 is unconstitutionally overbroad. Likewise, without clear statutory language to define the boundaries of what is or is not acceptable, § 666 is unconstitutionally vague for all of the reasons articulated in *McDonnell*.[5]

### D.    Section 666 is Unconstitutionally Vague As Applied In This Case

Even if § 666 is not invalid on its face, the federal program bribery counts should be dismissed on the ground that § 666 is unconstitutionally vague as applied to the conduct alleged in this case.

#### 1.    The indictment fails to charge an official act or any analog of an official act

In *McDonnell,* § 201 survived a due process vagueness challenge only because the Supreme Court adopted a narrowing construction of that statute's "official act" requirement. 136 S. Ct. at 2374-75. A public official prosecuted for *quid pro quo* bribery under § 201 can no longer be convicted on the basis of a broad range of unspecified official activity, but only on the basis of a substantive "decision or action" on a "specific," "focused and concrete matter" that

---

[5] *United States v. Boyland*, 862 F.3d 279, 290-91 (2d Cir. 2017), is not to the contrary. There, defendant sought plain error review for his convictions for honest services fraud, Hobbs Act extortion, and § 666 bribery based on the court's failure to charge an "official act" as defined in *McDonnell*. In the supplemental briefs Boyland filed after *McDonnell* was decided, Boyland did not raise any constitutional arguments. *See* Suppl. Brs. for Pet'r, Doc. Nos. 74, 96, Boyland, No. 15-3118 (2d Cir. 2017). And the government confirmed that no constitutional argument was before the Second Circuit. Br. of Government at 34 n.15, Doc. No. 91, Boyland, No. 15-3118 (2d Cir. Nov. 9, 2016) ("[T]he government will not address [the constitutional] argument[.] . . . Boyland did not raise this argument in his supplemental brief."). Thus, the only issue before the court was whether the failure to charge an "official act" as defined in *McDonnell* with respect to these counts was plain error. The question of whether *McDonnell* applies to § 666 was not briefed or argued in any meaningful sense. *See United States v. Crawley*, 837 F.2d 291, 292-93 (7th Cir. 1988) (Posner, J.) (noting that "an inferior court [ ] is free to reject" appellate dicta, including when "the issue addressed in the passage was not presented as an issue, hence was not refined by the fires of adversary presentation.").

involves "a formal exercise of governmental power that is similar in nature to a lawsuit, administrative determination or hearing."  *Id.* at 2369-70, 2372.

In the present case, the government has undertaken to apply § 666 to conduct that lacks anything resembling an official act or the equivalent thereof.  The conduct at issue concerns an alleged scheme that did not seek to influence any particular official act or official decision by Auburn University, the state university receiving federal funds.  Rather, the object of the scheme was to influence student-athletes in their choice of financial advisors and clothing providers in connection with their future professional careers.  Nor does the conduct alleged here approach any analog of the official act requirement, such as would be required to narrow the application of § 666 and bring it within constitutional bounds.  Because the acts alleged in the indictment concern an agreement to influence students, and do not involve any attempt to influence some specific action of Auburn University, they are neither official acts as defined in *McDonnell*, nor plausible constitutionally adequate analogs of such official acts under § 666.  The government's theory is the antithesis of *McDonnell*'s narrowing of *quid pro quo* bribery, and of what any ordinary person could reasonably be expected to comprehend as conduct prohibited by § 666.[6]

The government will likely contend that, because § 666 has no express "official act" element, the indictment does not have to plead an official act at all.[7]  But without an appropriate

---

[6]  To the extent the Court interprets § 666 to contain an official act element, then the federal program bribery counts should be dismissed for failure to charge that element, and thus failure to charge an offense.

[7]  *See also* n. 5, *supra* (discussing *Boyland*).  Before *McDonnell*, a number of Second Circuit cases referred to § 666 generically as proscribing the exchange of a benefit for an "official act," but none undertook to define the nature of the act in question, as would be necessary to meet the due process standards articulated in *McDonnell*.  *E.g.*, *United States v. Ganim*, 510 F.3d 134, 140 n. 7 (2d Cir. 2007) (explaining that the court's description of the "quo" of § 666 as an "official act" was not intended to import the statutory term defined in § 201).

14

analog to an official act in the context of federal program bribery, the statute is utterly boundless and impermissibly vague.

> ### 2. An ordinary person would be unable to discern whether § 666 prohibits the alleged scheme to influence students in their choice of future financial advisors and clothing providers

Section 666 fails to provide fair notice because a person of common intelligence cannot discern with sufficient definiteness the contours of the conduct it proscribes, and would not necessarily understand the conduct alleged in the indictment to fall within the statute's grasp. *Farrell v. Burke*, 449 F.3d 470, 485 (2d Cir. 2016) (statute prohibiting behavior "in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law"); *United States v. Batchelder*, 442 U.S. 114, 123 (1979) ("[N]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes.").

While § 666, by its terms, refers to corrupt efforts to influence state agents "in connection with" any "business" or "transaction" of a state agency, the indictment in this case does not allege that Michel had any business before, or sought to do any business with, a state agency. Nor does it allege that Michel sought to influence any transaction of Auburn University.  His alleged dealings with associate coach Person were limited to efforts to steer individual student-athletes to his own clothing business or to CW-1's financial advisory business, in connection with their potential future NBA careers.  (Ind. ¶¶ 1, 3, 21, 28.)  In *McDonnell*, the Supreme Court defined impermissible influence to include influencing an official to influence another official to take official action, *not* influencing an official (associate coach Person) to influence third parties, like the students here.  *McDonnell*, 136 S. Ct. at 2372.

