**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

      -against-

CHUCK CONNORS PERSON and RASHAN MICHEL,

        Defendants.

17-CR-683 (LAP)

Oral Argument Requested

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**JOINT MOTION TO SUPPRESS WIRETAP AND CELL PHONE EVIDENCE**

**SHER TREMONTE LLP**
Theresa Trzaskoma
Michael Tremonte
Michael W. Gibaldi
Emma Spiro
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600
ttrzaskoma@shertremonte.com

*Counsel for Chuck Connors Person*

**COOLEY LLP**
Jonathan Bach
Reed Smith
Kaitland Kennelly
1114 Avenue of the Americas
New York, New York 10036
(212) 479-6000
jbach@cooley.com

*Counsel for Rashan Michel*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND .................................................................................................... 2

ARGUMENT ......................................................................................................... 10

I.   THE WIRETAP ORDERS DID NOT COMPLY WITH THE STRINGENT
     CONDITIONS OF TITLE III ........................................................................ 10

     A.   The Wiretap Act Strictly Limits the Permissible Use of Electronic
          Surveillance ........................................................................................ 10

     B.   Mr. Person and Mr. Michel Have Standing To Challenge All Wiretap Orders.... 11

     C.   Given Mr. Blazer's Cooperation, the Wiretap Orders Were Unnecessary
          and, Therefore, Unlawful ...................................................................... 12

     D.   The Wiretap Orders Were Not Supported by Probable Cause To Believe That
          Any of the Targets Were Committing a Target Offense ........................ 15

II.  THE WARRANTS TO SEIZE AND SEARCH MR. PERSON'S AND MR.
     MICHEL'S CELL PHONES WERE UNCONSTITUTIONALLY OVERBROAD ....... 20

     A.   The Fourth Amendment Prohibits General Warrants ............................ 20

     B.   The Warrants Were Facially Overbroad ................................................ 21

     C.   All Evidence Derived from the Unlawful Searches of Mr. Person's and
          Mr. Michel's Cell Phones Must Be Suppressed .................................. 23

CONCLUSION ....................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. al-Kidd*,
  563 U.S. 731 (2011).................................................................................................20

*Berger v. State of New York*,
  388 U.S. 41 (1967)..................................................................................................10

*Coolidge v. New Hampshire*,
  403 U.S. 443 (1971)...........................................................................................20, 23

*Dalia v. United States*,
  441 U.S. 238 (1979)................................................................................................13

*Gelbard v. United States*,
  408 U.S. 41 (1972)..................................................................................................11

*Herring v. United States*,
  555 U.S. 135 (2009)................................................................................................23

*In re Nextel Cellular Tel.*,
  No. 14-MJ-8005-DJW, 2014 WL 2898262 (D. Kan. June 26, 2014) .............................22–23

*Katz v. United States*,
  389 U.S. 347 (1967)................................................................................................10

*People v. Jacobs*,
  130 N.E.2d 636 (N.Y. 1955).................................................................................19, 20

*Riley v. California*,
  134 S. Ct. 2473 (2014)........................................................................................21, 23

*Skilling v. United States*,
  561 U.S. 358 (2010)..........................................................................................16–17, 18

*United States v. Bershchansky*,
  788 F.3d 102 (2d Cir. 2015).....................................................................................24

*United States v. Bianco*,
  998 F.2d 1112 (2d Cir. 1993)...................................................................................11

*United States v. Blackmon*,
  273 F.3d 1204 (9th Cir. 2001) .................................................................................12

*United States v. Cirillo*,
  499 F.2d 872 (2d Cir. 1974)....................................................................................15

*United States v. Clark*,
    638 F.3d 89 (2d Cir. 2011)........................................................................24

*United States v. Concepcion*,
    579 F.3d 214 (2d Cir. 2009).............................................................12, 13

*United States v. Czubinski*,
    106 F.3d 1069 (1st Cir. 1997)..............................................................17

*United States v. Diaz*,
    176 F.3d 52 (2d Cir. 1999)...............................................................15–16

*United States v. Figueroa*,
    757 F.2d 466 (2d Cir. 1985)..................................................................10

*United States v. Galpin*,
    720 F.3d 436 (2d Cir. 2013)..................................................................21

*United States v. Geibel*,
    369 F.3d 682 (2d Cir. 2004)..................................................................19

*United States v. Giordano*,
    416 U.S. 505 (1974)..................................................................10, 11, 13

*United States v. Hasenstab*,
    575 F.2d 1035 (2d Cir. 1978)...............................................................18

*United States v. Jacobson*,
    4 F. Supp. 3d 515 (E.D.N.Y. 2014) ......................................................20

*United States v. Kahn*,
    415 U.S. 143 (1974)..............................................................................12

*United States v. Leon*,
    468 U.S. 897 (1984).......................................................................11, 23

*United States v. Lilla*,
    699 F.2d 99 (2d Cir. 1983)...........................................................12–13, 15

*United States v. Regan*,
    713 F. Supp. 629 (S.D.N.Y. 1989) .......................................................17

*United States v. Reilly*,
    76 F.3d 1271 (2d Cir. 1996)..................................................................23

*United States v. Rice*,
    478 F.3d 704 (6th Cir. 2007) ...............................................................11

*United States v. Ross*,
     456 U.S. 798 (1982) ............................................................................................23

*United States v. Rybicki*,
     354 F.3d 124 (2d Cir. 2003) ..............................................................................18

*United States v. Starr*,
     816 F.2d 94 (2d Cir. 1987) ................................................................................17

*United States v. U.S. Dist. Court for E. Dist. of Mich., S. Div.*,
     407 U.S. 297 (1972) ..........................................................................................10

*United States v. Vinyard*,
     266 F.3d 320 (4th Cir. 2001) .............................................................................17

*United States v. Walters*,
     997 F.2d 1219 (7th Cir. 1993) ...........................................................................16

*United States v. Wey*,
     256 F. Supp. 3d 355 (S.D.N.Y. 2017) .........................................................22, 24

*United States v. Winn*,
     79 F. Supp. 3d 904 (S.D. Ill. 2015) ...........................................................21–22, 24

**Statutes**

18 U.S.C. § 371 ...................................................................................................5, 9, 16

18 U.S.C. § 666 ...................................................................................................2, 9, 16

