UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

UNITED STATES OF AMERICA                    :

   -v.-                                                  :        17 Cr. 683 (LAP)

CHUCK CONNORS PERSON,                       :
and RASHAN MICHEL,

                     Defendants.         :

-----------------------------------------------------------------x


## GOVERNMENT BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE INDICTMENT


GEOFFREY S. BERMAN
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007


Robert L. Boone
Edward B. Diskant
Noah Solowiejczyk
Eli J. Mark
Aline R. Flodr
Assistant United States Attorneys

- Of Counsel -

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ............................................................................. 1

II.  FACTUAL BACKGROUND ............................................................................. 3

   A. THE SCHEME.................................................................................................. 3

   B. THE CHARGE.................................................................................................. 6

III. LEGAL STANDARD FOR DISMISSAL ....................................................... 7

IV.  ARGUMENT ...................................................................................................... 9

   A.   THE INDICTMENT PROPERLY ALLEGES A FEDERAL FUNDS BRIBERY SCHEME ................... 10

      1.   Applicable Law........................................................................................ 10

      2.   Discussion ............................................................................................... 12

   B.   THE FEDERAL FUNDS BRIBERY STATUTE AND THE HONEST SERVICES FRAUD STATUTE ARE

   CONSTITUTIONALLY VALID …………………………………………………….............18

   C.   THE INDICTMENT PROPERLY ALLEGES A SCHEME TO DEFRAUD AUBURN UNIVERSITY OF

   THE HONEST SERVICES OF ITS EMPLOYEE CHUCK CONNORS PERSON ...................................... 21

      1.   Applicable Law........................................................................................ 22

      2.   Discussion ............................................................................................... 23

   D.   THE WIRE FRAUD CONSPIRACY CHALLENGE IS MOOT ....................................... 29

   E.   THE TRAVEL ACT CHARGE IS CONSTITUTIONALLY VALID ................................ 33

V.   CONCLUSION ................................................................................................ 37

# Table of Authorities

**Cases**

Boyce Motor Lines, Inc. v. United States,
    342 U.S. 337 (1952) ................................................................................................ 8

Costello v. United States,
    350 U.S. 359 (1956) ................................................................................................ 7

McNally v. United States,
    483 U.S. 350 (1987) .............................................................................................. 22

Perrin v. United States,
    444 U.S. 37 (1979) .................................................................................... 33, 34, 35

Porcelli v. United States,
    404 F.3d 157 (2d Cir. 2005) ............................................................................ 31, 32

Sabri v. United States,
    541 U.S. 600 (2004) .............................................................................................. 11

Salinas v. United States,
    522 U.S. 52 (1997) .......................................................................................... 11, 12

Skilling v. United States,
    561 U.S. 358 (2010) ............................................................................ 19, 21, 22, 23

United States v. Boyland,
    862 F.3d 279 (2d Cir. 2017) ................................................................................. 20

United States v. Brann,
    990 F.2d 98 (3d Cir. 1993) ............................................................................. 12, 13

United States v. Bruno,
    661 F.3d (2d Cir. 2011) .................................................................................. 22, 25

United States v. Brunshtein,
    344 F.3d 91 (2d Cir. 2003) ................................................................................... 21

United States v. Ciavarella,
    716 F.3d 705 (3d Cir. 2013) ................................................................................. 25

United States v. Crozier,
    987 F.2d 893 (2d Cir. 1993) ................................................................................. 21

United States v. De La Pava,
    268 F.3d 157 (2d Cir. 2001) ................................................................................... 7

United States v. DeSantis,
    134 F.3d 760, 764 (6th Cir. 1998) ....................................................................... 31

United States v. Elie,
  2012 WL 383403, at *1 (S.D.NY. Feb. 7, 2012), ............................................................... 8

United States v. Elson,
  968 F. Supp. 900 (S.D.N.Y. 1997) ................................................................................ 8

United States v. Fernandez,
  722 F.3d 1 (1 Cir. 2013) ........................................................................ 11, 13-14, 14

United States v. Ferrara,
  990 F. Supp. 146 (E.D.N.Y. 1998) ............................................................................ 12

United States v. Finazzo,
  850 F.3d 94 (2d Cir. 2017) ....................................................................................... 31

United States v. Ganim,
  510 F.3d 134 (2d Cir. 2007) .............................................................................. 11, 22

United States v. Gaudin,
  515 U.S. 506 (1995) ................................................................................................. 31

United States v. Gaudreau,
  860 F.2d 357 (10th Cir. 1988) ................................................................................. 35

United States v. Gray,
  96 F.3d 769 (5th Cir. 1996) ............................................................................... 30, 32

United States v. Greenberg,
  835 F.3d (emphasis in original; internal quotation marks and citations omitted) ......... 29-30

United States v. Halloran,
  664 F. App'x 23 (2d Cir. 2016) ............................................................................... 19

United States v. Halloran,
  821 F.3d 321 (2d Cir. 2016) .............................................................................. 19, 23

United States v. Hernandez,
  980 F.2d 868 (2d Cir. 1992) ...................................................................................... 7

United States v. Keen,
  676 F.3d 981 (11th Cir. 2012) ................................................................................. 13

United States v. Lupton,
  620 F.3d 790 (7th Cir. 2010) ........................................................................... 11-12, 15

United States v. Marmolejo,
  89 F.3d 1185 (5 Cir. 1996) ...................................................................................... 12

United States v. McDonnell,
  136 S. Ct. 2355 ................................................................................................... 18-19

United States v. Nayak,
  769 F.3d 978 (7th Cir.2014) .................................................................................... 23

United States v. Nouri,
   711 F.3d 129 (2d Cir. 2013) ........................................................................ 22, 27, 28-29

United States v. Percoco,
   No. 16-cr-776 (VEC), 2017 WL 6314146 (S.D.N.Y. Dec. 11, 2017) ................................ 19

United States v. Perrin,
   580 F.2d 730 (5th Cir. 1978) ........................................................................ 34-35

United States v. Piggie,
   303 F.3d 923 (8th Cir. 2002) ........................................................................ 30, 32

United States v. Robinson,
   663 F.3d 265 (7th Cir. 2011) ........................................................................ 12

United States v. Rooney,
   37 F.3d 847 (2d Cir. 1994) ........................................................................ 17, 18

United States v. Rosen,
   716 F.3d 691 ........................................................................ 20, 20-21, 22, 25

United States v. Rybicki,
   354 F.3d 124 (2d Cir. 2003) ........................................................................ 26

United States v. Seregos,
   655 F.2d 33 (2d Cir. 1981) ........................................................................ 33, 35

United States v. Smith,
   985 F. Supp. 2d 547 (S.D.N.Y. 2014) ........................................................................ 23

United States v. Stavroulakis,
   952 F.2d 686 (2d Cir. 1992) ........................................................................ 7

United States v. Stringer,
   730 F.3d 120 (2d Cir. 2013) ........................................................................ 7, 9

United States v. Szur,
   289 F.3d 200 (2d Cir. 2002) ........................................................................ 33

United States v. Townsend,
   630 F.3d 1003, 1011 (11th Cir. 2011) ........................................................................ 12

United States v. Urciuoli,
   613 F.3d 11 (1st Cir. 2010) ........................................................................ 25

United States v. Urlacher,
   979 F.2d 935 (2d Cir. 1992) ........................................................................ 21

United States v. Vitillo,
   490 F.3d 314 (3d Cir. 2007) ........................................................................ 15

United States v. Whitfield,
   590 F.3d 325 (2009) ........................................................................ 15, 15-16, 16

United States v. Walters,
    997 F.2d 1219....................................................................................................... 30

United States v. Welch,
    327 F.3d 1081 (10th Cir. 2003) ............................................... 33, 35, 36-37, 37

United States v. Williams,
    540 U.S. 36 (1992) ............................................................................................. 8

United States v. Yannotti,
    541 F.3d 112 (2d Cir. 2008) .......................................................................... 7, 9

**Statutes**

18 U.S.C. § 371....................................................................................................... 6, 10

18 U.S.C. § 666 .................................................................................................... passim

18 U.S.C. § 1343....................................................................................................... 6

18 U.S.C. § 1346....................................................................................................... 6, 22

18 U.S.C. § 1349 ...................................................................................................... 6

18 U.S.C. § 1952....................................................................................................... 6

Ala. Code § 13A-11-120 ......................................................................................... 33, 34

Ala. Code § 13-11-121 ............................................................................................. 34

## I.        Preliminary Statement

This case concerns a college basketball coach's corrupt abuse of his power and influence over his players to enrich himself at the expense of his university.  Indictment 17 Cr. 683 (LAP) (the "Indictment") charges Chuck Connors Person and Rashan Michel (collectively, the "defendants") with participating in a scheme in which Person, a coach for Auburn University's men's basketball team, took nearly $100,000 dollars from a financial advisor and business manager ("CW-1")[1] in exchange for Person using his influence over Auburn's players to pressure and direct those players and their families to retain the services of CW-1 once those players turned professional.  The scheme was formed, in part, by Michel, who had a preexisting relationship with Person.  Michel brokered the arrangement between CW-1 and Person and received for himself tens of thousands of dollars in payments from CW-1 for introducing CW-1 to Person and for promising to introduce CW-1 to other corrupt basketball coaches.  (Indictment ¶ 21).