An ordinary person would not think that arranging future financial advisory relationships or future tailoring relationships for potential professional athletes constitutes university business,

such as to trigger § 666.  The indictment does not allege – and it is surely not the case – that Auburn University is in the business of recommending financial advisors or clothing providers to members of its student body.  To the ordinary person, it would be irrelevant to the business of *the university* whether associate coach Person gave students good advice or conflicted advice on such matters – especially where, as here, the relationships turn on future professional earnings after the students have left the NCAA.  In short, the relationship between the alleged object of influence and the state university that allegedly received federal funds is so attenuated that the average person could not reasonably be expected to see it as connected, within the meaning of the statute, to any "business" or "transaction" of the university.  Put another way, the vague generic terms that form the "quo" element of § 666 bribery ("business," "transaction") do not put the ordinary person on notice that the conduct alleged here would subject him or her to federal criminal penalties.

The government seems to be attempting to link the conduct at issue to the business of the university by alleging that the conduct implicates NCAA rules.  Such an approach expands the scope of federal criminal liability in a way that would not be obvious to the ordinary person.  The rules of a private, self-regulating organization have no force as penal statutes and do not provide fair or reasonable notice of potential criminal liability.  University personnel who violate NCAA rules might know that they could be subject to adverse employment consequences, but they would never reasonably anticipate criminal prosecution on the basis of such violations.  *Cf. Marinello v. United States*, Slip. Op., 584 U.S., No. 16-1144 (Mar. 21, 2018) ("[A]n individual may sometimes believe that . . . he is running the risk of having violated an IRS rule, but we sincerely doubt he would believe he is facing a potential felony prosecution for tax obstruction.").  Indeed, we are not aware of any other § 666 prosecution based on allegedly

influencing a violation of the rules of a private membership organization.  Notably, in other contexts, the Second Circuit has roundly dismissed the government's attempts to criminalize violations of internal organizational rules.  *See United States v. Finnerty*, 533 F.3d 143, 149-51 (2d Cir. 2008) (A "violation of an NYSE rule does not establish securities fraud in the civil context, let alone in a criminal prosecution.").

### 3.    There is substantial concern that § 666 is arbitrarily applied here

Although a criminal statue "need not achieve meticulous specificity," it must set "explicit standards" that provide "'minimal guidelines' to law enforcement authorities."  *Mannix v. Phillips*, 619 F.3d 187, 197 (2d Cir. 2010) (internal citations omitted).  A statute may not "permit a standardless sweep that allows policemen, prosecutors and juries to pursue their personal predilections."  *Kolender v. Lawson,* 461 U.S. 352, 358 (1983).

On an analysis of vagueness as applied, a statute that fails to provide sufficiently clear standards to guide law enforcement may still survive review if it has "a core meaning that can reasonably be understood."  *Farrell v. Burke*, 449 F.3d at 94.  In such a case, the court asks whether "the conduct falls so squarely in the core of what is prohibited by the law that there is no substantial concern about arbitrary enforcement because no reasonable enforcing officer could doubt the law's application in the circumstances."  *Id.*

Section 666 does not have a core meaning that can be reasonably understood.  As discussed above, *supra* at IA&B, it defines an offense that is at least as sweeping and standardless as the law the Supreme Court condemned for its "shapeless" and "standardless sweep" in *McDonnell*.  136 S. Ct. at 2373.  Moreover, even if one could argue that § 666 has a core meaning – such as targeting the corrupting influence of bribery on governmental and state agency decision-making – the scheme alleged here falls well outside that core:  The indictment alleges a scheme to influence the choices of student-athletes, none of whom is an agent of any

recipient of federal funds.  It is difficult to imagine a case farther from what Congress intended when enacting prohibitions against federal program bribery.  A reasonable prosecutor could easily doubt whether the alleged payments to associate coach Person violate the federal program bribery statute, even if they arguably fall within its broad and standardless sweep.

The statute's vague language leaves substantial doubt over the law's correct application and gives rise to "substantial concern" that its enforcement here is an arbitrary exercise of prosecutorial discretion, without fair notice, in violation of due process.  *McDonnell*, 136 S.Ct. at 2372-73.

## II.    THE INDICTMENT FAILS TO ALLEGE BREACH OF AN "OFFICIAL OR PUBLIC DUTY OWED TO THE GOVERNMENT OR PUBLIC AT LARGE" (COUNTS ONE AND TWO)

The federal program bribery charges must be dismissed for the additional reason that they fail to allege a "corrupt" action in a manner sufficient to satisfy the requirements of the statute. An agent acts "corruptly" under § 666 only if he or she violates an "official or public duty owed to the government or the public at large."  *United States v. Rooney*, 37 F.3d 847, 854 (2d Cir. 1994); *see also United States v. Bahel*, 662 F.3d 610, 638 (2d Cir. 2011) ("a fundamental component of a 'corrupt' act is a breach of some official duty owed to the government or the public at large"); *United States v. Ford*, 435 F.3d 204, 210-14 (2d Cir. 2006).