18 U.S.C. § 1343 ..............................................................................................2, 5, 9, 16

18 U.S.C. § 1346 .........................................................................................2, 5, 9, 16, 17

18 U.S.C. § 1349 ..............................................................................................2, 5, 9, 16

18 U.S.C. § 1952 ..................................................................................................5, 16, 18

18 U.S.C. §§ 2510–2520 ................................................................................... *passim*

Ala. Code § 13A-11-120 ..........................................................................................19

Ala. Code § 13A-11-121 ..........................................................................................19

N.Y. Penal Law § 180.00 .........................................................................................19

U.S. Const. amend. IV .............................................................................................20

Defendants Chuck Connors Person and Rashan Michel respectfully submit this memorandum of law in support of their motion to suppress the following: (1) all communications intercepted pursuant to orders issued on December 9, 2016, January 9, 2017, January 26, 2017, February 10, 2017, April 27, 2017, and May 25, 2017 (the "Wiretap Orders"); (2) all material obtained from the search of their cell phones pursuant to warrants issued on November 3, 2017 and November 6, 2017 (the "Warrants"); and (3) all evidence derived therefrom.

## PRELIMINARY STATEMENT

A wiretap is the most intrusive of all investigative methods. Equally invasive is the unfettered search of a modern cell phone, through which law enforcement can access nearly all aspects of an individual's life, including the most intimate details. When used in combination, a wiretap and cell phone search practically eviscerate the boundary between an individual's public and private life. For this reason, the Fourth Amendment and the Wiretap Act demand scrupulous adherence to strict requirements before the government may listen to every single phone call an individual places or receives, or before the government may search the entire contents of an individual's cell phone. The government failed to comply with those requirements here.

With respect to the Wiretap Orders, the government tapped the phones of Defendants Chuck Connors Person and Rashan Michel without establishing either (1) the necessity of a wiretap, or (2) probable cause to believe that an individual was committing a target offense. *First*, the Wiretap Orders fail the necessity test because the government's confidential informant, Marty Blazer, enticed Mr. Person and Mr. Michel into the alleged scheme and recorded all his conversations with them at law enforcement's direction. The government's boilerplate assertions that a wiretap was necessary under these circumstances are nonsensical. In particular, the government's conclusory contention that wiretaps were needed to capture other potential crimes is belied by the government's failure to set forth any facts, much less probable cause, to believe

1

that any separate schemes existed. *Second*, the Wiretap Orders were unsupported by probable cause because, for the reasons set forth in the Defendants' respective motions to dismiss the indictment, the facts alleged do not constitute federal crimes.

The broad searches of Defendants' cell phones were likewise unlawful because the Warrants supporting those searches violated the Fourth Amendment's prohibition on general warrants. Based upon evidence tying a small handful of the Defendants' phone calls and text messages to their respective iPhone cell phones, the Warrants authorized "a complete review of the seized [electronically stored information]," which included emails, notes, internet search history, photos, videos, and music. The Fourth Amendment does not permit this sort of "general, exploratory rummaging in a person's belongings."

Consequently, settled law demands the suppression of all communications intercepted pursuant to the Wiretap Orders and all materials seized pursuant to the Warrants, as well as all evidence derived therefrom.

## BACKGROUND

### *The Wiretap Orders*

On December 9, 2016, the government applied for an order authorizing the interception of wire and electronic communications over the cell phones of Rashan Michel and Chuck Connors Person. (*See* Ex. 1 (the "December 9 Wiretap Application").) The target subjects of the December 9 Wiretap Application were Mr. Michel, Mr. Person, and two other individuals who have not been indicted. The target offenses were wire fraud, 18 U.S.C. § 1343, and conspiracy to commit wire fraud, 18 U.S.C. § 1349. (*Id.* at US_00008565.) The government noted that federal funds bribery, 18 U.S.C. § 666, and honest services fraud, 18 U.S.C. § 1346, were not target offenses because they are not defined as predicate offenses under 18 U.S.C. § 2516. (*Id.* at US_00008566 & n.1.)

2

The December 9 Wiretap Application was supported by the Affidavit of FBI Special Agent Scott Carpenter (the "December 9 Affidavit"), which described the government's investigation into allegations of bribery schemes in men's college basketball. (Ex. 1 at US_00008598.) Despite its conclusory assertion of a wide-ranging investigation, the December 9 Affidavit alleged only a single, distinct scheme: government informant Marty Blazer, a business manager and financial advisor to professional athletes, had offered to pay money to Mr. Person supposedly on the understanding that some of the loan would be offset to the extent Mr. Person referred college basketball players to Mr. Blazer and to the extent those players engaged the services of Mr. Blazer if and when they entered the NBA.[1] The December 9 Affidavit did not allege any legitimate reason, let alone probable cause, to believe that Mr. Person or Mr. Michel were or had been engaging in any other similar conduct or in any other scheme.

The December 9 Affidavit acknowledged that Mr. Blazer's cooperation played a vital role in the government's investigation. (*See* Ex. 1 at US_00008639.) In fact, as reflected in the affidavit, the government built its entire case against Mr. Michel and Mr. Person upon the cooperation of Mr. Blazer. Mr. Blazer, through Mr. Michel, proposed the terms of a loan to Mr. Person, and it was Mr. Blazer (working for and at the direction of law enforcement) who proposed that the loan balance could be reduced by Mr. Person's referral of basketball players to Mr. Blazer. For months, Mr. Blazer had surreptitiously recorded his telephone calls with Mr. Michel and Mr. Person; captured his text messages with the two men; and recorded an in-person meeting between himself, Mr. Michel, and Mr. Person in Alabama – all at law enforcement's direction.

---

[1] The December 9 Affidavit referred to Mr. Blazer as "CW-1."