The conduct of Auburn University's athletic coaches and players is regulated by the National Collegiate Athletic Association ("NCAA").   (See Indictment ¶ 9).  The NCAA is a non-profit organization that regulates athletics for its member schools, conferences, and other associations.  (Indictment ¶ 9)  At its core, the NCAA strives to protect the amateur status of its student athletes in intercollegiate sports.  (See Indictment ¶ 11).   To that end, the NCAA has enacted rules prohibiting coaches and other staff from facilitating contact between student-athletes and agents or financial advisors and receiving compensation directly or indirectly from outside sources with respect to any actions involving the student-athletes.  (Indictment ¶ 15).  In

---

[1] As stated in the Indictment, CW-1 is an individual who ran a business management firm that primarily serviced professional athletes, as well as a registered investment advisory firm that provided investment related services to CW-1's clients, including athletes.  CW-1's activities described in the Indictment were undertaken during the course of his cooperation and at the instruction of law enforcement.  (*See* Indictment ¶ 8).

addition to prohibiting conduct that threatens the amateurism of intercollegiate athletics, the NCAA also requires that student-athletes, coaches, and other team staff, annually affirm that they are unaware of such conduct having taken place.  (Indictment ¶ 16).

Person, as a basketball coach for Auburn University, had a duty to run a basketball program that complied with NCAA rules.  That meant he could not facilitate contact between student-athletes and agents or financial advisors and he was prohibited from receiving compensation directly or indirectly from outside sources with respect to any actions involving student-athletes.   Person's and Michel's scheme to use Person's power and influence as an Auburn basketball coach to direct Auburn's players to retain the services of CW-1 in exchange for money violated the NCAA rules and, consequently, violated the duty Person owed to Auburn.  The defendants' scheme and the ways in which their conduct violated federal criminal laws are explained at length in a 32-page complaint and in the 27-page Indictment.  Indeed, while ostensibly moving to dismiss the Indictment, the defendants do not seriously dispute that the Indictment satisfies the pleading requirements of Fed. R. Crim. P. 7 or that it fairly apprises them of the nature of the charges against which they must defend.

Instead, in the defendants' respective motions to dismiss, the defendants make a series of premature arguments that at their core turn on their views of the sufficiency of evidence at a trial that has not yet occurred.  Specifically, the defendants argue (1) that the federal funds bribery counts, the honest services wire fraud counts, and the wire fraud conspiracy count should be dismissed for legal or factual insufficiency, and (2) that the federal funds bribery statute, the honest services statute, and the Alabama commercial bribery statute upon which the Travel Act charge is based are unconstitutionally vague.  As explained below, none of their arguments has

merit as all of the counts in the Indictment are properly alleged.  Accordingly, the defendants'
motions to dismiss the Indictment should be denied.

## II.     Factual Background

### A.  The Scheme

The Indictment alleges that Chuck Person, the defendant, solicited at least $91,500 in
bribes from CW-1 in exchange for agreeing to exert his official influence over certain basketball
players he coached at Auburn University, so that the athletes would retain CW-1's business
management services when they entered the National Basketball Association ("NBA"), as well
as the services of Rashan Michel, the defendant, as a suit maker.  (Indictment ¶ 21).  Michel,
who had a preexisting relationship with Person, brokered the arrangement between Person and
CW-1, and also solicited and received for himself tens of thousands of dollars in payments from
CW-1 in exchange for introducing CW-1 to Person, and for promising to introduce CW-1 to
other basketball coaches at NCAA Division I universities who were interested in accepting bribe
payments from CW-1 in exchange for directing certain of their athletes to retain CW-1's
services.  (*Id*.)

The scheme began in our about September 2016, when CW-1 was introduced to Michel
through a mutual friend.  (Indictment ¶ 22).  CW-1 had previously informed their mutual friend
that CW-1 was willing to pay college coaches to use their influence over student-athletes to
retain CW-1's services as a financial advisor and business manager.  (*Id*.) Upon meeting Michel,
CW-1 learned that Michel had a connection to a basketball coach at Auburn University, whom
Michel ultimately revealed to be Chuck Person, the defendant.  (*Id*.)  From September 2016 to in
or about November 2016, Michel and CW-1 had several discussions about making a loan to
Person.  (*Id*. at ¶ 23).  Michel claimed that Person was seeking a $50,000 loan in exchange for

his agreement to use his influence over the basketball players he coached at Auburn to retain CW-1's financial advisory services.  (*Id*.)  During this time, Michal and CW-1 also discussed how the purported "loan" would be "offset" by Person for each player that Person directed to retain CW-1's services.  (*Id.*)  In order to conceal the true nature of their bribery scheme with Person, Michel suggested that they document the purported loan using a sham promissory note. (*Id*. at ¶ 24; Compl. ¶ 35d).  The note was a sham because there was no expectation that Person would ever repay the loan so long as Person was able to steer student-athletes under his control to CW-1 and Michel.  (Indictment at ¶ 24).

On or about November 29, 2016, Chuck Person and Rashan Michel, the defendants, met with CW-1 at a restaurant in the vicinity of Auburn University's campus.  (*Id*. at ¶ 25).  During the meeting, Person agreed to accept $50,000 in bribe payments from CW-1 in exchange for using his position as a basketball coach at Auburn to steer Auburn basketball players to CW-1's financial advisory and business management services.  (*Id*.)  At the end of the meeting, CW-1 paid Person $5,000 in cash, and Person, Michel, and CW-1 agreed that Person would receive the balance of the bribe payment in three monthly installments of $15,000.  (*Id*.)

The following day, on or about November 30, 2016, Chuck Person spoke by telephone to CW-1 about a specific student-athlete ("Player-1") that Person wanted to steer to CW-1, and told CW-1 that Player-1 was likely to enter the NBA draft at the conclusion of the current season. (*Id*. at ¶ 26).  On that same call, Person asked CW-1 to confirm that he would be receiving the next installment of the bribe payment on the agreed-upon schedule.  (*Id*.)  On or about December 1, 2016, CW-1 wired an additional $5,000 to a bank account controlled by Person at Person's request.  (*Id*. at ¶ 27).

On or about December 12, 2016, Chuck Person, the defendant, arranged for CW-1 and Michel to meet Player-1 in a hotel room in Manhattan, New York, while Auburn University was in town for a basketball game. (*Id*. at ¶ 28). During that meeting, Person introduced CW-1 to Player-1 as a financial advisor who could help Player-1 once he entered the NBA, and introduced Michel as someone from whom Player-1 could obtain custom clothing.[2] (*Id*.) Person also informed Player-1 that he could speak to CW-1 on a separate telephone, which CW-1 would provide to Player-1. (*Id*.) Once that meeting ended, Person accepted approximately $15,000 dollars in cash from CW-1 outside of the presence of Player-1. (*Id*.)

A few days later, on or about December 17, 2016, Person informed Player-1's mother ("Mother-1") that Player-1 should leave Auburn University soon to play for the NBA. (*Id*. at ¶ 29). Person also encouraged Mother-1 to retain CW-1's services for Player-1, and falsely told Mother-1 that CW-1 represented Person and another well-known NBA player who previously attended Auburn, to pressure and influence Mother-1 into retaining CW-1. (*Id*. at ¶ 29; Compl. ¶ 44b). Person further told Mother-1 that CW-1 would help Mother-1 financially while Player-1 was still in college. (Indictment ¶ 29).

The next day, on or about December 18, 2016, Person introduced CW-1 to Mother-1 and a male believed to be the player's stepfather ("Stepfather-1") at Person's home in Alabama. (Id. at ¶ 30). During that meeting, Person again vouched for CW-1's abilities as a financial advisor and urged Mother-1 and Stepfather-1 to retain CW-1's services for their son. (*Id*.) Person also told Player-1's family members that CW-1 would make a cash payment of approximately $1,000 to them that day, which CW-1 provided at the meeting. (*Id*.)

---

[2] As stated in the Indictment, Michel was the founder and operator of a clothing company located in Atlanta, Georgia, which had a client base that consisted primarily of professional athletes. (*See* Indictment ¶ 7).

On or about January 18, 2017, Person arranged a similar meeting between CW-1 and another one of his players ("Player-2") and Player-2's mother ("Mother-2") at Person's home in Alabama.  (*Id*. at ¶ 31).  During that meeting, Person introduced CW-1 as someone who would be one of Player-2's business managers and financial advisors.  (*Id*.)  Person also told Mother-2 that CW-1 would be able to help Mother-2 financially while Player-2 was still in school.  (*Id*.)  After the meeting ended, outside the presence of Player-2 and Mother-1, CW-1 provided Person with approximately $10,000 dollars in cash.  (*Id*.)

Between in or about January 2017, and in or about July of 2017, Person continued to accept bribe payments from CW-1, including via wire transfer.  (*Id*. at ¶ 33).

### B.  The Charges

Based on the allegations described above, the Indictment charges both defendants with Conspiracy to Commit Bribery in violation of Title 18, United States Code, Section 371 (Count One), Conspiracy to Commit Honest Services Wire Fraud in violation of Title 18, United States Code, Section 1349 (Count Three), the substantive act of Honest Services Wire Fraud in violation of Title 18, United States Code, Sections 1343, 1346, 1349, and 2 (Count Four), Conspiracy to Commit Wire fraud in violation of Title 18, United States Code, Section 1349 (Count Five), and Travel Act Conspiracy in violation of Title 18, United States Code, Sections 1952(a)(1) and (a)(3) (Count Six).  The Indictment also charges Person with Solicitation of Bribes and Gratuities in violation of Title 18, United States Code, Section 666(a)(1)(B) and 2 (Count Two).