Here the indictment fails to identify any *duty* that would make an attempt to influence decisions of student-athletes in selecting a future financial advisor, or a future clothing provider, a "corrupt" act within the meaning of the statute.  The only duties alluded to in the indictment are those that might flow indirectly from NCAA rules.  But NCAA rules do not give rise to any "official or public duty owed to the government or the public at large."  *Rooney*, 37 F.3d at 854. Associate coach Person's compliance with the amateurism standards of the NCAA does not implicate the functioning of federal or Alabama state government, the public trust, or the rules of

any federal program providing funding to the university.  To the extent that Auburn University owes any duties as a result of its voluntary membership in the NCAA, they are private contractual duties.  And to the extent that Auburn University may impose contractual duties on its staff to comply with NCAA rules, such duties would likewise be quintessentially private duties, not "official or public duties owed to the government or the public at large."  *Id*.

In the absence of a breach of an "official or public duty owed to the government or the public at large," the indictment fails to charge a violation of the program bribery statute and must therefore be dismissed.

## III.   THE HONEST SERVICES FRAUD COUNTS SHOULD BE DISMISSED (COUNTS THREE AND FOUR)

Counts Three and Four charge honest services fraud in violation of 18 U.S.C. § 1346, alleging that Michel participated in a scheme to deprive Auburn University of the honest services of its employee, associate coach Person.  As set forth in the indictment, the gravamen of these charges appears to be that bribes offered or paid to Person – in exchange for his alleged agreement to "exercise his influence as a coach at Auburn University to persuade and pressure student-athletes to retain the services of CW-1" – corrupted Person and deprived the university of his honest services.  (Ind. ¶¶ 45, 47.)  These charges largely replicate and suffer from the same constitutional infirmities as the government's federal program bribery charges in Counts One and Two.  *See McDonnell,* 136 S.Ct. 2355 (vacating honest services fraud convictions that rested on elements of analogous federal bribery statute).  Moreover, they suffer from the additional defect that they fall outside the core of honest services fraud conduct recognized in *United States v. Rybicki*, 354 F.3d 124, 138-40 (2d Cir. 2003), as defining the proper scope of such prosecutions based on pre-*McNally* case law:  Unlike traditional bribery or kickback cases, the present indictment does not present circumstances in which the bribe payor had or sought business with

bribe recipient's employer (Auburn University), or in which the bribe recipient (associate coach Person) was acting on behalf of his employer with respect to the conduct in question.

To proceed on an honest services fraud theory, the government must sufficiently allege either a violation of a federal bribery statute or conduct that falls within the paradigm of a "bribe" or "kickback" as defined by pre-*McNally* case law.  *Skilling*, 561 U.S. at 411-413.  The government fails to allege a sustainable violation of a federal bribery statute for all of the reasons set forth above, including the due process concerns arising from the vague language of § 666. See *supra* at I & II.  The government also fails to allege a scheme that falls within acceptable parameters for bribery or kickback cases, as defined by the Second Circuit in *Rybicki*.  In *Rybicki*, the Second Circuit addressed the scope of § 1346 in response to due process vagueness challenges.  It found an acceptable definition of prohibited bribes and kickbacks in those cases in which the defendant seeks "a business relationship or transaction with the victim" and "pays the victim's employee . . . in exchange for favored treatment."  354 F.3d at 139.  Indeed, every bribery case cited in *Rybicki* in defining the reach of pre-*McNally* bribery and kickback cases shares this common structure:  a defendant seeks to transact business with a victim who is the principal of the corrupted employee or agent.  *Id.* at 127, 139-140.[8]

---

[8] *See United States v. Hasenstab*, 575 F.2d 1035 (2d Cir. 1978) (purchasing agent accepted kickbacks from supplier for routing orders to the supplier and supplying information about competitors' contract bids); *United States v. Price*, 788 F.2d 234 (4th Cir. 1986) (union officials accepted bribes in exchange for obtaining union memberships for unqualified persons); *United States v. Schwartz*, 785 F.2d 673 (9th Cir. 1986) (union officials gave union insurance contracts to third parties in exchange for third parties' lobbying national union for action to keep the officials in their positions); *United States v. Conner*, 752 F.2d 566 (11th Cir. 1985) (employees took kickbacks from real estate brokers doing business with their employers); *United States v. Boffa*, 688 F.2d 919 (3d Cir. 1982) (union official accepted bribes from employer in exchange for providing assistance to employer's efforts to de-unionize); *United States v. Bohonus*, 628 F.2d 1167 (9th Cir. 1980) (officer and director extorted kickbacks from insurance brokers by threatening to cancel contracts with the brokers); *United States v. Bryza*, 522 F.2d 414 (7th Cir. 1975) (purchasing agent accepted kickbacks from supplier from whom he purchased on

The present case falls outside *Rybicki's* authoritative definition of honest-services bribery because it does not concern any payment or attempt to influence an employee with respect to a business relationship or potential business relationship between the alleged payor of the bribe and the principal or employer of the alleged bribe recipient.  The present case also falls outside the *Rybicki* paradigm because the alleged scheme does not include or contemplate any action to be taken by the supposedly corrupted employee (associate coach Person) on behalf of his principal or employer (Auburn University) with respect to any business relationship or transaction.  Rather, the scheme alleged here follows an altogether different course:  the defendants allegedly attempted to influence students at Auburn University, not the university itself, to steer business toward CW-1 (financial advisory business) and Michel (tailoring business) in connection with the students' future professional careers.  This would be a very different case if the university were seeking the services of a financial advisor or a clothing provider and associate coach Person made recommendations to the university while under the influence of undisclosed bribes.  But that is not what happened here.  Instead, if anyone can complain about receiving conflicted and dishonest advice from Person, it is the students who allegedly received recommendations from him without knowing that he had an undisclosed financial interest.