Notwithstanding Mr. Blazer's established ability to lure Mr. Michel and Mr. Person into the government's net, the December 9 Affidavit asserted that the government's usual investigative procedures were insufficient to achieve the objectives of the investigation. (*See* Ex. 1 at US_00008637 – US_00008638.) Although the December 9 Affidavit purported to establish this proposition with boilerplate language, it actually provided no meaningful support for its assertion that normal investigative procedures had proven inadequate to investigate the alleged scheme for Mr. Blazer to pay Mr. Person in exchange for Mr. Person introducing players to Mr. Blazer. Instead, the December 9 Affidavit focused on the need for wiretaps to uncover *additional* conduct by Mr. Person or Mr. Michel. (*Id.* at US_00008641 (emphasis added).) Specifically, the December 9 Affidavit speculated that other individuals might have been paying Mr. Person, and relied on vague statements made by Mr. Michel to assert that he could be participating in bribery schemes involving other coaches. (*Id.* at US_00008640.) In other words, while Mr. Blazer had been an effective tool for purposes of setting up and investigating the scheme actually alleged in the government's wiretap application, the government sought to tap the cell phones of Mr. Michel and Mr. Person in the hope of uncovering other schemes that it had no legitimate reason, much less probable cause, to believe existed.

In addition, the December 9 Affidavit is replete with other unsupportable or nonsensical positions. In contending that an undercover agent would not be effective, for example, the December 9 Affidavit cited Mr. Person's cautious manner for the proposition that Mr. Person would be wary of strangers seeking to earn his trust. (Ex. 1 at US_00008639.) But this contention was directly at odds with the fact that Mr. Person trusted Mr. Blazer implicitly even though Mr. Blazer had been a complete stranger to Mr. Person before November 2016. Similarly, the December 9 Affidavit argued that the telephone records might not list the actual users of the

4

telephones. (*See id.* at US_00008645.) While this generalization may be true in many instances, it was not true here. Mr. Blazer had the ability to make (and did make) consensual recordings of his conversations with Mr. Michel and Mr. Person, and in this way the government was able to establish that Mr. Michel was in fact the user of "Target Cellphone-1" even though it was subscribed to in the name of another individual, and that Mr. Person was the user of "Target Cellphone-2" even though it was registered to Auburn University.[2] (*Id.* at US_00008567.)

Based upon the government's application, the reviewing judge signed an Order of Interception (the "December 9 Wiretap Order") authorizing broad surveillance of Mr. Person's and Mr. Michel's phones. Following the December 9 Wiretap Order, the government made five additional applications to tap the cell phones of Mr. Michel and/or Mr. Person. Those applications were granted by Orders of Interception dated January 9 (Michel and Person cell phones), January 26 (additional Person cell phone), February 10 (Michel and Person cell phones), April 27 (Michel cell phone), and May 25, 2017 (Michel cell phone). Each of these orders relied upon the same facts set forth in the December 9 Affidavit, as well as communications obtained pursuant to each successive wiretap order. (*See* Exs. 2, 3, 4, 5 & 6.) Mr. Person and Mr. Michel were target subjects of all Wiretap Orders. In the Wiretap Orders issued after December 9, 2016, the target offenses were expanded to include wire fraud, 18 U.S.C. § 1343, honest services fraud, 18 U.S.C. § 1346, conspiracy to commit wire fraud and honest services fraud, 18 U.S.C. § 1349, violation of the Travel Act, 18 U.S.C. § 1952, and conspiracy to violate the Travel Act, 18 U.S.C. § 371.

---

[2]     We also note that the government could easily have subpoenaed Auburn University for records establishing that this particular cell phone number was assigned to Mr. Person.

***The Alleged Facts Supporting the Wiretap Orders***

Summarized below are the facts alleged in the December 9 Affidavit. As more fully set forth in this brief, those facts are deficient. All subsequent wiretap applications contain the same factual allegations and are, therefore, deficient for the same reasons.[3]

Chuck Person is a former professional basketball player and associate head coach of the men's basketball team at Auburn University. (*See* Dec. 9 Aff. ¶ 5(b).) In 2016, Mr. Person had some financial difficulties, which he discussed openly with Rashan Michel, a custom tailor for professional athletes. (*See id.* ¶¶ 5(a), 9(f).) Mr. Person did not know Marty Blazer at all before November 2016.

Mr. Michel had known Marty Blazer for approximately one year; they met through a sports agent. (*See* Dec. 9 Aff. ¶ 8.) Mr. Blazer was a business manager and financial advisor to professional athletes. (*Id.* ¶ 1.) For several months, Mr. Blazer and Mr. Michel had discussed Mr. Blazer's desire to identify a college coach who would be willing to refer basketball players to Mr. Blazer so that those players would use Mr. Blazer's services if and when they left college and entered the NBA.

On September 8, 2016, Mr. Michel spoke to Mr. Blazer about an unnamed assistant basketball coach at Auburn University who had financial issues and was looking for a loan of $60,000. (*See* Dec. 9 Aff. ¶ 9.) Mr. Michel explained that the coach was willing to repay Mr. Blazer over a two-year period, and that the coach had the ability to "give us 2 or 3 kids that's all coming out of his program." (*See id.* ¶ 9(d).) Mr. Blazer said he could lend the coach $50,000.

---

[3]     Citations to the fact section of the December 9 Affidavit, which begins on the page bates-stamped US_00008598 of Exhibit 1, are referenced herein as "Dec. 9. Aff. ¶ __."

(*See id.* ¶ 9(g).) In later conversations, Mr. Michel identified the Auburn coach as Mr. Person. (*See id.* ¶ 10.)

Throughout November 2016, Mr. Blazer and Mr. Michel spoke further about the terms of a loan to Mr. Person. On November 18, Mr. Blazer and Mr. Michel discussed the possibility that the loan would be "offset" by the value of any future business that Mr. Person referred to Mr. Blazer and Mr. Michel. (*See* Dec. 9 Aff. ¶ 12.) In one call on November 22, Mr. Michel proposed that the principal of the loan be offset by a certain amount for each player referred by Mr. Person. (*Id.* ¶ 13(a).) Mr. Michel also suggested that Mr. Blazer reduce the terms of the loan to writing in a promissory note without any mention of the offset provision. (*See id.* ¶ 13(b).) Mr. Blazer and Mr. Michel then discussed why Mr. Blazer would not give Mr. Person a $50,000 loan at ten percent interest unless he expected that Mr. Person could refer him players in return. (*See id.* ¶ 13(c).)

In another call with Mr. Michel on November 23, Mr. Blazer proposed the idea to have the principal of the loan be offset by a percentage of the fees that Mr. Blazer earned from the players Mr. Person referred.  (*See* Dec. 9 Aff. ¶ 14(b).) Mr. Blazer asked Mr. Michel to relay these terms to Mr. Person. Mr. Michel responded that Mr. Person would do whatever Mr. Michel told him to do. (*See id.* ¶ 14(e).) Mr. Person was not a participant on any of these calls, and there is no suggestion in the December 9 Affidavit that Mr. Person even knew that Mr. Blazer and Mr. Michel were discussing the possibility of having the loan be offset through some sort of referral fee.