III.    **Legal Standard for Dismissal**

The dismissal of an indictment is an "'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights." *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) (citation omitted). Indeed, it is well-settled that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956).

To be valid on its face, "[a]n indictment is sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)); *see also* Fed. R. Crim. P. 7(c). In general, to satisfy the pleading requirements of Federal Rule of Criminal Procedure 7(c), "an indictment need do little more than to track the language of the statute charged and state the time and place . . . of the alleged crime." *United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) (internal quotation marks omitted).[3]  When determining whether a count sufficiently alleges a violation, the indictment should be read "in its entirety," *United States v. Hernandez*, 980 F.2d 868, 871 (2d Cir. 1992), and "must be read to include facts which are necessarily implied by the specific allegations made," *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (internal quotation marks omitted).

---

[3] Although there are circumstances in which greater specificity is required to pass muster under Rule 7(c) and the constitutional provisions it implicates, *see Stringe*r, 730 F.3d at 125-26 (discussing, for example, the special case of *Russell v. United States*, 369 U.S. 749 (1962)), defendants do not and could not contend such circumstances are present here.

Finally, it is well settled that a facially valid indictment is not subject to challenge based on the quality or quantity of evidence. *See United States v. Williams*, 540 U.S. 36, 54 (1992); *United States* v. *Elie*, No. 10 Cr. 336 (LAK), 2012 WL 383403, at *1 (S.D.NY. Feb. 7, 2012) (same).  A defendant seeking to challenge the sufficiency of the evidence must wait until after the close of the Government's case-in-chief at trial or after the jury's verdict.  *See* Fed. R. Crim. P. 29; *see also, e.g*., *United States v. Elson*, 968 F. Supp. 900, 905 (S.D.N.Y. 1997); *see also Elie*, 2012 WL 383403, at *1 ("[T]here is no summary judgment in criminal cases"). Indeed, because a post-trial motion is the proper avenue for challenging the accuracy or sufficiency of the Government's factual allegations, on a pretrial motion to dismiss, the allegations as set forth in the Indictment must be taken as true.  *See Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n.16 (1952).

## IV.     Argument

As an initial matter, there can be no serious dispute that the 27-page Indictment returned in this case amply alleges each of the elements of the offenses charged and fairly informs the defendants of the charges against which they must defend. *See Stringer*, 730 F.3d at 124.  As detailed extensively above, the Indictment alleges the existence of a conspiracy in which Person, a coach for Auburn University's men's basketball team, with the help of Michel, took nearly $100,000 dollars from a financial advisor and business manager ("CW-1") in exchange for Person using his influence over Auburn's players to pressure and direct those players and their families to retain the services of CW-1 once those players turned professional.  (Indictment ¶¶ 34-45; 50-53)  The Indictment also alleges a scheme to defraud Auburn University of (1) money or property (*i.e.*, the athletic scholarships to be issued to the student-athletes and their families) by and through false statements and representations, and (2) the intangible right to control the use of their assets by withholding materially valuable information that, if revealed, would likely cause tangible economic harm to Auburn University. (*Id.* ¶¶ 46-48.)

Moreover, far beyond "track[ing] the language of the statute charged and stat[ing] the time and place" of the alleged crime, *Yannotti*, 541 F.3d at 127 this Indictment – which was preceded by a 32-page criminal complaint – sets forth in considerable detail the manner and method in which the conspiracy was carried out, the nature of the alleged false statements and omissions, the property or intangible right at issue, as well as factual allegations regarding the defendants' fraudulent intent. (*E.g.*, *id.* ¶¶  9-27).

That alone warrants denial of a motion ostensibly challenging the validity of the Indictment. Nonetheless, the Government responds to each of the defendants' core arguments below.

A.      The Indictment Properly Alleges A Federal Funds Bribery Scheme

The defendants urge the Court to dismiss the bribery counts of the Indictment. Count One charges Person and Michel with participating in a bribery conspiracy in which Person accepted bribe payments and Michel offered bribe payments in violation of Title 18, United States Code, Section 371.  (Indictment ¶¶ 34-38).  Count Two charges Person with the substantive offense of soliciting bribes and gratuities in violation of Title 18, United States Code, Section 666(a)(1)(B) and 2.  (Indictment ¶¶ 39, 40).   Person argues that Counts One and Two fail to allege that Person was an agent of Auburn University during the time period of the charged conduct and that, even if the Indictment does allege him to have been an agent, it fails to allege that he was acting within the scope of his agency when he directed certain players on Auburn's basketball team to retain the services of CW-1.  (*See* Person Br. 11, 12)  Person also claims that the charged conduct – Person's steering of Auburn's basketball players to CW-1 in exchange for cash – does not constitute a "business or transaction" of Auburn University.  (*See* Person Br. 13).  Separately, Michel argues that the Indictment fails to allege that Person's conduct was "corrupt" as required by Title 18, United States Code, Section 666.  (*See* Michel Br. 18-19).   None of these arguments has merit, and the defendants' various motions to dismiss the bribery counts should be rejected.

1.      Applicable Law

Title 18, United States Code, Section 666  (hereinafter, "Section 666") makes it a crime either to corruptly solicit or accept anything of value or to corruptly give or offer anything of value with the intent to influence an agent of an organization or of a State, local or Indian tribal government "in connection with any business, transaction, or series of transactions of such organization, government, or agency [that receives a threshold amount of federal funding]

involving any thing of value of $5,000 or more." 18 U.S.C. § 666(a)(1)(B), (a)(2). Thus, Section 666 criminalizes "a quid pro quo agreement—to wit, a government official's receipt of a benefit in exchange for an act he has performed, or promised to perform, in the exercise of his official authority." *United States* v. *Ganim*, 510 F.3d 134, 141 (2d Cir. 2007). As the Supreme Court has described, Section 666 was designed "generally to protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery" after prior bribery statutes had proven inadequate. *Sabri* v. *United States*, 541 U.S. 600, 606 (2004); *see also Salinas* v. *United States*, 522 U.S. 52, 58 (1997) (noting that Section 666 "was designed to extend federal bribery prohibitions to bribes offered to state and local officials employed by agencies receiving federal funds").

Two elements of this statute are relevant to the defendants' motions. *First*, the term "agent" is expressly defined in Section 666 as "a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative." 18 U.S.C. § 666(d)(1). Congress declined to provide any "further explication." S. Rep. No. 98-225, at 370. Courts therefore broadly construe the term "agent" in this context. *See*, *e.g.*, *United States* v. *Fernandez*, 722 F.3d 1, 11 (1st Cir. 2013) ("Narrowing the scope of § 666(d)(1)'s definition of 'agent' would be 'inconsistent not only with the expansive, unqualified language that Congress has elected to use, but also with Congress' clear objective of ensuring the integrity of entities receiving substantial sums of federal funds.") (quoting *United States* v. *Keen*, 676 F.3d 981, 991 (11th Cir. 2012)); *United States* v. *Lupton*, 620 F.3d 790, 800-01 (7th Cir. 2010) ("Parties cannot contract around definitions provided in criminal statutes; even if Lupton could not be considered a common law agent under Equis's contract, it is nonetheless possible for him to be an 'agent'

11

under the terms of 18 U.S.C. § 666(d)(1).”); *United States* v. *Brann*, 990 F.2d 98, 101 (3d Cir. 1993) (“The definition thus includes in the term ‘agent’ an employee of any level from the lowest clerk to the highest administrator.”).

*Second*, the “quo” element of the statute is reflected in the criminalization of bribery “in connection with any business, transaction, or series of transactions of” an entity receiving a qualifying amount of federal funds.  Section 666 does not define the terms “business,” “transaction,” or “series of transactions,” but the Supreme Court has cautioned courts to avoid “narrowing construction[s]”of the “business or transaction clause.”  *Salinas*, 522 U.S. at 57. *See* Salinas, 522 U.S. at 57 (noting that “[t]he word ‘any,’ which prefaces the business or transaction clause, undercuts the attempt to impose [a] narrowing construction”); *see also United States* v. *Ferrara*, 990 F. Supp. 146, 151 (E.D.N.Y. 1998) (“Congress fashioned [§ 666] to avoid the type of accounting quagmires which defendant invites us to enter.”).  Accordingly, Courts have broadly construed the terms “business” and “transaction” in this context.  *See*, *e.g.*, *United States* v. *Robinson*, 663 F.3d 265, 275 (7th Cir. 2011) (finding that “the language of the business or transaction clause in § 666(a) is broad enough to include bribes offered to influence the intangible business or transactions of a federally funded organization . . . .”); *United States* v. *Marmolejo*, 89 F.3d 1185, 1191-93 (5th Cir. 1996) (finding that the transactional element of the § 666(a) offense “cover[s] transactions involving intangibles, such as conjugal visits, that are difficult to value.”); *United States* v. *Townsend*, 630 F.3d 1003, 1011 (11th Cir. 2011) (finding that intangibles are things of value under Section 666(a)(1)(B).