Although Person was an employee of Auburn University, he was not acting on any proposed business of the university.  He was seeking to steer business from individual players to outside third parties that would coincide with the onset of the player's professional careers, once they were outside the confines of both the university and the NCAA.  There is no allegation in

---

employer's behalf); *United States v. George*, 477 F.2d 508 (7th Cir. 1973) (employer's suppliers paid kickbacks to employee in exchange for employer's business).

the indictment, nor could there be, that it was part of Person's duties or powers as an associate coach to introduce players to prospective financial advisors or to prospective tailors, or to advise their families about such matters. If he was able to give such advice, it was because of his personal relationships with players and their families, not because the university had vested him with authority over such matters. They fell outside his official capacity. *See Skilling*, 561 U.S. at 407 (defining core of honest services fraud to include violation of a fiduciary duty).

It might well be that the conduct alleged here is unethical, or in violation of the rules of amateurism promulgated by the NCAA, but that does not make it a federal crime. The scope of federal criminal liability is necessarily limited to a well-defined core of clearly prohibited conduct, and prosecutions that exceed such bounds lack fair notice and raise the specter of arbitrary enforcement. *See United States v. Carpenter*, 791 F.2d 1024, 1035 (2d Cir. 1986) ("not every breach of an employee's fiduciary duty to his employer constitutes mail or wire fraud"); *United States v. Sun-Diamond Growers of Calif.*, 138 F.3d 961, 973 (D.C. Cir. 1998) ("Every material act of dishonesty by an employee deprives the employer of that worker's 'honest services,' yet not every such act is converted into a federal crime by the mere use of the mails or interstate phone system."); *United States v. Cochran*, 109 F.3d 660, 667 (10th Cir.1997) ("it would give [the court] great pause if a right to honest services is violated by every breach of contract or every misstatement made in the course of dealing"); *United States v. Czubinski*, 106 F.3d 1069, 1077 (1st Cir.1997) (Congress did not enact § 1346 "to create what amounts to a draconian personnel regulation").

The honest services fraud doctrine, as circumscribed by *McDonnell, Skilling,* and *Rybicki*, does not include within its core the creative and ambitious prosecution attempted here. To the extent the government relies on flexible language to push the honest services fraud statute

(and a federal bribery statute) to new limits, it walks into a vague penumbra that raises constitutional concerns.  Such statutes, to the extent they apply at all, are unconstitutionally vague as applied in this case.  The honest services fraud counts should be dismissed.

## IV.   THE INDICTMENT FAILS TO ALLEGE A VALID WIRE FRAUD CONSPIRACY (COUNT FIVE)

Count Five charges a wire fraud conspiracy to deprive Auburn University of money or property.  The indictment alleges two objects of the conspiracy:  (1) to cause Auburn University to continue to provide scholarship payments to student-athletes who had been rendered ineligible, and (2) to deprive Auburn University of the right to control the use of its assets, including with respect to the allocation of scholarship funds.  (Ind. ¶¶ 48-49.)

This theory of prosecution has a precariously broad sweep.  It rests on the following syllogism:  the university pays scholarships to student-athletes; an NCAA rule violation renders a student-athlete ineligible; an NCAA rule violation thus affects the disposition of the university's funds.  Under that theory, any violation of NCAA rules can serve as a predicate for a federal wire fraud charge.  Judge Easterbrook rejected this theory in *United States v. Walters*, noting that any "theory that makes criminals of those who consciously cheat on the rules of a private organization . . . raises a red flag."  997 F.2d 1219, 1225 (7th Cir. 1993).  The theory should be rejected here as well.

As set forth below, the indictment fails to allege three essential elements of wire fraud conspiracy:  (1) a conspiracy to obtain money or property from the victim; (2) a specific fraudulent intent to deprive the victim of an interest in money or property; and (3) a scheme to deprive the victim of such an interest by material misrepresentations.

### A.    The Indictment Fails To Allege That The Object Of The Scheme Was To Obtain Money Or Property From The University

Count Five must be dismissed because it fails to allege a scheme in which the financial deprivation allegedly suffered by the victim was the source of the defendants' contemplated gain. A correspondence between the putative loss to the victim and the putative gain of the defendants is a required element of any wire fraud prosecution.  The wire fraud statute prohibits a scheme to defraud in which "the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other."  *Skilling*, 561 U.S. at 400, citing *United States v. Starr*, 816 F.2d 94 (2d Cir. 1987).  The government must prove that the defendants sought "to get money or property" from the victim by fraud.  *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000).