On November 29, 2016, Mr. Blazer and Mr. Michel met Mr. Person at an Applebee's restaurant near Auburn University. (Dec. 9 Aff. ¶ 16.) Mr. Michel explained the terms of the promissory note to Mr. Person, including the proposed terms of the potential offset. (*See id.*

¶¶ 16(b)–(c).) Mr. Person signed the promissory note, and Mr. Michel handed Mr. Person $5,000 in cash. (*See id.* ¶¶ 16(e)–(f).) After Mr. Person signed the promissory note, he communicated with Mr. Blazer by telephone and text messages. Mr. Blazer and Mr. Person discussed the terms of the loan and made plans for Mr. Blazer to meet two Auburn basketball players, as well as one of the player's mothers.[4] (*See* Dec. 9 Aff. ¶¶ 20–21, 23–24, 26–27.)

***The Warrants To Seize and Search Mr. Person's and Mr. Michel's Cell Phones***

On September 26, 2017, law enforcement arrested Mr. Person and Mr. Michel on a criminal complaint and recovered their iPhone cell phones incident to the arrests. (*See* Ex. 7 at CP_00000105; Ex. 8 at RM_00000079.) The government applied for a warrant to seize and search Mr. Person's iPhone on November 3, 2017, and the reviewing judge signed the warrant on the same day. Three days later, the government applied for a warrant to seize and search Mr. Michel's iPhone, and the reviewing judge again signed the warrant on the same day.

The government's warrant applications were supported by Affidavits of FBI Special Agent Patrick McCadden and the Criminal Complaint.[5] The application for Mr. Person's phone described his participation in a total of two text message exchanges and seven phone calls over a period of several months. (*See* McCadden Person Aff. ¶ 12; Compl. ¶¶ 38–41, 44, 48, 52–53.) Similarly, the application for Mr. Michel's phone described his participation in four phone calls and one text message exchange over a period of several months. (See McCadden Michel Aff. ¶ 13; Compl. ¶¶ 32–35; 38.) Although the applications generally noted that an iPhone "can be used to . . . send and receive . . . emails" (McCadden Person Aff. ¶ 5; McCadden Michel Aff.

---

[4]      The Indictment refers to these individuals as "Player-1," "Player-2," and "Mother-1."

[5]      Citations to the Affidavit of FBI Special Agent Patrick McCadden in support of the government's application for a warrant to search Mr. Person's phone, which begins on the page bates-stamped CP_00000104 of Exhibit 7, are referenced herein as "McCadden Person Aff. ¶ __." Citations to the Affidavit of Mr. McCadden in support of the government's application for a warrant to search Mr. Michel's phone, which begins on the page bates-stamped RM_00000078 of Exhibit 8, are referenced herein as "McCadden Michel Aff. ¶ __."

¶ 5), the applications provided no basis, let alone probable cause, to believe that contraband or evidence of a crime was likely to be found in other applications on Mr. Person's or Mr. Michel's phones, such as their emails, notes, internet search history, photos, videos, music, or any of the other myriad data stored on a modern cellphone.

Despite the limited detail provided by the warrant application, the Warrants broadly authorized the search of Mr. Person's and Mr. Michel's *entire* cell phones "for evidence, fruits, and instrumentalities of scheme to (i) pay NCAA coaches in exchange for those coaches using their influence with NCAA players to convince those players and/or their families to retain certain agents, financial advisors, and others; and (ii) pay high school and NCAA players and conceal those payments from universities, thereby defrauding those universities of scholarship money and of the right to control their assets, all in violation of Title 18, United States Code, Sections 371, 666, 1343, 1346, 1349, and 2." (Ex. 9 at CP_00000149; Ex. 10 at RM_00000123.) The Warrants did not limit law enforcement's review to Mr. Person's and Mr. Michel's phone records and text messages. Instead, the Warrants provided the following, general authorization to locate such evidence anywhere on Mr. Person's and Mr. Michel's phones:

> This warrant authorizes the seizure of the Subject Device as well as the copying of electronically stored information on the Subject Device for later review. . . . In conducting this review, law enforcement personnel may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses. Such techniques may include, but shall not be limited to, ***surveying various file directories or folders and the individual files they contain***; ***conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents***; ***"scanning" storage areas to discover and possibly recover recently deleted data***; ***scanning storage areas for deliberately hidden files***; and ***performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation***. Depending on the circumstances, ***a complete***

> *review of the seized ESI may require examination of all of the seized data to evaluate its contents and determine whether the data is responsive to the warrant.*

(Ex. 9 at CP_00000150; Ex. 10 at RM_00000124 (emphasis added).)

## ARGUMENT

## I.     THE WIRETAP ORDERS DID NOT COMPLY WITH THE STRINGENT CONDITIONS OF TITLE III

### A.     The Wiretap Act Strictly Limits the Permissible Use of Electronic Surveillance

A wiretap is "the greatest of all invasions of privacy." *Berger v. State of New York*, 388 U.S. 41, 64 (1967) (Douglas, J., concurring). "It places a government agent in the bedroom, in the business conference, in the social hour, in the lawyer's office – everywhere and anywhere a 'bug' can be placed." *Id.* at 64–65. Given the seriously intrusive nature of a wiretap, the Supreme Court held in *Berger v. New York* that a statute authorizing electronic surveillance violated the Fourth Amendment because it lacked "adequate judicial supervision or protective procedures." 388 U.S. at 60. Then, in *Katz v. United States*, the Court overruled its prior decisions that had limited the Fourth Amendment's reach to physical trespasses, and held that the Fourth Amendment requires "advance authorization by a magistrate upon a showing of probable cause" to conduct electronic surveillance of a telephone conversation. *See* 389 U.S. 347, 358 (1967).