## 2.    Discussion

Person raises a number of challenges to the sufficiency of the factual allegations in the Indictment relating to the conspiracy to commit Section 666 bribery charge contained in Count

One and the substantive bribery charge contained in Count Two.  His arguments have no merit

and should be rejected.  The Indictment clearly alleges, among other things, that Person was an

agent of Auburn University; that Person corruptly received bribe payments from CW-1; that

Michel corruptly facilitated those bribe payments; and that in exchange for those bribe payments,

Person took official action by directing certain Auburn basketball players to retain the services of

CW-1.  Nothing more is required to plead a violation of Section 666.  (Indictment ¶¶ 21-40).

First, Person contends that he was not an agent of Auburn University because, as a

basketball coach, he "had no control over the federal funds that were distributed to Auburn."

(*See* Person Br. 11,12).  Person's view of agency is wrong.  As stated earlier, the term "agent" is

expressly defined in Section 666 as "a person authorized to act on behalf of another person or a

government and, in the case of an organization or government, includes a servant or *employee*

and a partner, director, officer, manager, and representative."  18 U.S.C. Section 666(d)(1)

(emphasis added).  It is undisputed that Person was an *employee* of Auburn University during the

charged conduct.  (*See* Person Br. 4,5).  As such, he was an "agent" of Auburn University.  (*See*

*United States* v. *Brann*, 990 F.2d 98, 101 (3d Cir. 1993) ("The definition thus includes in the

term 'agent' an employee of any level from the lowest clerk to the highest administrator.")).

The Indictment alleges as much in the very first paragraph and throughout the Indictment, (*e.g.*,

Indictment ¶¶ 1, 6, 36, 40), and nothing more is required.  Indeed, courts have consistently

rejected Person's argument that Section 666 requires that an agent be authorized to act with

respect to an entity's funds.  *See*, e.g., *United States* v. *Keen*, 676 F.3d 981, 989-90 (11th Cir.

2012) (rejecting the defendant's effort to add a requirement to the "agent" definition because

"[n]owhere does the statutory text either mention or imply an additional qualifying requirement

that the person be authorized to act specifically with respect to the entity's funds."); *United*

*States* v. *Fernandez*, 722 F.3d 1, 10 (1st Cir. 2013) (rejecting defendants' argument that they did not qualify as "agents" for purposes of Section 666 because they lacked the "authority to control the expenditure of funds by any entity receiving federal funds").

Person further claims that even if the Indictment properly alleges him to have been an agent of Auburn University, it fails to allege that he was acting within the scope of his agency when he directed certain players on Auburn's basketball team to retain the services of CW-1. (*See* Person Br. 12).  There is no allegation in the Indictment, Person argues, that directing players to financial advisors was part of Person's role as an Auburn employee.  (*Id.*)  Person, again, misunderstands the concept of agency in the context of Section 666 and mischaracterizes the allegations in the Indictment.  Nowhere in Section 666 does it say that the agent must be "acting within the scope of his agency," (Person Br. 12), to violate the statute.  Instead, Section 666 says, among other things, that an agent is prohibited from corruptly soliciting or demanding "anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency. [that receives a threshold amount of federal funding] involving any thing of value of $5,000 or more."  18 U.S.C. § 666(a)(1)(B).

The concept of "agent" that Person invokes is the common-law meaning.  Indeed, the cases he cites in support of his argument are not criminal cases analyzing the definition of "agent" under Section 666, but civil cases discussing common-law agency principles.  (*See* Person Br. 12, n.15).  In Section 666, however, Congress defined the term "agent" more broadly than its common-law meaning.  *Compare* 18 U.S.C. § 666(d)(1) ("a person authorized to act on behalf of another person or a government") *with* Restatement (Third) of Agency § 1.01 (2006) ("Agency is the fiduciary relationship that arises when one person (a "principal") manifests

assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."). Indeed, courts explicitly eschew the common-law meaning in evaluating the term "agent" under Section 666. *See*, *e.g.*, *Lupton*, 620 F.3d at 800-01 ("[E]ven if Lupton could not be considered a common law agent under Equis's contract, it is nonetheless possible for him to be an 'agent' under the terms of 18 U.S.C. § 666(d)(1)."); *United States* v. *Vitillo*, 490 F.3d 314, 323 (3d Cir. 2007) ("There is nothing in the statute to suggest that we should consult extrinsic sources, such as the Restatement of Agency, in attempting to further define 'agent.'").

Moreover, Person's argument also mischaracterizes the allegations in the Indictment.  Of course it was not Person's job to recommend financial advisors to his players, but that is precisely the point.  As the Indictment alleges, Person, as a NCAA Division I men's basketball coach, had a duty to run an NCAA-compliant basketball program for Auburn, which included not directing players to financial advisors or agents in exchange for cash.  (Indictment ¶ 15). Person acted in derogation of these duties to Auburn in engaging in the bribery scheme charged in the Indictment.

Person argues that his efforts to steer Auburn University basketball players to financial advisors were outside the mission of the university and therefore did not involve the "business or transaction" of the university.  To support this argument, Person relies exclusively on a Fifth Circuit case, *United States* v. *Whitfield*, which involved two state judges who were convicted of accepting bribes from an attorney in exchange for favorable rulings in his cases.  590 F.3d at 335.  In *Whitfield*, the government argued that the judges were "agents" of the Administrative Office of the Courts ("AOC"), a Mississippi state agency that was "charged with assisting in the efficient administration of the *nonjudicial* business of the courts of the state."  *Id*. at 344

(emphasis added) (citation omitted) (internal quotation marks omitted).  The AOC handled the finances of the Mississippi court system, including payroll, travel expenses, inventory, and budgeting.  *Id.*  The Fifth Circuit found that the judges' rulings were not made "in connection with" the business or transactions of the AOC, as they were made while the judges were performing purely *judicial* duties.  *Id.* at 346-67.

Whatever the merits of *Whitfield*, they are not implicated here.  Person is an employee and agent of Auburn University, and his work to steer Auburn's players to financial advisors in exchange for cash was in connection with a "business" or "transaction" of the university.  Although Auburn may not be "in the business of recommending financial advisers for basketball players," (Person Br. 13), it is certainly in the business of running an NCAA compliant athletics program.  Auburn fields multiple varsity sports teams in NCAA Division I competition, including men's basketball, (Indictment ¶ 5), and to compete in NCAA competition, Auburn must comply with NCAA rules.  To ensure that compliance, Auburn's coaches and players must make annual certifications to Auburn regarding their participation in and knowledge of NCAA violations.  (*See* Compl. 27, n.8, Indictment ¶¶ 16, 18).  At trial the Government expects to show that Person's employment contract with Auburn required him to comply with the NCAA rules and to ensure compliance with those rules by people under his supervision.  The defendant owed a duty to Auburn to follow the NCAA rules, and actions taken by Person that violated these rules – i.e., steering Auburn's players to financial advisors in exchange for cash – involved the "business" of Auburn, as they affected Auburn's ability to run a NCAA compliant program and subjected Auburn to penalties by the NCAA.  (*See* Indictment ¶ 20).

Finally, Michel argues that an agent acts "corruptly" under Section 666 "only if he or she violates 'an official or public duty owed to the government or the public at large.'"  (Michel Br.

18) (internal citations omitted).  The only duties identified in the Indictment, Michel claims, are those that flow indirectly from the NCAA rules, and those rules do not give rise to any official or public duty owed to the government or the public at large.  (*Id*.)  As such, Michel contends, the Indictment fails to charge a violation of the program bribery statute and therefore must be dismissed.  (*Id*. at 19).  Michel's argument is based principally on the Second Circuit case of *United States* v. *Rooney*, 37 F.3d 847, 854 (2d Cir. 1994), and his misunderstanding of the court's holding in that case.

In *Rooney*, the Second Circuit reversed a Section 666 conviction for soliciting a bribe where it found that the defendant had not violated any duty.  *Rooney*, 37 F.3d at 854.  The defendant in *Rooney* undertook to develop a housing project by acquiring loans through a federal agency known as the Farmers Home Administration (FmHA).  *Id*.at 848.   At some point during the development of the project, the project began experiencing a number of construction delays and substantially exceeded its initial costs.  *Id*.  The defendant was obligated to repay all funds borrowed through the FmHA as well as the additional costs the project incurred, which were owed to the general contractor.  *Id*.  The defendant offered to pay the general contractor the costs owed by obtaining further funds from FmHA, if the contractor would agree to construct a pond adjacent to the development project for free.  *Id*. at 849.  At trial, the defendant was convicted for corruptly soliciting a thing of value intending to be influenced in connection with a federally funded housing project in violation of Title 18, United States Code, Section 666(a)(1)(B).  *Id*.

The Second Circuit reversed the defendant's conviction on the grounds that his solicitation of the general contractor "cannot be considered 'corrupt' because he violated no duty."  *Id*. at 852.  The court held that the "usual" Section 666 case, in which "a government employee or private individual demands or accepts a kickback, personal bribe, or gratuity from

17

an individual in exchange for the awarding of a contract, the disbursement of federal funds, or some other favorable treatment," is one that "easily meets" the pertinent requirement of Section 666—*i.e*, that the conduct involve a "violation of some duty owed to the government or to the public in general"—as a matter of law.  *Id*.at 850, 53.  However, the case before it did not involve such conduct.  Rather, the defendant was "a private individual involved in a private development project that happen[ed] to have as its lender [a] federal agency," and, though charged with soliciting a bribe, did not request or accept anything that could conceivably be characterized as a bribe.  *Id*. at 850 ("Rooney did not seek to divert government funds for the project himself through a kickback or otherwise.").