Here, the government has charged wire fraud even though the defendants sought no gain from Auburn University, their alleged victim, but instead allegedly sought gain only from funds that would be paid by student-athletes when and if they succeeded in pursuing professional careers.  Importantly, the scheme alleged in this case distinguishes it from *United States v. Gatto*, another NCAA case pending in this district, in which Judge Kaplan recently denied a motion to dismiss wire fraud counts.  *See* Order Den. Defs.' Mot. to Dismiss (Doc. No. 106), No. 17-cr-686 (LAK) (S.D.N.Y. Feb. 28, 2018).  *Gatto* concerned the recruitment of student-athletes to a university, in which the award of scholarship funds was thus an essential aspect of the scheme, and Judge Kaplan contemplated that, in that context, there might be ways in which it was connected to defendants' intended gain.  By contrast, the present case, which alleges a scheme intended to obtain future payments from outside the university itself, falls squarely under *Walters*, in which the Seventh Circuit found, consistent with Supreme Court and Second Circuit authority, that similar NCAA rule violations could not be charged as fraud.  997 F.2d at 1224-25.

The intent to obtain money or property and the intent to harm are separate elements of the wire fraud statute. *United States v. Davis*, 2017 WL 3328240, *8 (S.D.N.Y. Aug. 3, 2017) (Preska, J.). The intent to obtain identifies the object of the scheme, while the intent to harm is part of the specific intent required to allege fraud. *Id.* Wire fraud prosecutions require a correspondence between the object sought to be obtained and the loss or harm to which the victim is exposed. *United States v. Starr*, 816 F.2d 94, 98, 101 (2d Cir. 1987). While the victim "need not take money from his own pocket and place it directly in the hands of the defrauder," a wire fraud charge will not lie when there is no direct correspondence between the property alleged to have been obtained and the property alleged to have been lost. *Lorentzen v. Curtis*, 18 F.Supp. 2d 322, 331 (S.D.N.Y. 1998) (B. Parker, J.) (dismissing civil RICO mail fraud claims); *United States v. Brennan*, 938 F.Supp. 1111, 1128 (E.D.N.Y. 1996) (upholding mail fraud indictment where "alleged benefit" to defendant insurers in avoiding payouts "corresponded directly to the contemplated loss" imposed on victim insurers who were obliged to pay the claims) (reversed on other grounds, 183 F.3d 139 (2d Cir. 1999)).

Cases such as this one, in which the defendants sought to obtain nothing from the victim, are virtually unheard of. Whether a mail or wire fraud prosecution can proceed in the absence of a scheme to obtain the victim's money or property was, however, presented and squarely rejected in *Walters*. There, the defendant, a sports agent, participated in a scheme to induce Division I college football players to sign contracts promising to retain him if and when they pursued professional careers; he provided the students with cash, cars, and other valuable items, all in violation of NCAA rules. 997 F.2d. at 1221. The government charged Walters with mail fraud, alleging that he had committed fraud by "causing the universities to pay scholarship funds to athletes who had become ineligible [to compete under NCAA rules] as a result of the" contracts

they had signed with him.  *Id*.  In short, the theory of prosecution was the same theory the government is pursuing here.

The Seventh Circuit reversed Walters's conviction, emphasizing that his scheme was not devised to "obtain" money or property from the universities, which were allegedly his victims. *Id*. at 1224.  Judge Easterbrook acknowledged that "scholarship funds" were certainly "money" for purposes of the mail fraud statute, but the crucial element missing, as he articulated it, was that Walters was not enriched at the universities' expense.  *Id*. at 1227.  Any profit to be gained by Walters would come from the players' eventual "professional incomes," and not from any scholarships awarded by the university.  *Id.* at 1224.  Judge Easterbrook, relying on the text of the mail fraud statute, reasoned that the "scheme or artifice to defraud" clause and the "obtaining money or property" clause of the mail fraud statute "contemplate a transfer" of money or property from the victim to the defendant.  *Id.* at 1227.

The virtually identical wire fraud scheme alleged in the present case must be dismissed for the same reasons.  To the extent the indictment alleges a scheme to obtain money, it does not allege a scheme to obtain money or property from Auburn University, but rather to obtain money from individual Auburn players once launched upon their professional careers.  Although the indictment alleges that Auburn University could potentially disburse scholarship funds to ineligible athletes, it does not allege that Auburn University would be out of pocket to the defendants themselves.  Consistent with the holding in *Walters*, Second Circuit law is clear that the wire fraud statute gives rise to culpability only where a defendant's gain derives from a loss of the victim.  *Autuori*, 212 F.3d at 115; *United States v. Males*, 459 F.3d 154, 158-59 (2d Cir. 2006) (wire fraud "requirement…that the defendant devise a scheme or artifice for obtaining money or property is satisfied where a defendant fraudulently obtains the use of another person's

money or property for a period of time, using it for his own personal profit, and depriving the owner of the ability to do so"); *United States v. Miller*, 997 F.2d 1010, 1016 (2d Cir. 1993) (wire fraud requires the "obtention of money or property" by the defendant).