In response to *Berger* and *Katz*, Congress enacted Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 87 Stat. 197, 18 U.S.C. §§ 2510–2520 (1970 ed.) ("Title III"). "Title III was enacted, in large part, to meet the restrictions imposed on electronic surveillance practices and procedures by *Berger* and *Katz*." *United States v. Figueroa*, 757 F.2d 466, 471 (2d Cir. 1985); *see also United States v. U.S. Dist. Court for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 302 (1972). Recognizing that a wiretap is an "extraordinary investigative device," *United States v. Giordano*, 416 U.S. 505, 527 (1974), "Title III authorizes the interception of private wire and

oral communications, but only when law enforcement officials are investigating specified serious crimes and receive prior judicial approval, *an approval that may not be given except upon compliance with stringent conditions.*" *Gelbard v. United States*, 408 U.S. 41, 46 (1972) (emphasis added).

"Title III contains its own exclusionary rule." *United States v. Bianco*, 998 F.2d 1112, 1125 (2d Cir. 1993). No intercepted communications "and no evidence derived therefrom may be received in evidence in any trial . . . if the disclosure of that information would be in violation of [Title III]." 18 U.S.C. § 2515. Section 2518(10)(a) sets forth three "specific grounds for exclusion under § 2515." *Bianco*, 998 F.2d at 1125. The specific grounds for exclusion are: "(i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval." 18 U.S.C. § 2518(10)(a). Because Title III contains its own, statutory exclusionary rule, suppression is "not limited to constitutional violations"; rather, suppression is required whenever "there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *Giordano*, 416 U.S. at 527.[6]

**B.   Mr. Person and Mr. Michel Have Standing To Challenge All Wiretap Orders**

Under Title III, any "aggrieved person" has standing to challenge a wiretap order. 18 U.S.C. § 2518(10(a). An "aggrieved person" with standing to move for suppression is "a person

---

[6]    Further, because Title III contains its own, statutory exclusionary rule, the good faith exception set forth in *United States v. Leon*, 468 U.S. 897 (1984), should not apply to wiretap orders issued improperly under Title III. *See United States v. Rice*, 478 F.3d 704, 712–14 (6th Cir. 2007) (holding that "[t]he language and legislative history of Title III strongly militate against engrafting the good-faith exception into Title III warrants"). The Second Circuit has never held to the contrary.

who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11).

Here, as parties to intercepted communications and as persons against whom interception was directed, Mr. Person and Mr. Michel have clear standing to challenge the Wiretap Orders under Title III.

### C.   Given Mr. Blazer's Cooperation, the Wiretap Orders Were Unnecessary and, Therefore, Unlawful

Because a wiretap is so intrusive, Title III requires a demonstrated showing that a wiretap is necessary. In particular, the wiretap application must include, among other information, "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). Further, the judge may authorize the wiretap only "if the judge determines on the basis of the facts submitted by the applicant that," among other requirements, "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). "Taken together, §§ 2518(1)(c) and (3)(c) require a full and complete statement establishing necessity" of the wiretap. *United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001). The Second Circuit has "emphasized that 'generalized and conclusory statements that other investigative procedures would prove unsuccessful' will not satisfy Title III." *United States v. Concepcion*, 579 F.3d 214, 218 (2d Cir. 2009) (quoting *United States v. Lilla*, 699 F.2d 99, 104 (2d Cir. 1983)).

This requirement of necessity is "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974). As the Second Circuit has observed, although "it would be in some sense more efficient to wiretap whenever a telephone was used to facilitate the

commission of a crime," the necessity requirement "reflects a congressional judgment that the cost of such efficiency in terms of privacy interests is too high." *Lilla*, 699 F.2d at 105 n.7. Thus, Title III "evince[s] the clear intent to make doubly sure that the statutory authority be used with restraint." *United States v. Giordano*, 416 U.S. 505, 515 (1974). *See, e.g.*, *Dalia v. United States*, 441 U.S. 238, 250 (1979) ("The plain effect of the detailed restrictions of § 2518 is to guarantee that wiretapping or bugging occurs only when there is a genuine need for it and only to the extent that it is needed."); *Concepcion*, 579 F.3d at 220 ("A wiretap is not a device to be turned to as an initial matter, but only where the circumstances demonstrate that it is necessary.").

For instance, in *United States v. Lilla*, the Second Circuit held that a wiretap order violated Title III where the supporting affidavit itself proved the success of normal investigative procedures. *See* 699 F.2d at 105. In *Lilla*, law enforcement listened on an extension as an informant spoke to the defendant about purchasing marijuana and cocaine over the phone. After the telephone call, the informant and an undercover officer met the defendant, who sold them one pound of marijuana and explained that he could sell them cocaine in one or two weeks. *See id.* at 100–01. Despite the success of law enforcement's operation, the government applied for a wiretap on the grounds that the defendant's operation "must involve others," and that no other methods existed to investigate further. *See id.* at 101. The Second Circuit held that Title III does not authorize a wiretap in these circumstances, where "the normal investigative procedures that *were* used were successful." *See id.* 104 (emphasis in original).

Here, as in *Lilla*, the affidavit in support of the first Wiretap Order conceded that Mr. Blazer's cooperation with law enforcement, including his ability to obtain recordings of telephone calls and in-person conversations with Mr. Person and Mr. Michel, had been critical to the government's investigation. (*See* Ex. 1 at US_00008639.) Indeed, the December 9 Affidavit

described at length the content of phone calls, text messages, and an in-person meeting – all recorded by Mr. Blazer at law enforcement's direction – that collectively painted a complete picture of the financial arrangement among Mr. Blazer, Mr. Michel, and Mr. Person. In other words, Mr. Blazer had apparently found a college basketball coach who needed money and was willing, in exchange, to refer basketball players to Mr. Blazer. Any future conduct relating to this offense – introductions to players and their families, for example – would similarly be susceptible to Mr. Blazer's consensual recordings. This is precisely the target offense alleged in the December 9 Application.

Notwithstanding the conclusory assertion that the government needed a wiretap, the December 9 Affidavit failed to explain in any meaningful way why "normal investigative procedures" – including the continued use of Mr. Blazer, who was at the government's beck and call, who was taking direction from law enforcement, and who already enjoyed robust contact and communication with Mr. Person and Mr. Michel – were inadequate to investigate the alleged scheme to pay money to Mr. Person in exchange for referring players. In fact, the *only* justification provided for the highly intrusive use of a wiretap on Mr. Person's and Mr. Michel's cell phones was that a wiretap would be necessary to uncover *additional* conduct by Mr. Person or Mr. Michel. (*See* Ex. 1 at US_00008640 – US_00008641 (emphasis added).) To support this contention, the government merely speculated that Mr. Person could have been receiving payments from others, and that Mr. Michel could have been facilitating payments to other coaches. The government relied on vague statements made by Mr. Michel regarding his access to coaches and players to support the latter assertion. (*Id.* at US_00008640.)