In this case, by contrast, Person, an agent of a federally funded program, Auburn University, accepted cash bribes in exchange for steering Auburn's basketball players to financial advisors in clear violation of the duty Person owed to Auburn to follow the NCAA rules.  "It is an obvious violation of duty and public trust for a public official *or* some other person responsible for parceling out government benefits to accept or demand a personal benefit intending to be improperly influenced in one's official duties."  *Rooney*, 37 F.3d at 853. As such, this case fits squarely within the "usual" Section 666 cases referenced in *Rooney*.

**B.    The Federal Funds Bribery Statute and the Honest Services Fraud Statute are Constitutionally Valid**

Person and Michel challenge the constitutionality of the federal funds bribery statute, 18 U.S.C. § 666, in light of the Supreme Court's decision in *United States v. McDonnell*, 136 S. Ct. 2355 (2016).[4] (*See* Michel Br. 7, 13; Person Br. 19.)  More specifically, they claim that the *McDonnell* Court's construction of the term "official act" in 18 U.S.C. § 201(a)(3) was

---

[4] Michel makes both a facial and as applied challenge to the Section 666, while Person only argues that it is unconstitutional as applied here.  (Michel Br. 7, 13; Person Br. 16.)

motivated by constitutional concerns that implicitly require all federal bribery statutes to contain an "official act" element.  Because § 666 on its face does not require an "official act," they contend, it is unconstitutionally vague and overbroad, and could criminalize any violation of the NCAA rules.  (*See* Person Br. 20.)   Michel and Person also argue that the honest services fraud statute is unconstitutionally vague (Person Br. 16; Michel Br. 19), although that argument is foreclosed by controlling precedent.  *McDonnell*, 136 S. Ct. at 2375; *Skilling v. United States*, 561 U.S. 358, 409 (2010); *United States v. Halloran*, 664 F. App'x 23, 26 (2d Cir. 2016); *United States v. Halloran*, 821 F.3d 321, 337–40 (2d Cir. 2016) (rejecting a vagueness challenge to § 1346, despite defendant's argument that § 1346 fails to specify the source of the fiduciary duty a defendant must breach).

As Judge Valerie Caproni noted in rejecting a similar vagueness challenge to Section 666 in *United States v. Percoco*, No. 16-cr-776 (VEC), 2017 WL 6314146, at *4 (S.D.N.Y. Dec. 11, 2017), the defendants' argument is based on a misreading of *McDonnell*. *McDonnell* did not invalidate any criminal statutes, but simply narrowed the definition of an "official act" under the federal bribery statute in order to obviate the constitutional vagueness concerns that the McDonnells raised.  *Id.*  *McDonnell* "in no way states or implies that all federal bribery statutes that implicate the conduct of government officials are *required* to have such an element to be constitutional."  *Percoco*, 2017 WL 6314146, at *4.  To the contrary, the *McDonnell* Court explicitly avoided broader constitutional questions surrounding the effected criminal statutes by narrowing the definition of "official act."  *Id.*  Even if the Court believes that *McDonnell* reaches Section 666, the cure for such a constitutional concern would be, as in

*McDonnell*, a jury instruction that appropriately cabins the jury's considerations, rather than a ruling that the criminal statute is unconstitutional.[5]

Lastly, the defendants' argue that the application of Section 666 to their alleged conduct would be unconstitutional, because "the Indictment seems to suggest that any act of disloyalty by an employee is sufficient so long as harm to the employer was foreseeable, even if such harm is collateral to the offense."  (*See* Person Br. 19.)  First, this is not an issue that can be resolved on a motion to dismiss.   The defendants' arguments rest on assertions about what the facts at trial will show; and, accordingly they must wait until an evidentiary record has been developed.   Second, and in any event, there is no merit to the defendants' suggestion that they lacked fair notice that their conduct was prohibited.   "'[I]t has always been as plain as a pikestaff that bribes and kickbacks' are prohibited."  *United States v. Rosen*, 716 F.3d 691, 700 (quoting *Skilling v. United States*, 561 U.S. at 412).   Moreover, "the requirement that the Government prove [the] defendant's specific intent to bribe eliminates the possibility that he will be prosecuted for bribery without fair notice."  *Id.*   Accordingly, the defendants' vagueness challenges to Section 666 have no more merit than the claims that other courts have roundly rejected.  *See, e.g., Rosen*, 716 F.3d at 700-01 (on appeal from conviction at trial, rejecting

---

[5] We note, however, that the Second Circuit has already held that *McDonnell* does not apply to violations of § 666.  In reviewing a challenge to the jury instructions given during the trial of a New York State Assemblyman, the Court determined that the instructions given for honest services fraud and Hobbs Act extortion were flawed in light of *McDonnell* but reached a different "conclusion with respect to the instructions given for [the bribery counts under] 18 U.S.C. § 666." *United States v. Boyland*, 862 F.3d 279, 290–91 (2d Cir. 2017). Section 666, the Court found, does not limit potential criminality to "official acts"; but, instead,  Section 666 "prohibits individuals from 'solicit[ing] ... anything of value from any person, *intending to be influenced* or rewarded *in connection with any* business, transaction, or series of transactions of [an] organization, government, or agency.' " *Id.* (citing 18 U.S.C. § 666(a)(1)(B)) (emphases in original). The Second Circuit thus found that the *McDonnell* standard did not apply to the Section 666 counts. *Id.*

vagueness challenge to § 666); *United States v. Brunshtein*, 344 F.3d 91, 98 (2d Cir. 2003) (same); *United States v. Urlacher*, 979 F.2d 935, 939 (2d Cir. 1992) (same); *United States v. Crozier*, 987 F.2d 893, 900 (2d Cir. 1993) (same).

**C.      The Indictment Properly Alleges a Scheme to Defraud Auburn University of the Honest Services of Its Employee Chuck Connors Person**

The defendants argue that the conspiracy to commit honest services wire fraud and honest services wire fraud charged in Counts Three and Four should be dismissed because (1) the Indictment fails to allege that Person owed a fiduciary duty to Auburn (Person Br. 14-15); (2) that even if Person owed a fiduciary duty to Auburn the Indictment fails to allege that he was acting within the scope of that duty (Person Br. 15; Michel Br. 21-22); and (3) the Indictment fails to allege a scheme to deprive Auburn of Person's honest services because the scheme alleged "exceeds the accepted parameters of bribery and kickback prosecutions as set forth in pre-*McNally* case law." (Michel Br. 2, 20-21). The defendants' arguments are meritless. The defendants fundamentally mischaracterize the allegations in the Indictment, which detail a *quid pro quo* scheme whereby Person accepted bribe payments in exchange for agreeing to and exercising his position as a coach and employee of Auburn in order to influence the players that he coached and their families to retain the services of a financial advisor, in direct violation of the terms of his employment contract with Auburn and the applicable NCAA rules, in exchange for thousands of dollars in bribe payments. Schemes involving a *quid pro quo* like the one charged in this case whereby an agent accepts bribes in exchange for taking actions adverse to the interests of his principal are the "solid core" of what the honest services fraud statute prohibits. *See United States v. Skilling*, 561 U.S. 358, 404 (2010) (describing the "doctrine's solid core" as involving "offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes"). As is alleged in the Indictment, it was "by virtue of his official position as an NCAA Division I men's basketball

coach" that Person "had the ability to provide sports agents, financial advisors, business managers and others with access to the student-athletes whom he coached" and wielded substantial influence over these student-athletes that he supervised.  (*See* Indictment ¶¶ 1-2).

### 1.   Applicable Law

The mail and wire fraud statutes criminalize "schemes" to defraud and 18 U.S.C. § 1346 provides that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the *intangible right of honest services*."[6]  In *Skilling v. United States,* a private-sector honest services fraud case, the Supreme Court held that, in order to prevent 18 U.S.C. § 1346 from being unconstitutionally vague, the statute must be read to proscribe "fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived." *Skilling*, 561 U.S. at 404.  In applying *Skilling*, the Second Circuit has stated that, to commit honest services wire fraud "the charged conduct must involve a *quid pro quo*, *i.e.*, an 'intent to give or receive something of value in exchange for an . . . act.'" *United States v. Nouri*, 711 F.3d 129, 139 (2d Cir. 2013) (quoting *United States v. Bruno*, 661 F.3d 733, 743-44 (2d Cir. 2011)).  There need not be an explicit promise to perform a particular act at the time of payment, or even a close temporal connection; it is sufficient if the defendants understood that the employee (in this case, Person) was expected as a result of the payment to exercise particular kinds of influence as specific opportunities arose.  *See United States v. Rosen*, 716 F.3d 691, 698 n.3, 700 (2d Cir. 2013); *United States v. Ganim*, 510 F.3d 134, 141 (2d Cir. 2007).  In addition to holding that honest services fraud requires a *quid pro quo*, the Supreme Court in *Skilling* noted that the "solid core" of the honest services doctrine "involved offenders who, *in violation of a*

---

[6] Congress enacted this provision in 1988 to overturn the Supreme Court's then-recent decision in *McNally v. United States*, 483 U.S. 350, 360 (1987), which had held that only tangible property rights were protected from schemes to defraud under the mail and wire fraud statutes.