The indictment fares no better with respect to the second alleged object of the scheme – a theory also rejected in *Walters* – that the defendants schemed to deprive Auburn University of property in the form of "the right to control" its assets. *Walters*, 997 F.2d at 1226 n. 3. While the right to control assets is a "property interest" that can satisfy the cognizable harm element of a wire fraud, it does not thereby serve as "money or property" that the defendants *schemed to obtain* from the victim by means of the fraud. *Davis*, 2017 WL 3328240, at *8. Rather, in the right-to-control cases, defendants invariably obtain or seek money or property from the victim, and their fraudulent interference with the victim's right of control is only the means to that end.

In *Davis*, this Court undertook a thorough survey of the leading right-to-control cases. *Id*. at *9-11. Every such case involves the defendant's appropriation of money or property from the victim. The right-to-control doctrine serves to distinguish cases in which the defendants schemed to obtain money or property by fraud, from those where they sought to obtain money or property by non-fraudulent deceit, not from cases in which the defendants sought to obtain no money or property at all. *Id*. at *8. In the present case, the defendants stand to gain only from future income streams offered by individual athletes pursuing professional careers. They derive no financial gain from the university's alleged loss of its right of control. We are aware of no other wire fraud case, based on an alleged loss of right of control, that deviates from the traditional doctrine in this manner. To maintain a viable wire fraud prosecution, the loss of a right to control must be the source of the defendant's gain.

Two further Second Circuit opinions merit discussion, since either might be misread to hold that wire fraud requires only an intent to harm a victim in its property interests, even absent a scheme to obtain a corresponding gain.  In *United States v. Porcelli ("Porcelli I")*, 865 F.2d 1352, 1355 (2d Cir. 1989), the defendant was convicted of mail fraud for submitting false sales tax returns on sales of gasoline, by which means he avoided paying approximately $4.75 million in sales taxes to New York State.  The court found that Porcelli obtained "tangible" property or "cash" by virtue of the scheme, and that the victim, New York State, "lost money as a result." *Id.* at 1360.  A further question was whether the defendant had also "deprive[d] New York of property," where there was no evidence that Porcelli had ever actually collected the tax from his customers.  *Id.* at 1359.  The court concluded that, notwithstanding the lack of collection, there was a relevant property interest – a chose in action for uncollected sales taxes – and held that depriving the state of that interest sufficiently established "a scheme . . . to defraud the State of money due from sales taxes." *Id.* at 1361, n.2.

Sixteen years later, in response to a subsequent challenge to Porcelli's conviction, the Second Circuit ruled that, in contrast to a prosecution under the Hobbs Act, a prosecution under the mail fraud statute does not require the government to prove that the defendant "literally 'obtain[ed]' money or property."  *United States v. Porcelli* (*Porcelli IV*), 404 F.3d 157, 161-62 (2d Cir. 2005).  We read this language, not as negating the scheme to "obtain" element of mail fraud, but as clarifying that it suffices if the defendant merely intended to obtain funds, even if he or she did not literally succeed in doing so.  Indeed, in the same opinion, the Second Circuit went on to consider a second argument regarding whether the defendant had in fact "obtained" the funds from the victim.  Porcelli argued, in effect, that he could not have "obtained" funds from New York State, his alleged victim, because he "already possessed" them.  *Id*. at 162.  The

Second Circuit regarded this as an "attractive" argument and did not discount its legal merit, but ultimately held that it was unwilling to revisit *Porcelli I* decided some years earlier. *Id.* at 163.

In short, far from eroding the requirement that mail fraud requires a scheme to obtain money or property from the victim, *Porcelli IV* is fully consistent with *Porcelli I*'s fact-specific holding that Porcelli had indeed fraudulently obtained uncollected taxes from his victim. *Porcelli I*, 865 F.2d at 1359-60, 1361 n.2.  The defendants in this case, unlike the defendant in *Porcelli*, did not appropriate or obtain use of Auburn University's money, nor did they scheme to do so.

In *United States v. Finazzo*, the Second Circuit addressed a similar issue.  850 F.3d 94 (2d Cir. 2017).  There, defendants schemed to obtain lucrative manufacturing contracts from Finazzo's employer while paying kickbacks to Finazzo himself.  *Id.* at 97-98.  The jury nonetheless rendered a special verdict finding Finazzo guilty of mail and wire fraud on the theory that he intended to deprive his employer of a right to control assets, rather than on the government's primary theory that defendants obtained money through their fraud.  *Id.* at 96-97, 104.

On appeal, Finazzo argued that the right-to-control was not "obtainable" property, and that the district court's jury instructions therefore erroneously permitted him to be convicted "without proof that he caused or intended to cause harm."  *Id.* at 105.  Relying on *Porcelli IV*, the Second Circuit held that there was no such "obtainability requirement" under the mail and wire fraud statutes.  *Id. at* 107.  *Finazzo* concerns the "cognizable harm" element under those statutes, and its application should be limited to that context.  Unlike Finazzo, Michel does not contend that a deprivation of the right of control is insufficient to satisfy the intent to harm element of a wire fraud prosecution.  Rather, Michel contends that a deprivation of the right to control does

not satisfy the separate element that the defendant schemed to *obtain* the victim's money or property, especially where, as here, there is no correspondence between the alleged victim's deprivation of a right to control and the defendants' intended financial gain.  It should be noted that the *Finazzo* defendants indisputably obtained money or property, including lucrative kickbacks, from their victim.  *Id.* at 97-103.  Here, by contrast, the object of defendants' intended gain was never Auburn University's property.