Yet the December 9 Affidavit provided no specific or substantive details and no legitimate reason, let alone probable cause, to believe that any other alleged crimes had ever

occurred, were underway, or had even been contemplated by Mr. Person or Mr. Michel, the individuals whose phones were about to be tapped. Instead, the December 9 Affidavit supported the complete opposite: that Mr. Person was seeking a loan, and that he and Mr. Michel had been lured unwittingly into the government's scheme.[7] In this way, the government's affidavit here resembled the defective affidavit in *Lilla*, which described a fully successful law enforcement operation but asserted the need for a wiretap on the basis of speculation that the defendant's scheme "must involve others." *See* 699 F.2d at 101. If the necessity requirement of Title III has any force, it must, at a minimum, prevent the government from embarking upon fishing expeditions to identify potential additional crimes. For this reason alone, the applications for the Wiretap Orders were deficient.[8]

### D.   The Wiretap Orders Were Not Supported by Probable Cause To Believe That Any of the Targets Were Committing a Target Offense

In addition to the necessity requirement, a wiretap order must be based upon a finding of probable cause to believe "(1) that an individual was committing, had committed, or is about to commit a crime; (2) that communications concerning that crime will be obtained through the wiretap; and (3) that the premises to be wiretapped were being used for criminal purposes or are about to be used or owned by the target of the wiretap." *United States v. Diaz*, 176 F.3d 52, 110 (2d Cir. 1999); *see* 18 U.S.C. § 2518(3). "The standard for probable cause applicable to § 2518 is

---

[7]      Not only did the government have no reason, apart from rank speculation, to believe that Mr. Person was accepting money from other sources or that Mr. Michel was involved in bribery schemes other than those instigated by Mr. Blazer, but the government's theory was never substantiated, even with the benefit of thousands of hours of Mr. Person's and Mr. Michel's phone calls. There has been no suggestion whatsoever that Mr. Person or Mr. Michel were engaged in any alleged bribery schemes apart from those that the government itself concocted and directed Mr. Blazer to execute.

[8]      Deficiencies in the original December 9 Affidavit taint all subsequent applications, which included a combination of the original facts alleged in the December 9 Affidavit and communications that should never have been intercepted. *See United States v. Cirillo*, 499 F.2d 872, 878 n.3 (2d Cir. 1974) ("Since the application for these extensions was based on conversations intercepted as a result of the first order, if the first order were invalid, the subsequent extensions would be 'tainted' by the primary illegality.").

'the same as the standard for a regular search warrant.'" *Diaz*, 176 F.3d at 110 (quoting *United States v. Fury*, 554 F.2d 522, 530 (2d Cir. 1977)). Thus, probable cause exists only "if the 'totality-of-the-circumstances' indicate a probability of criminal activity." *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 230–32 (1983)).

Here, the Wiretap Orders specified the following target offenses: wire fraud, 18 U.S.C. § 1343, honest services fraud, 18 U.S.C. § 1346, conspiracy to commit wire fraud and honest services fraud, 18 U.S.C. § 1349, violation of the Travel Act, 18 U.S.C. § 1952, and conspiracy to violate the Travel Act, 18 U.S.C. § 371. Federal funds bribery, 18 U.S.C. § 666, which has also been charged in this case, is not a predicate offense under Title III. *See* 18 U.S.C. § 2516.

For substantially the same reasons discussed in Mr. Michel's and Mr. Person's memoranda of law in support of their respective motions to dismiss (ECF Nos. 46, 55), the Wiretap Orders were not supported by probable cause to believe that any target subject was committing any of the target offenses.[9] Consequently, the Wiretap Orders were facially insufficient, and all communications intercepted pursuant to those orders, as well as all evidence derived therefrom, must be suppressed.

*First*, the applications for the Wiretap Orders did not establish probable cause to believe that an individual was committing, or conspiring to commit, wire fraud. In brief, the theory of wire fraud in this case suffers from the same defects identified by Judge Easterbrook in *United States v. Walters*, 997 F.2d 1219 (7th Cir. 1993). Most fundamentally, the wire fraud statute prohibits only schemes to defraud "in which the victim's loss of money or property supplied the defendant's gain, *with one the mirror image of the other*." *Skilling v. United States*, 561 U.S.

---

[9]      Mr. Person and Mr. Michel adopt all arguments set forth in those memoranda of law to the extent applicable to this motion.

358, 400 (2010) (emphasis added). Thus, "[w]hile a finding that defendants garnered some benefit from their scheme may be helpful to the jury to establish motive, it cannot be probative of fraudulent intent unless it results, or is contemplated to result, from a corresponding loss or injury to the victim of the fraud." *United States v. Starr*, 816 F.2d 94, 101 (2d Cir. 1987).

Here, the applications for the Wiretaps Orders established at most that Mr. Blazer, Mr. Michel, and Mr. Person structured a mutually beneficial arrangement *without any corresponding loss or injury to a victim*. The potential gain to Mr. Blazer, Mr. Michel, and Mr. Person did not depend upon Auburn University (the victim alleged in the Indictment) suffering any deprivation of money or property, even if Auburn was harmed inadvertently. *See, e.g.*, *United States v. Regan*, 713 F. Supp. 629, 637 (S.D.N.Y. 1989) ("The money or property deprivation must be a goal of the plot, not just an inadvertent consequence of it."). Accordingly, for this reason and all other reasons set forth in the defendants' motions to dismiss, a theory of wire fraud based upon these facts is untenable and was not a lawful basis to support a wiretap order.