*fiduciary duty*, participated in bribery or kickback schemes." 561 U.S. at 407 (emphasis added); *see also United States v. Nayak*, 769 F.3d 978, 981 (7th Cir.2014) (noting that *Skilling* "also held that 'the violation of a fiduciary duty' was a prerequisite to an honest-services fraud conviction"); *United States v. Smith*, 985 F. Supp. 2d 547, 590 (S.D.N.Y. 2014) (holding that "honest-services wire fraud . . . requires the violation of a fiduciary duty") *aff'd sub nom. United States v. Halloran*, 664 F. App'x 23 (2d Cir. 2016).

### 2.   Discussion

As an initial matter, Person's argument that he was not a fiduciary to Auburn is frivolous, and ignores both the allegations in the Indictment and well-settled case law.  The Indictment plainly alleges that Person was employed as a coach for Auburn's Division I men's basketball program and by virtue of that position could provide others, including financial advisors, "with access to the student-athletes whom he coached."  (Indictment ¶¶ 1, 5-6.).  While Person was employed by Auburn, he owed a fiduciary duty to act in Auburn's interests.  *See Nouri,* 711 F.3d at 137 n.1 ("the 'existence of a fiduciary relationship' between an employee and employer is 'beyond dispute,' and the violation of that duty through the employee's participation in a bribery or kickback scheme is within the core of actions criminalized by § 1346." (citing *Skilling*, 130 S.Ct. at 2930-31 & n.41). [7]

The defendants argue in the alternative that even if Person did owe Auburn a fiduciary duty, he was not "acting within the scope of [his fiduciary duty] when he recommended financial advisors to players," as such conduct was "well outside the purpose of Mr. Person's employment relationship with Auburn."  (Person Br. 15; *see also* Michel Br. 21-22).  According

---

[7] In any event, the existence of a fiduciary duty is a question of fact for the jury.  *See Halloran*, 821 F.3d at 340.

to Person, his duties were strictly limited to "things like running practices, developing team strategies and instructing players in their skills and techniques" and that whatever Person did with the student-athletes as part of the scheme alleged in the Indictment was "on his downtime." (Person Br. 15). This argument, however, ignores and mischaracterizes the allegations in the Indictment describing Person's violation of his fiduciary duty to Auburn. (Indictment ¶¶ 4, 11-12, 15-16, 18-19.) As the Indictment alleges, Person, as a coach for a Division I men's basketball program, had a duty to run a program that complied with the NCAA rules applicable to Auburn. Among other things, those rules prohibited facilitation of contact between student-athletes and agents or financial advisors and prohibited the receipt of compensation directly or indirectly from outside sources with respect to any actions involving student-athletes. (Indictment ¶ 15).[8] Person acted in derogation of these duties to Auburn by engaging in the bribery scheme charged in the Indictment. The fact that Person's compliance with NCAA rules was part of "the purpose of Mr. Person's employment relationship with Auburn" (Person Br. 15), is clear from the requirement that Person annually certify to Auburn that he had reported any knowledge of violations of NCAA rules involving the University (Indictment ¶ 18).[9]

---

[8] Under the NCAA Bylaws "[r]eceipt of benefits by an institutional staff member for facilitating or arranging a meeting between a student-athlete and an agent, financial advisor or a representative of an agent or advisor (e.g., 'runner') [is prohibited]." NCAA Division I Bylaw § 10.1(d). Furthermore, "staff members of the athletics department of a member institution shall not represent, directly or indirectly, any individual in the marketing of his or her athletics ability or reputation to an agent, . . . and shall not receive compensation or gratuities of any kind, directly or indirectly, for such services." NCAA Division I Bylaw § 11.1.3. Moreover, "[a]n outside source is prohibited from paying or regularly supplementing an athletics department staff member's annual salary and from arranging to supplement that salary for an unspecified achievement." NCAA Division I Bylaw § 11.3. The allegations in the Indictment violate all of these NCAA provisions applicable to Person as a coach for Auburn University.

[9] In addition, although the allegations in the Indictment in this regard are more than sufficient to defeat a motion to dismiss, at trial the Government will introduce Person's employment contract with Auburn, which did not limit his duties in the artificial and narrow manner suggested by the

Moreover, Person allegedly sought to conceal these prohibited payments from Auburn by filing materially false annual certifications regarding NCAA Rules violations in which he did not disclose his own violations of NCAA rules by accepting the payments outlined in the Indictment, all of which deprived Auburn of its right to its employee's honest and faithful services. (Indictment ¶ 4, 18).   Affirmative efforts to hide bribe payments can also constitute evidence of the requisite *quid pro quo*.  *See, e.g.*, *Rosen*, 716 F.3d at 703 (finding that that bribor's "fail[ure] fully to disclose the payments" constituted evidence of guilt); *Bruno*, 661 F.3d at 745 (2d Cir. 2011) (finding that the "failure to disclose the transaction" in question constituted evidence of a *quid pro quo*); *United States* v. *Urciuoli,* 613 F.3d 11, 14 (1st Cir. 2010) (stating that "[e]vidence further showed that [the payor] sought to hide the extent of [his company's] relationship with [the public official]."); *United States* v. *Ciavarella,* 716 F.3d 705, 729 (3d Cir. 2013) (explaining that, after *Skilling,* "while the evidence of nondisclosure by itself may not constitute honest services fraud based on a conflict of interest theory . . ., we believe that where there is also evidence of bribery or kickbacks, . . .  then the [undisclosed conflict] evidence may be relevant to proof of a scheme to defraud under a bribery-and-kickback theory of honest services fraud.").   Furthermore,

---

defendants.  Rather, per the terms of Person's own contract with Auburn, Person was required to "faithfully perform the duties and obligations of the position of Associate Head Men's Basketball Coach" which included "conform[ing] and comply[ing] with the policies, rules, and regulations of [Auburn's] Athletic Department, the University, and to the rules and regulations of the SEC and the NCAA."  (US_00015519).  Furthermore, Person had an affirmative duty under his employment contract with Auburn to "exercise due care to assure that all persons under coach's supervision or subject to coach's control or authority shall abide by all policies, rules, and regulations of the Athletic Department, the University, and the rules and regulations of the SEC and the NCAA" (US_00015520).  Finally, Person's employment contract with Auburn also provided that if Person was found to have engaged in a violation of NCAA rules Auburn could, at its sole discretion, suspend Person with reduced pay, suspend Person without pay, or terminate Person's employment with cause.  (US_00015521).  There is no dispute – nor can there be – that Person's conduct was in direct violation of these duties, which Person undertook as the Associate Head Coach of Auburn's men's basketball program.

as the Indictment alleges, by violating NCAA Rules as part of the bribery scheme, Person exposed Auburn to numerous potential penalties, and his actions therefore were directly adverse to Auburn's interests and exposed his employer to potential harm.  (Indictment ¶ 20).

Finally, there is no merit to—nor legal authority for—defendants' claim that private sector honest services fraud cases are limited to cases in which the "bribe payor had or sought business with the bribe recipient's employer (Auburn University), or in which the bribe recipient (associate coach Person) was acting on behalf of his employer with respect to the conduct in question."  (Michel Br. 19-20; *see also* Person Br. 15.)  The defendants primarily rely on the Second Circuit's en banc decision in *United States v. Rybicki*, 354 F.3d 124, 127 (2d Cir. 2003) (en banc), a case which predates *Skilling*, but aspects of which remain good law, to support their argument about limitations upon honest services fraud cases that involve private actors.  While such a fact pattern may be commonplace in private sector honest services fraud prosecutions, neither Michel nor Person cite a single case standing for the proposition that such a showing is required to meet the elements of honest services fraud post-*Skilling*.  Indeed, in the *Rybicki* decision itself the Second Circuit, in stating the elements for a private sector honest services fraud case, did not limit, as the defendants suggest, the conduct proscribed by the honest services statute to only those schemes in which "a defendant seeks to transact business with a victim who is the principal of the corrupted employee or agent."  (Michel Br. 20, n.8)  Nor have the defendants cited to any other case that narrows the scope of honest services fraud to the parameters that they suggest.[10]

_____

[10] In *Rybicki*, the Second Circuit stated that the elements of honest services fraud were (1) a scheme or artifice to defraud; (2) for the purpose of knowingly and intentionally depriving another of the intangible right of honest services; (3) where the misrepresentations (or omissions) made by the defendant are material in that they have the natural tendency to influence or are capable of influencing the employer to change its behavior; and (4) use of the mails or wires in

Michel further seeks to depict what occurred here as "in violation of the rules of amateurism promulgated by the NCAA," but argues that this alone "does not make it a federal crime." (Michel Br. 22). Of course, the scheme alleged in the Indictment is not simply an NCAA rules violation. Rather, the Indictment alleges that Person *took bribes* in exchange for violating a fiduciary duty to his employer and using his official position as a coach to take steps directly adverse to his employer's interest that could result in pecuniary harm to his employer. And the Indictment alleges that Person took steps to conceal this scheme from his employer and made material misrepresentations to his employer in required annual certifications of his compliance with his employer's rules. This falls well within the "solid core" of honest services fraud described in *Skilling*. Person's violation of his employer's own rules for its athletic department and the NCAA rules that applied to Auburn's basketball program, moreover, are relevant to analyzing whether the honest services fraud violation occurred, as these rules help define the scope of Person's fiduciary duties to his employer.