### B.     The Indictment Fails To Allege Fraudulent Intent To Deprive The University Of Money Or Property

The indictment fails to allege that defendants had specific fraudulent intent to harm Auburn University.  This is hardly a surprise, since the university and its money and property were bystanders in the alleged scheme, never its target.  This stands in contrast to *United States v. Gatto*, in which obtaining scholarship funds from the university was the very object of the recruiting scheme alleged in the indictment.

The government must prove as an element of wire fraud that the defendant had a specific intent to inflict cognizable harm on the victim.  *United States v. Binday*, 804 F.3d 558, 578 (2d Cir. 2015).  Significantly, the intended deprivation of money or property "must be a goal of the plot, not just an inadvertent consequence of it."  *United States v. Regan*, 713 F.Supp 629, 637 (S.D.N.Y. 1989).  "Mail and wire fraud indictments [must] allege that the persons charged intended to deprive their victims of money or property, not just that such deprivation could be theoretically characterized as a necessary consequence of their scheme."  *Id.*; *see also Walters*, 997 F.2d 1219, 1227 (7th Cir. 1993) ("Losses that occur as byproducts of a deceitful scheme do not satisfy the statutory requirement.").

Here, the indictment alleges a scheme to influence student-athletes to enter into commercial arrangements with a financial advisor and a clothing provider, not a scheme to harm

the university.  The alleged effects on scholarship eligibility, and the alleged economic risks to Auburn University, whether real or remote, were at most inadvertent byproducts of the alleged scheme, not its object.

It should be noted that the indictment fails to make even the modest allegation that, had the university known of the payments to the student-athletes' family members, it would have withdrawn their scholarships.  It is not at all far-fetched to suppose that the university would *not* terminate financial aid to a valued athlete, particularly when based on the mere acceptance of a benefit by the athlete's relative, and that it would instead seek to restore that athlete's eligibility before the NCAA.  NCAA Bylaws on financial aid provide that an institution "*may*" reduce or cancel financial aid under specified circumstances (not that it *must*) including if an athlete "[r]enders himself or herself ineligible for intercollegiate competition."  (Division 1 Manual 15.3.4.2(a), 15.4.5.2(a).)  If the government is unable to allege that the university would have withdrawn financial aid if it had known of the alleged NCAA infractions, it cannot sustain a theory that defendants intended cognizable harm to the university, and it has failed to allege a specific intent to defraud.  *See Binday*, 804 F.3d at 578; *United States v. Shellef*, 507 F.3d 82, 109 (2d Cir. 2007).

Nor is the indictment saved by the government's conjecture that the NCAA might have subjected the university to fines or sanctions because an athlete's family member accepted an impermissible benefit under NCAA regulations.  Cases finding cognizable harm based on exposure to fines or legal liability have generally been predicated on a theory that defendants fraudulently misrepresented their compliance with mandatory public laws.  *United States v.*

*Novak*, 443 F.3d 150, 157-59 (2d Cir. 2006) (surveying cases).[9]  We are not aware of a single

case in which such speculative harm is based on the alleged violation of the rules of a private

organization, which rules the organization may seek to enforce or ignore at its pleasure.

### C. The Indictment Fails To Allege A Scheme To Make False Representations Of Material Fact In Order To Obtain Money Or Property

The indictment fails to allege a material false representation or omission, a fundamental

element of wire fraud.  *Neder v. United States*, 527 U.S. 1, 22, 24 (1999); *Autuori*, 212 F.3d at

115.  The indictment theorizes that the university was defrauded of scholarship funds, and of the

right to control the allocation of such funds, as a result of the "making and concealment" of

payments to "student-athletes . . . and/or their families."  (Ind. ¶¶ 48, 49.)  Making a payment is

not a representation, and a payment to an athlete's family does not defraud anyone.  To the

extent the indictment alleges that the existence of such payments was concealed, it fails to allege

any legally cognizable duty of disclosure owed to the university.

The theory of the indictment appears to be that a student-athletes' eligibility would have

been falsely represented to the university in two separate ways, neither of which is sufficient to

allege material misrepresentation:  *First*, the indictment alleges that each Auburn student-athlete

was required to complete an annual "Student-Athlete Statement," certifying that "to the best of

---

[9]  *See United States v. Frank*, 156 F.3d 332 (2d Cir. 1998) (defendants misrepresented that they would dispose of hazardous waste in compliance with specific anti-dumping laws and regulations which defendants then violated); *United States v. Schwartz*, 924 F.2d 410 (2d Cir. 1991) (defendants misrepresented that their resale of goods purchased from a government contractor would comply with contractors conditions and The Arms Export Control Act, which defendant then violated); *United States v. Paccione*, 949 F.2d 1183 (2d Cir. 1991) (defendant misrepresented that they would dispose of medical waste in a manner adequate "to relieve [customers] of the risk of civil and criminal liability" and then engaged in illegal dumping subjecting customers to "substantial regulatory risks"); *see also United States v. Walker*, 191 F.3d 326 (2d Cir. 1999) (defendant immigration attorney filed fraudulent work authorization and asylum applications exposing clients to criminal prosecution).