*Second*, the facts alleged in the applications for the Wiretap Orders did not establish probable cause to believe that an individual was committing, or conspiring to commit, private sector honest services fraud. Despite the broad wording of the honest services fraud statute, "courts generally have been reluctant to apply § 1346 in a way that would expose employees to mail fraud prosecution for 'every breach of contract or every misstatement made in the course of dealing.'" *United States v. Vinyard*, 266 F.3d 320, 327 (4th Cir. 2001) (quoting *United States v. Cochran*, 109 F.3d 660, 667 (10th Cir. 1997)); *see, e.g.*, *United States v. Czubinski*, 106 F.3d 1069, 1077 (1st Cir. 1997) ("We find no evidence that Congress intended to create what amounts to a draconian personnel regulation."). Thus, in *Skilling v. United States*, the Supreme Court salvaged the honest service fraud statute from a constitutional vagueness challenge by limiting

its application to the "solid core" of cases involving "offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes." 561 U.S. at 407. Although *Skilling* did not further define "bribery and kickback schemes" sufficient to support a conviction for honest services fraud, the Second Circuit has done so in *United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) (en banc). In *Rybicki*, the Second Circuit defined "the bribery or kickback cases" as cases in which "a defendant who has or seeks some sort of business relationship or transaction with the victim secretly pays the victim's employee (or causes such a payment to be made) in exchange for favored treatment." 354 F.3d at 139.[10]

As explained in the defendants' motion to dismiss papers, this is not a bribery or kickback case as defined by *Rybicki*. Even under the government's theory, Mr. Blazer did not agree to offset his loan to Mr. Person because he sought "some sort of business relationship or transaction" with Mr. Person's employer, Auburn University. *Cf. Rybicki*, 354 F.3d at 139. Neither Mr. Blazer nor Mr. Michel sought to do any business at all with Auburn. Rather, Mr. Blazer and Mr. Michel wanted to do business with Auburn basketball players only if and only when those players left Auburn and became professionals. Because this type of activity falls well outside the "solid core" of honest services fraud cases described in *Skilling* and *Rybicki*, it could not establish probable cause to believe that anyone was committing private sector honest services fraud.

*Third*, the Wiretap Orders were not supported by probable cause to believe that any individual was violating the Travel Act, 18 U.S.C. § 1952. While the Wiretap Orders did not

---

[10]    *Rybicki* used as an example *United States v. Hasenstab*, in which the Second Circuit affirmed wire and mail fraud convictions based upon the following facts. The defendant, a purchasing agent for Pan American World Airways, Inc., had received "secret cash kickbacks" from the president of Tabulating Stock Forms, Inc., a company that supplied Pan American with printed business forms, "in return for [the defendant's] efforts to see that Tabulating received favored treatment from Pan American." *See Hasenstab*, 575 F.2d 1035, 1036–37 (2d Cir. 1978).

specify any particular predicate acts, the Indictment in this case alleges the commission of two

Alabama misdemeanors: commercial bribery, Ala. Code § 13A-11-120, and receipt of a

commercial bribe, Ala. Code § 13A-11-121. Both Alabama statutes, like the New York

commercial bribery statute, require the conferral of a benefit upon an employee or agent with the

intent to "improperly influence his conduct in relation to his employer's or principal's affairs."

Ala. Code § 13A-11-120(a)(1); Ala. Code § 13A-11-121(a)(1). *See also* N.Y. Penal Law

§ 180.00. The Second Circuit has interpreted this statutory language to mean that "the payment

must be made for the purpose of inducing the employee to act contrary to the interest of, and

inconsistently with, his duties to his current employer." *United States v. Geibel*, 369 F.3d 682,

699 (2d Cir. 2004) (interpreting New York commercial bribery statute). As with private sector

honest services fraud, the quintessential violation of a state commercial bribery statute involves

"payment of money to a purchasing agent, to cause him to buy goods for his employer from one

vendor rather than from another." *People v. Jacobs*, 130 N.E.2d 636, 637 (N.Y. 1955)

(interpreting New York commercial bribery statute).[11]

   Nothing in the wiretap applications suggests that Mr. Person was paid with the specific

intent that Mr. Person act contrary to his duties to Auburn University. To the contrary, Mr.

Person's alleged acceptance of payments from Mr. Blazer was entirely unconnected to Mr.

Person's duties as a basketball coach and Auburn University's business, generally. The alleged

arrangement among Mr. Blazer, Mr. Michel, and Mr. Person plainly contemplated that Mr.

Person would receive a loan, and that Mr. Person would refer basketball players to Mr. Blazer

only once they entered the NBA. These actions bear no similarity to the commercial bribery case

---

[11]   As stated in Mr. Person's memorandum of law in support of his motion to dismiss the indictment, we are
aware of no cases interpreting Alabama's commercial bribery statute.

described in *People v. Jacobs*. Moreover, as with wire fraud, unintended and indirect harm to an employer cannot suffice to establish criminal liability under a commercial bribery statute. If that were the case, then every violation of the NCAA rules by a college coach, including otherwise normal and legal conduct like consuming tobacco while coaching, could be said to be "in relation to his employer's or principal's affairs." There is no basis for such a sweeping interpretation of federal criminal law.

<p style="text-align:center">*      *      *</p>

In sum, the Wiretap Orders were facially insufficient because they were not supported by probable cause to believe a specific target offense was being committed, and because normal investigative procedures had proven successful. Therefore, under Title III, the contents of all communications intercepted pursuant to the Wiretap Orders, as well as all evidence derived therefrom, must be suppressed.

## II.    THE WARRANTS TO SEIZE AND SEARCH MR. PERSON'S AND MR. MICHEL'S CELL PHONES WERE UNCONSTITUTIONALLY OVERBROAD

### A.    The Fourth Amendment Prohibits General Warrants

The Warrants Clause of the Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "The Fourth Amendment was a response to the English Crown's use of general warrants, which often allowed royal officials to search and seize whatever and whomever they pleased while investigating crimes or affronts to the Crown." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). To prevent "general, exploratory rummaging in a person's belongings," *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971), the Warrants Clause "requires particularity and forbids overbreadth," *United States v. Jacobson*, 4 F. Supp. 3d 515, 521 (E.D.N.Y. 2014) (internal citation and

quotation marks omitted). Thus, a warrant's "description of the objects to be seized is defective if it is broader than can be justified by the probable cause upon which the warrant is based." *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013).