Both Michel and Person studiously avoid any discussion of a Second Circuit decision far more recent than *Rybicki*, namely *United States v. Nouri*, 711 F.3d 129 (2d Cir. 2013), which underscored how the rules of private associations are highly relevant in honest services fraud prosecutions. In *United States v. Nouri*, the executives of a small publicly traded company, Smart Online, arranged for secret payments to be made to licensed stockbrokers employed by Maxim Group ("Maxim") in exchange for the brokers agreeing to purchase stock in Smart Online on

---

furtherance of the scheme. *See Rybicki*, 354 F.3d at 147. While *Rybicki* is a pre-*Skilling* case and did not address the new requirement imposed by *Skilling* that the scheme or artifice to defraud described in the first element must involve a bribery or kickback scheme, there is nothing in *Rybicki* standing for the proposition that an honest services fraud charge must involve a structure where "a defendant seeks to transact business with a victim who is the principal of the corrupted employee or agent." (Michel Br. 20.)

behalf of their customers.  *Id.* at 133-34.  Neither the brokers' customers nor Maxim were aware of these payments.  *Id.* 134-35.  Maxim's rules prohibited its brokers from accepting payments from third parties and "explicitly required employees to disclose outside business activities prior to engaging in them and prohibited employees from offering or soliciting bribes."  *Id.* 136.  In addition to Maxim's own rules, under rules promulgated by the Financial Industry Regulatory Authority ("FINRA"), a broker was required "to get written approval from their firm before accepting compensation from an officer or director of a third-party company to solicit customers to purchase the company's stock."  *Id.* at 136.  The defendants were convicted of honest services wire fraud and conspiracy to commit the same, among other charges.  On appeal, a stockbroker-defendant employed by Maxim argued, *inter alia*, that there was "insufficient evidence to establish that he had a duty to disclose to his employer, Maxim, that he was receiving payments from Smart Online in exchange for his customers' purchases of Smart Online stock."  *Id.* at 144.  The Second Circuit rejected this argument, and explicitly relied on the fact that "both the industry rules and Maxim's rules prohibited Maxim's stockbrokers from receiving compensation from the CEO of an issuer of stock in exchange for purchases of that stock by the broker's customers."  *Id.* at 144. The Second Circuit also relied on FINRA rules, "which required brokers to disclose to and receive approval from their brokerage firm prior to doing anything outside the normal scope of their brokerage responsibilities and, more specifically, that FINRA rules required brokers to disclose to their employer if an officer or director of a public company paid the broker to solicit customers." *Id.* at 145.  The Circuit found that "this evidence was more than sufficient to demonstrate that [the stockbroker defendant] had a duty to disclose to his employer the payments he received from [the Smart Online executives]."  *Id.* at 145.  Here, the Indictment alleges that the defendants conspired to engage in a scheme to defraud Auburn of its right to the honest services of Person, who owed a

fiduciary duty to Auburn, which prohibited him from, among other things, accepting payments from third parties in violation of NCCA rules, and Person violated that duty through participating in a bribery scheme within the core of actions criminalized by § 1346.  The NCAA rules help inform the nature of the fiduciary duty that Person owed Auburn, and it was that fiduciary duty that Person breached through the scheme alleged in the Indictment.

Accordingly, because the Indictment alleges a straightforward bribery scheme whereby Person was bribed in exchange for taking actions "in violation of a fiduciary duty" to Auburn – the "solid core" of honest services fraud following *Skilling* – the defendants' motion to dismiss Counts Three and Four should be denied.

### D.      The Wire Fraud Conspiracy Challenge is Moot

Next, the defendants contend the wire fraud conspiracy charged in Count Five should be dismissed because (1) the indictment fails to allege a scheme to obtain money or property from the University (Michel Br. at 24-30); (2) the indictment fails to allege specific intent to harm the University (Person Br. at 21-22; Michel Br. at 30-32); (3) the indictment fails to allege the existence of material false representations (Michel Br. at 32-34); (4) the indictment fails to allege a scheme to obtain money or property from the University (Michel Br. At 24); and (5) the "indictment's wire fraud theory violates due process."  (Person Br. at 24).  While many of these arguments turn on assertions of fact or law that are simply incorrect, the Court need not address these claims because the Government anticipates seeking a Superseding Indictment that clarifies its existing wire fraud theory and will render substantially all of these issues moot.

The Government does not dispute that to prove a "scheme to defraud," the Government must show "that defendants *contemplated* some actual harm or injury to their victims," *Greenberg*, 835 F.3d at 306 (emphasis in original; internal quotation marks and citations

omitted).  The Government, however, has alleged such contemplated harm, namely the University's expenditure of significant resources under false pretenses.  Indeed, every court to address fact patterns similar to that presented here – including the Seventh Circuit in the *United States v. Walters* opinion relied upon so heavily by the defendants – has concluded that under these circumstances, a University suffers significant injury when caused to pay out money under false pretenses.  *See Walters*, 997 F.2d at 1224 (where sports agent paid bribes to student-athletes, university harmed because the scholarships were clearly property belonging to the universities and that, if the student-athletes had "told the truth, the colleges would have stopped their scholarships, thus saving money"); *United States v. Piggie*, 303 F.3d 923 (8th Cir. 2002) (same); *see also United States v. Gray*, 96 F.3d 769 (5th Cir. 1996) (college basketball coaches harmed their university-employer by arranging for recruits to receive fake academic credits so they could receive scholarships for which they were otherwise not entitled).  Indeed, as the Eighth Circuit noted, in affirming such a conviction, as a result of the defendants' conduct, the university "did not get the quality student it expected[,] . . .  was forced to institute a costly investigation," and had to withhold the affected players from competition, adding that "it is quite reasonable to believe that [the university] would have changed its business conduct had it known of the" defendants' conduct.  *Id.* at 775; *see also Piggie*, 303 F.3d at 927 (through charged conduct, defendant "intended to deprive the Universities . . . of the intangible right to award scholarships to *amateur* players and maintain a system of *amateur* athletic competition").

Nor is it true that the Indictment "fails to allege any legally cognizable duty of disclosure owed to the university."  (Michel Br. at 32.)  On the contrary, as discussed at length above, the Indictment alleges not only a fiduciary relationship between Person and the University but also that Person and the student-athletes at issue make regular, required certifications to the

University of any conduct amounting to a violation of NCAA rules.  The defendants' related assertion that these certifications were not "material" simply raises an issue of fact that cannot be decided at the motion-to-dismiss stage. *See, e.g.*, *United States v. Gaudin,* 515 U.S. 506, 523 (1995) (issue of materiality must be submitted to the jury); *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998) ("[U]nless no reasonable mind could find a statement or omission to be material, a criminal trial court *must* submit the issue to the jury." (citing *Gaudin*, 515 U.S. at 511) (emphasis in original); *United States v. Khalil*, No. 13-CR-386, 2014 WL 1599943 (E.D.N.Y. April 21, 2014) (denying motion to dismiss indictment); *see also United States v. Fanta*, No. 04 CR 1253, 2005 WL 3455755, at *2 (S.D.N.Y. Dec. 16, 2005) (denying motion to dismiss indictment because defendant's argument that alleged statements were not, in fact, false raised dispute about facts to be proven at trial; "A pretrial motion to dismiss an indictment under F.R. Cr. P. 12 is not a permissible vehicle for addressing the sufficiency of the Government's evidence.").

Equally unavailing is the defendants' suggestion that the indictment fails to allege that the "object of the scheme was to obtain money or property from the university" because it does not allege that the defendants *personally* obtained money or property through the scheme. (Michel Br. at 24.)  Indeed, the core principle espoused by the defendants – that "the wire fraud statute gives rise to culpability only where a defendant's gain derives from a loss of the victim" (Michel Br. at 26) – is simply not the law of this Circuit, where it is well-established that "neither the mail nor wire fraud statute requires that a defendant 'obtain' property before violating the statute." *Porcelli v. United States*, 404 F.3d 157, 162 (2d Cir. 2005) (*Porcelli IV*); *see also United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017) (same).

In *Porcelli*, a prosecution that spawned multiple trips to the Second Circuit, the defendant, who owned a series of gas stations, was convicted of intentionally failing to collect a New York state sales tax on gasoline.  In his final appeal, this time challenging the denial of a writ of coram nobis, Porcelli pressed precisely the argument raised here – namely, that because he had not personally acquired property from the state through his conduct, "he didn't actually 'obtain' money or property by his actions." *Porcelli IV*, 404 F.3d at 162. Specifically relying on a then-recent Supreme Court decision holding that a Hobbs Act conviction required evidence that the defendants obtained property from their victims, Porcelli asked the Circuit to extend that rationale to the mail and wire fraud statutes.  The Circuit rejected that argument, finding that such a "statutory construction of the Hobbs Act is not properly carried over to the mail fraud statute" and further concluding that "neither the mail nor wire fraud statute requires that a defendant 'obtain' property before violating the statute."  *Porcelli IV*, 404 F.3d at 162.[11]  As such, any failure of the Indictment to allege that the defendants personally obtained money or property from the University through the scheme would be immaterial.

Finally, there is no merit to the defendants' repeated suggestion that there is something novel, unique, or "precariously broad" (Michel Br. at 23) about the Government's fraud theory. On the contrary, as noted above, multiple courts have affirmed fraud charges brought on substantially similar fact patterns.  *See, e.g.*, *Gray*, 96 F.3d at 769; *Piggie*, 303 F.3d at 923.