[his] knowledge, [he] ha[d] not violated any amateurism rules," and has "not provided false or misleading information concerning [his] amateur status to the NCAA . . . or the institution's athletics departments."  (Ind. ¶ 17.)  The indictment does *not* allege, however, that any student-athlete, in fact, knew of any impermissible payments, such that the student-athlete would have provided a false or misleading Student-Athlete Statement.  There is no allegation that payments were offered to the student-athletes themselves, and no allegation that the student-athletes were present when payments or offers of payment were made to their family members.  This factual nicety is avoided through the government's use of imprecise and disjunctive pleading:  the indictment goes only so far as to allege that payments were made to "student athletes . . . *and/or* their families."  (Ind. ¶¶ 4, 48, 49) (emphasis added).

The government cannot charge an offense by pleading disjunctively that the alleged scheme either involved knowingly false Student-Athlete Statements or did not.  *United States v. Pirro*, 212 F.3d 86, 93-94 (2d Cir. 2000) (holding that an indictment predicated on false statements in a tax return was insufficient where it alleged that defendant failed to report an "ownership interest" in certain property, an allegation that "might or might not make the return incorrect," depending on whether the interests were stock, or other property); *see Russell v. United States*, 369 U.S. 749, 766 (1962) (A "cryptic" indictment "requires the defendant to go to trial with the chief issue undefined . . . enables his conviction to rest on one point and the affirmance of the conviction to rest on another" and "gives the prosecution free hand on appeal to fill in the gaps of proof by surmise or conjecture.").  Because the government's allegations are deliberately ambiguous, they are legally insufficient to charge the misrepresentation element of wire fraud.

*Second*, the indictment alleges that athletics staff were required to "certify annually that they had reported to their university any knowledge of violations of NCAA rules involving their institution."  (Ind. ¶ 18.)  While the indictment implies that such a certification by associate coach Person would have been false, it does not expressly allege, and provides no basis for concluding, that such falsity would have been material.  Specifically, the indictment does not allege when the annual certification was due, how the certification fit into the university's process for awarding financial aid to students, or that the certification would, in fact, have affected any pending financial aid award with respect to Player-1 or Player-2.  Thus, on the theory of the indictment, the university *might* have been defrauded in making a decision to provide financial aid to ineligible students, or it might merely have been deceived after the fact about the eligibility of some student to whom it had already decided to provide financial aid.  Because a deceitful statement made after the fact comes too late to have been "capable of influencing" a decision-maker with respect to the alleged deprivation of property, it is not material.  *Neder*, 527 U.S. at 16.

Because the indictment fails sufficiently to allege that the agreed upon scheme involves the use of material falsehoods to deprive the university of property, Count Five must be dismissed.

## V.   THE INDICTMENT FAILS TO ALLEGE A VALID TRAVEL ACT CONSPIRACY (COUNT SIX)

Count Six charges a violation of the Travel Act, 18 U.S.C. § 1952, by taking state misdemeanor offenses and converting them into a federal felony.  In particular, it alleges a conspiracy to commit Alabama misdemeanor offenses involving bribery.  This Count should be dismissed because the Alabama statutes are unconstitutionally vague as applied in this case, for all the reasons discussed in Point I above.

The Alabama misdemeanor statutes at issue prohibit a person from providing a benefit to an employee or agent "without the consent of the latter's employer or principal, with intent to improperly influence his conduct in relation to his employer's or principal's affairs," and similarly prohibit an employee or agent from soliciting or accepting such a benefit, "upon an agreement or understanding that the benefit will improperly influence his conduct in relation to his employer's or principal's affairs."  Ala. Code §§ 13A-11-120, 13A-11-121.  The language of these provisions is even vaguer and broader than that of the federal program bribery statute discussed in Part I above.  Moreover, no published Alabama case law glosses these statutory provisions, so there is no authority under Alabama law for a narrowing construction.  Nor is there any Alabama authority to support a commercial bribery prosecution based on a violation of NCAA Bylaws.  *See Abernethy v. State*, 545 So.2d 185, 188 (Ala. Crim. App. 1988) ("Mere tampering with a player's eligibility in violation of N.C.A.A. rules is not a criminal offense unless done with the specific intent to influence the outcome of a sports contest").

For reasons discussed in Point I, an ordinary person could not be expected to discern whether Auburn University's "affairs" would include the decision of an individual Auburn student to enter into an agreement with a financial advisor in the event that the student pursues a professional basketball career after leaving Auburn University.  The text of the Alabama statutes do not provide fair notice that this prosecution could follow.  Count Six should therefore be dismissed.

## VI.   THE INDICTMENT SHOULD BE DISMISSED FOR REASONS STATED IN CO-DEFENDANT PERSON'S BRIEF

Michel hereby joins the arguments set forth in defendant Person's Motion to Dismiss to the extent they are applicable to him.

## **CONCLUSION**

For all the reasons stated above, the indictment should be dismissed.

Dated:  New York, New York
        March 30, 2018

                                    COOLEY LLP


                                    By:  _/s/Jonathan Bach_____
                                         Jonathan Bach
                                         Reed Smith
                                         Kaitland Kennelly

                                    1114 Avenue of the Americas
                                    New York, New York  10036
                                    Phone:  (212) 479-6000

                                    *Attorneys for Defendant Rashan Michel*