Modern technology presents new challenges to the Fourth Amendment's established privacy protections. Because the government often claims the need to examine an entire computer hard drive to locate particular electronic files, the Second Circuit has noted the "serious risk that every warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant." *Galpin*, 720 F.3d at 447 (internal citation and quotation marks omitted). That risk is compounded by the reality that computers have become "akin to a residence in terms of the scope and quantity of private information it may contain." *Id.* at 446. Modern cell phones are no different. As the Supreme Court recently observed, "many of these devices are in fact minicomputers that also happen to have the capacity to be used as a telephone. They could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers." *Riley v. California*, 134 S. Ct. 2473, 2489 (2014). For these reasons, a digital search "demands a heightened sensitivity" to the requirements of the Fourth Amendment. *Galpin*, 720 F.3d at 447.

### B.     The Warrants Were Facially Overbroad

The Warrants here were unconstitutionally overbroad because they authorized the searches of Mr. Person's and Mr. Michel's *entire* cell phones based upon affidavits that tied Mr. Person's cell phone to seven phone calls and two text messages and Mr. Michel's cell phone to four phone calls and one text message.

This case stands on all fours with *United States v. Winn*, in which the district court suppressed all evidence obtained from the defendant's cell phone pursuant to an overbroad warrant. *See* 79 F. Supp. 3d 904, 926–27 (S.D. Ill. 2015). In *Winn*, like here, the complaint

supporting the search warrant established probable cause to believe that the defendant's cell phone contained "only two categories of data" that related to the charged crime of public indecency: photos and videos. *See id.* at 919. The government's warrant application offered no basis "to believe that the calendar, phonebook, contacts, SMS messages, MMS messages, emails, ringtones, audio files, all call logs, installed application data, GPS information, WIFI information, internet history and usage, or system files were connected with [the defendant's] act of public indecency." *See id.* at 919–20. Nevertheless, a magistrate judge signed a warrant authorizing the seizure and search of "any and all files" that constituted evidence of the charged offense. The district court held that the warrant was unconstitutionally overbroad "because it allowed the police to search for and seize broad swaths of data without probable cause to believe it constituted evidence of public indecency." *See id.* at 920. Because the warrant was an unconstitutional "general warrant," the district court held that it had "no valid portions" and, therefore, suppressed all evidence obtained from the defendant's cell phone. *See id.* at 926–27.[12]

For substantially the same reasons, a magistrate judge in the District of Kansas denied the government's application to search the entire contents of a cell phone on the basis of evidence that the cell phone was involved in drug distribution. *See generally In re Nextel Cellular Tel.*, No. 14-MJ-8005-DJW, 2014 WL 2898262 (D. Kan. June 26, 2014). The magistrate judge rejected the government's application to search the entire cell phone because it would "result in the overseizure of data and indefinite storage of data that it lacks probable cause to seize," and was "so broad that it appear[ed] to be nothing more than a 'general, exploratory rummaging in a person's belongings.'" *Id.* at *10 (quoting *Coolidge*, 403 U.S. at 467). As the court observed,

---

[12]     Judge Nathan recently cited *Winn* with approval in an order granting a motion to suppress. *See United States v. Wey*, 256 F. Supp. 3d 355, 392 (S.D.N.Y. 2017).

"probable cause to believe drug trafficking communication may be found in phone's the [sic] mail application will not support the search of the phone's Angry Birds application." *Id.* at \*13. *See also United States v. Ross*, 456 U.S. 798, 824 (1982) ("Just as probable cause to believe that a stolen lawnmower may be found in a garage will not support a warrant to search an upstairs bedroom, probable cause to believe that undocumented aliens are being transported in a van will not justify a warrantless search of a suitcase.").

The Warrants in this case fare no better. On the basis of minimal evidence linking Mr. Person's and Mr. Michel's cell phones to the charged crimes, the Warrants authorized nothing less than "a complete review of the seized ESI" to search for evidence of a crime. (*See* Ex. 9 at CP_00000150; Ex. 10 at RM_00000124.) In other words, the Warrants invited "general, exploratory rummaging," *Coolidge*, 403 U.S. at 467, in devices that contain "a digital record of nearly every aspect of" Mr. Person's and Mr. Michel's lives. *Riley*, 134 S. Ct. at 2490. The Warrants' overbreadth violated the Fourth Amendment.

## C. All Evidence Derived from the Unlawful Searches of Mr. Person's and Mr. Michel's Cell Phones Must Be Suppressed

The Fourth Amendment's exclusionary rule "forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139 (2009). Although the exclusionary rule contains a good faith exception, "[g]ood faith is not a magic lamp for police officers to rub whenever they find themselves in trouble." *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996). Regardless of an officer's good faith, the Fourth Amendment requires suppression where an invalidated warrant is based upon an "affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *United States v. Leon*, 468 U.S. 897, 923 (1984) (internal citation and quotation marks omitted). The government bears the burden "'to demonstrate the objective reasonableness of the officers' good faith reliance' on an

invalidated warrant." *United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011) (quoting *United States v. George*, 975 F.2d 72, 77 (2d Cir. 1992)).

The Warrants in this case were so patently overbroad that the good faith exception to the exclusionary rule cannot apply. *See, e.g.*, *Wey*, 256 F. Supp. 3d at 396–409; *Winn*, 79 F. Supp. 3d 926–27. Accordingly, all evidence seized pursuant to the unconstitutional Warrants, as well as all evidence derived from such evidence, must be suppressed. *See, e.g.*, *United States v. Bershchansky*, 788 F.3d 102, 112 (2d Cir. 2015) ("Exclusion extends to both physical evidence and indirect products of unlawful searches . . . .").

## CONCLUSION

For the foregoing reasons, Defendants Chuck Connors Person and Rashan Michel respectfully move for an order suppressing all communications intercepted pursuant to the Wiretap Orders, all material obtained from the searches of their cell phones, and all evidence derived therefrom.

Dated:  New York, New York
       April 30, 2018

<div style="margin-left: 50%;">

Respectfully submitted,

*/s/ Theresa Trzaskoma*

SHER TREMONTE LLP
Theresa Trzaskoma
Michael Tremonte
Michael W. Gibaldi
Emma Spiro
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600
ttrzaskoma@shertremonte.com

*Counsel for Chuck Connors Person*

</div>

24

COOLEY LLP
Jonathan Bach
Reed Smith
Kaitland Kennelly
1114 Avenue of the Americas
New York, New York 10036
(212) 479-6000
jbach@cooley.com

*Counsel for Rashan Michel*