---

[11] The defendants contend they "read this language" in *Porcelli IV* "not as negating the scheme to 'obtain' element . . . but as clarifying that it suffices if the defendant merely intended to obtain funds, even if he or she did not literally succeed in doing so."  (Michel Br. at 28.)  That reading is entirely inconsistent with the plain language of *Porcelli* where, as noted above, the issue was squarely presented to and rejected by the Circuit, which reaffirmed its holding that "neither the mail nor wire fraud statute requires that a defendant 'obtain' property before violating the statute." ."  *Porcelli IV*, 404 F.3d at 162.

Indeed, in a related case, Judge Kaplan recently denied a very similar motion to dismiss, rejecting substantially all of the arguments raised here. *See United States v. Gatto*, 17 Cr. 686 (LAK).

Nonetheless, as noted above, the Court need not and should not address these issues at this time, because the Government intends to seek a Superseding Indictment which will further clarify its theory of wire fraud and render substantially all of these arguments moot.

### E.     The Travel Act Charge is Constitutionally Valid

Defendant Rashan Michel also moves to dismiss Count Six of the Indictment on the grounds that the Alabama commercial bribery statute upon which the Travel Act charge is based is "unconstitutionally vague as applied in this case." (Michel Br. at 34).[12]  In particular, Michel contends that the Alabama commercial bribery statute, Ala. Code § 13A-11-120, 13A-11-121, is "even vaguer and broader than that of the federal program bribery statute" and that since "no published Alabama case law glosses these statutory provisions . . . there is no authority under Alabama law for a narrowing construction." (Michel Br. at 25).

The motion to dismiss Count Six should be denied.  While Michel seeks to characterize the Travel Act charges in this case as novel and argues that the Government is "taking state misdemeanor offenses and converting them into a federal felony," (Michel Br. at 34), numerous Travel Act prosecutions have been predicated on state commercial bribery statutes that closely track the language of Alabama's commercial bribery statute.  *See, e.g., Perrin v. United States*, 444 U.S. 37 (1979); *United States v. Welch*, 327 F.3d 1081 (10th Cir. 2003); *United States v. Szur*, 289 F.3d 200 (2d Cir. 2002); *United States v. Seregos*, 655 F.2d 33 (2d Cir. 1981).

---

[12] Person has not separately moved to dismiss Count Six.

Indeed, the Supreme Court has addressed the constitutionality of a Travel Act prosecution predicated on a state commercial bribery statute that is strikingly similar to Alabama's commercial bribery statute.  In *Perrin v. United States*, 444 U.S. 37 (1979), the defendant was charged with, among other things, violation of the Travel Act and conspiring to violate the Travel Act based on Louisiana's commercial bribery statute.  The Louisiana commercial bribery statute that existed at the time of the Supreme Court's decision in *Perrin* is almost identical to the Alabama commercial bribery statute, and stated in pertinent part that commercial bribery "is the giving or offering to give, directly or indirectly, anything of apparent present or prospective value to any private agent, employee, or fiduciary, without the knowledge and consent of the principal or employer *with the intent to influence such agent's, employee's, or fiduciary's action in relation to the principal's or employer's affairs*."  *Perrin v. United States*, 444 U.S. at 38 (quoting La. Rev. Stat. An.. § 14.73 (1974) (emphasis added)).  Alabama Criminal Code § 13A-11-120 states that a person commits a crime if he "confers, or agrees or offers to confer, any benefit upon any employee or agent without the consent of the latter's employer or principal, *with intent to improperly influence his conduct in relation to his employer's or principal's affairs*."  Ala. Code. § 13A-11-120 (emphasis added).[13]

Like Michel in this case, the defendant in *Perrin* challenged the constitutionality of the Louisiana commercial bribery statute and also argued that asserted ambiguities in the Travel Act "resulted in failure to provide adequate notice that [the defendant's] conduct violated federal as well as Louisiana laws."  *Perrin*, 444 U.S. 41.  The Fifth Circuit rejected the challenges to the constitutionality of the Louisiana commercial bribery statute, see *United States v. Perrin*, 580

---

[13] Ala. Code §  13-11-121 criminalizes receiving a commercial bribe and contains similar language.

F.2d 730, 734-45 (5th Cir. 1978) ("While the Louisiana Supreme Court has not passed on these arguments, other courts have unanimously rejected constitutional attacks on similar commercial bribery statute . . . . Since the Louisiana Commercial Bribery Statute prohibits behavior about which 'men of common intelligence' need not guess, the statute is not unconstitutionally vague.") (citations and quotations omitted).  The Supreme Court affirmed that ruling, further stating that the alleged ambiguities and failure to provide adequate notice that the conduct violated federal and Louisiana law did not even "merit discussion." *Perrin*, 444 U.S. at 41 n. 7.

Under *Perrin* and its progeny, the Court should reject Michel's arguments that Alabama's commercial bribery statute is unconstitutionally vague and that he lacked fair notice that his conduct was illegal.  *See, e.g. Perrin,* 444 U.S. at 41; *Welch*, 327 F3d at 1095-1100 (rejecting vagueness challenge to Utah commercial bribery statute that, like the Alabama statute, contained language regarding offering benefits to a fiduciary or agent "with the purpose of influencing the conduct of the agent or fiduciary in relating to his . . . principal's affairs."); *United States v. Gaudreau*, 860 F.2d 357, 359 n.2 (10th Cir. 1988) (noting that state "commercial bribery statutes have been uniformly upheld in the face of vagueness challenges."); *Seregos*, 655 F.2d at 36 ("[T]here is nothing vague or indefinite about 'bribery' as used in the Travel Act . . . . [a]nd in view of Seregos' admittedly illicit activities, which we conclude below violated that statute, the argument that he was denied fair notice must be rejected").

In asserting that the Alabama commercial bribery statute is vague as applied to him, Michel further contends that no ordinary person could be "expected to discern whether Auburn University's 'affairs' would include the decision of an individual Auburn student to enter into an agreement with a financial advisor in the event that the student pursues a professional basketball career after leaving Auburn University." (Michel Br. 35).  This argument misconstrues the

allegations in the Indictment which control in deciding a motion to dismiss and which make

plain that the "affairs" of Auburn University were implicated by the scheme charged.  As the

Indictment alleges, basketball coaches like Person were prohibited under NCAA rules from

"facilitating contact between student-athletes and agents or financial advisors" and "receiving

compensation directly or indirectly from outside sources with respect to any actions involving

the student-athletes" and were required to complete certifications submitted to their universities

that they had reported knowledge of any NCAA rules. (Indictment ¶  15-16).  Finally, the

Indictment alleges that violations of the NCAA rules by a university employee like Person could

lead to various penalties for the university. (Indictment ¶  20).  Furthermore, with respect to the

Travel Act charge itself, the Indictment alleges that Person was paid to "us[e] his official

position at Auburn University to steer student-athletes on Auburn University's NCAA Division I

men's basketball team to retain the services of CW-1 and Michel." (Indictment ¶ 53(a)).

Accordingly, the bribe payments to Person implicated "his conduct in relation to his employer's

or principal's affairs," as Person's acceptance of payments from Michel and CW-1 and his

facilitatation of meetings in exchange for those payments, violated the rules applicable to

Auburn's basketball program and exposed Auburn to financial penalties.  *See also Welch*, 327

F.3d at 198-99 (in scheme where bribe payors paid members of the International Olympic

Committee ("IOC") to steer Olympic games to Salt Lake City, reasoning that the phrase "in

relating to his . . . principal's affairs" was not constitutionally vague as applied to the defendants,

that the scheme plainly implicated the International Olympic Committee's affairs and

specifically citing to language IOC charter in determining that "a person of ordinary intelligence would understand that Defendants' alleged conduct was 'contrary to the interest of' the IOC").[14]

## V.     Conclusion

For the reasons set forth above, the defendants' motion to dismiss the Indictment should be denied.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____/s/_____
Robert L. Boone/Edward B. Diskant/
Noah Solowiejczyk/Eli J. Mark/Aline R. Flodr
Assistant United States Attorneys
(212) 637-2208/2294/2473/2431/1110

---

[14] Moreover, the Tenth Circuit in *Welch* noted that "[t]he possibility Defendants . . . would misunderstand the unremarkable proposition that their use of the channels of commerce in the manner alleged might promote, in violation of the Travel Act, unlawful activity of bribery as defined by [Utah's commercial bribery statute]" was particularly remote in light of "the indictment's allegations as to Defendants' concerted efforts to conceal their conduct." *Welch*, 327 F.3d at 1101 (citing *Rybicki*, 287 F.3d at 264). Here, as is described in the Complaint, Michel openly discussed with CW-1 the need to conceal and hide their efforts to pay bribes to Person, and specifically discussed the possibility that were their activities discovered it could impact Person's future employment as a college basketball coach. *See* Complaint ¶ 35(b)-(c) (discussing efforts to conceal payments to Person and that by structuring the payments on paper as a loan, it would make "the transaction appear 'the right way' and 'clean,' so that 'it don't hurt nobody,'" and noting that concealment of the bribes was needed "because [PERSON's] got a chance of being a head coach and I don't need nothing to come back to haunt."). Accordingly, Michel's arguments that he was not provided "fair notice that this prosecution could follow" (Michel Br. at 45) are unavailing for this additional reason.