UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

UNITED STATES OF AMERICA                    :

   -v.-                                                        :        S1 17 Cr. 683 (LAP)

CHUCK CONNORS PERSON,                   :
and RASHAN MICHEL,

                Defendants.           :

-------------------------------------------------------------x


## GOVERNMENT BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO SUPPRESS WIRETAP AND CELL PHONE EVIDENCE


GEOFFREY S. BERMAN
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007


Robert L. Boone
Noah Solowiejczyk
Eli J. Mark
Aline R. Flodr
Assistant United States Attorneys

- Of Counsel -

# **TABLE OF CONTENTS**

I.   DEFENDANTS' MOTION TO SUPPRESS WIRETAP INTERCEPTIONS ON ..............................1

NECESSITY GROUNDS SHOULD BE DENIED.......................................................................1

    A.   Background Relevant to the Necessity of the December 9 Order.......................................2

    B.   Applicable Law ................................................................................3

    C.   Discussion ........................................................................................5

II.   DEFENDANTS' MOTION TO SUPPRESS WIRETAP INTERCEPTIONS ON PROBABLE

CAUSE GROUNDS SHOULD BE DENIED .........................................................................9

    A.   Applicable Law ................................................................................9

    B.   Discussion ......................................................................................11

III.   DEFENDANTS' MOTION TO SUPPRESS THE WIRETAP SHOULD ALSO BE DENIED

BECAUSE THE GOVERNMENT ACTED IN GOOD FAITH ...............................................17

IV.   DEFENDANTS' MOTION TO SUPPRESS EVIDENCE OBTAINED FROM THEIR CELL

PHONES SHOULD BE DENIED ......................................................................................18

    A.   Facts Relevant to the Searches of the Cell Phones .........................................................18

       1.  The Search Warrants.........................................................................18

       2.  The Instant Motion..........................................................................21

    B.   The Search Warrants Were Properly Issued and Relied Upon in Good Faith ...............................21

       1.  Applicable Law ..............................................................................21

       2.  The Search Warrants Were Supported by Probable Cause and Were Not...................................22

       Overbroad .......................................................................................22

       3.  Law Enforcement Agents Relied in Good Faith on the Warrant .................................29

    V.   CONCLUSION..................................................................................30

## Table of Authorities

**Cases**

*Herring* v. *United States*, 555 U.S. 135 (2009)............................................................................29

*Illinois* v. *Gates*, 462 U.S. 213 (1983) ...............................................................................passim

*In re Nextel Cellular Telephone*, No. 14 MJ 8005, 2014 WL 2898262 (D. Kan. June 26, 2014) .............28

*Maryland* v. *Garrison*, 480 U.S. 79 (1987) ...........................................................................22

*Spinelli* v. *United States*, 393 U.S. 410 (1969) .....................................................................10

*Texas* v. *Brown*, 460 U.S. 730 (1983)..................................................................................22

*United States* v. *Ambrosio*, 898 F. Supp. 177 (S.D.N.Y. 1995)..................................................10

*United States* v. *Barret*, 824 F. Supp. 2d 419 (E.D.N.Y. 2011)..................................................26

*United States* v. *Bellomo*, 954 F. Supp. 630 (S.D.N.Y. 1997).................................10, 17, 22, 29

*United States* v. *Concepcion*, 579 F.3d 214 (2d Cir. 2009) ...............................................4, 10

*United States* v. *Diaz*, 176 F.3d 52 (2d Cir. 1999).........................................................4, 6, 9

*United States* v. *Feola*, 651 F. Supp. 1068 (S.D.N.Y. 1987) .....................................................7

*United States* v. *Feola*, 875 F.2d 857 (2d Cir. 1989).................................................................7

*United States* v. *Finazzo*, 850 F. 3d 94 (2d Cir. 2017) ...........................................................13

*United States* v. *Fury*, 554 F.2d 522 (2d Cir. 1977).................................................................10

*United States* v. *Galpin*, 720 F.3d 451 (2d Cir. 2013) .............................................................28

*United States* v. *Gangi*, 33 F. Supp. 2d 303 (S.D.N.Y. 1999) ..........................................10, 11

*United States* v. *Ganias*, 824 F.3d. 199 (2d Cir. 2016).............................................................24

*United States* v. *Gatto*, 17-cr-0686 (LAK), 2018 WL 2465379 (S.D.N.Y. June 1, 2018)...................24, 26

*United States* v. *Gatto*, 295 F. Supp. 3d 336 (S.D.N.Y. 2018) ............................................13, 16

*United States* v. *Gigante*, 979 F. Supp. 959 (S.D.N.Y. 1997) ...................................................11

*United States* v. *Gotti*, 42 F. Supp. 2d 252 (S.D.N.Y. 1999) ....................................................17

*United States* v. *Gray*, 96 F.3d 769 (5th Cir. 1996) ................................................................16

*United States* v. *Juarez*, No. 12-CR-59 (RRM), 2013 WL 357570 (E.D.N.Y. Jan. 29, 2013) ..................25

*United States* v. *Kahn*, 415 U.S. 143 (1974)............................................................................3

*United States* v. *Labate*, No. 00 Cr. 632 (WHP), 2001 U.S. Dist. LEXIS 6509, (S.D.N.Y. May 18, 2001)

..............................................................................................................................10

*United States* v. *Leon*, 468 U.S. 897 (1984) ................................................................17, 18, 29

*United States* v. *Lilla*, 699 F.2d 99 (2d Cir. 1983)..........................................................4, 6, 7, 8

*United States* v. *Lustyik*, 57 F. Supp. 3d 213 (S.D.N.Y. 2014)..................................................28

*United States* v. *Magaddino*, 496 F.2d 455 (2d Cir. 1974) ......................................................10

*United States* v. *Martino*, 664 F.2d 860 (2d Cir. 1981) ............................................................6

*United States* v. *Miller*, 116 F.3d 641 (2d Cir. 1997) ..................................................................4

*United States* v. *Nichols*, 912 F.2d 598 (2d Cir. 1990) .............................................................22

*United States* v. *Piggie*, 303 F.3d 923 (8th Cir. 2002) .............................................................16

*United States* v. *Romain*, No. 13 Cr. 724 (RWS), 2014 WL 6765831 (S.D.N.Y. Dec. 1, 2014)................26

*United States* v. *Rosa*, 626 F.3d 56 (2d Cir. 2010) ..................................................................22

*United States* v. *Ruggiero*, 44 F.3d 1102 (2d Cir. 1995) ...........................................................10

*United States* v. *Ruggiero*, 726 F.2d 913 (2d Cir. 1984) .............................................................4

*United States* v. *Ruggiero*, 824 F. Supp. 379 (S.D.N.Y. 1993) ...................................................10

*United States* v. *Rybicki*, 354 F.3d 124 (2d Cir. 2003) .............................................................14

*United States* v. *Salas*, No. 07 Cr. 557 (JGK), 2008 U.S. Dist. LEXIS 92560 (S.D.N.Y. Nov. 5, 2008) ..11

*United States* v. *Scala*, 388 F. Supp. 2d 396 (S.D.N.Y. 2005) .....................................................11

*United States* v. *Shi Yan Liu*, 239 F.3d 138 (2d Cir. 2000)........................................................28

*United States* v. *Singh*, 390 F.3d 168 (2d Cir. 2004) ................................................................26

*United States* v. *Steinberg*, 525 F.2d 1126 (2d Cir. 1975).............................................................7

*United States* v. *Tomero*, 462 F. Supp. 2d 565 (S.D.N.Y. 2006) ................................................17

*United States* v. *Torres*, 901 F.2d 205 (2d Cir. 1990).................................................................4

*United States* v. *Travisano*, 724 F.2d 341 (2d Cir. 1983) .........................................................26

*United States* v. *Ulbricht*, 858 F.3d 71 (2d Cir. 2017)..............................................................23

*United States* v. *Ulbricht*, No. 14 Cr. 68 (KBF), 2014 WL 5090039 (S.D.N.Y. Oct. 10, 2014) ...............23

*United States* v. *Vilar*, No. 05 Cr. 621 (KMK), 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007) .......25, 28, 29

*United States* v. *Wagner*, 989 F.2d 69 (2d Cir. 1993)....................................................6, 10, 22

*United States* v. *Walters*, 997 F.2d 1219 (7th Cir. 1993).........................................................13

*United States* v. *Winn*, 79 F. Supp. 3d 904 (S.D. Ill. 2015) .......................................................27

*United States* v. *Yannotti*, 541 F.3d 112 (2d Cir. 2008)..............................................................9

*United States* v. *Young*, 822 F.2d 1234 (2d Cir. 1987) ......................................................4, 6, 7

*Walczyk* v. *Rio*, 496 F.3d 139 (2d Cir. 2007)....................................................................22, 26

## Statutes

18 U.S.C. § 1343...........................................................................................................11

18 U.S.C. § 1346....................................................................................................15, 16

18 U.S.C. § 1349...........................................................................................................11

18 U.S.C. § 2516...........................................................................................................16

18 U.S.C. § 2518.....................................................................................................3, 4, 9

**Other Authorities**

S. Rep. No. 1097, 90th Cong., 2d Sess., *reprinted* in 1968 U.S.C.C.A.N. 2190 .........................................4

**Rules**

Fed. R. Crim. P. 41 ................................................................................................................................24

Defendants Chuck Connors Person and Rashan Michel (collectively, the "defendants") jointly move to suppress all wiretap interceptions and evidence obtained from the defendants' respective cellphones pursuant to validly obtained judicially authorized search warrants. For the reasons that follow, their motions should be denied in their entirety.[1]

## I.   DEFENDANTS' MOTION TO SUPPRESS WIRETAP INTERCEPTIONS ON NECESSITY GROUNDS SHOULD BE DENIED

The defendants move to suppress all communications intercepted pursuant to a December 9, 2016 Order, which authorized the interception of wire and electronic communications occurring over cellular telephones used by Chuck Connors Person and Rashan Michel, respectively, (the "December 9 Order"), and all communications intercepted pursuant to subsequent wiretap orders dated January 9, 2017, January 26, 2017, February 10, 2017, and April 27, 2017, (collectively, the "Wiretap Orders"),[2] claiming that the wiretaps were unnecessary. (Suppress Br. at 12-15.)  Specifically, the defendants argue that the Government's December 9, 2016 application for an order of interception (the "December 9 Application") failed to explain "in any meaningful way" why normal investigative procedures were inadequate to investigate the alleged scheme, but instead, merely claimed that the wiretap was necessary to "uncover

---

[1] For ease of reference, the Government refers herein to the defendants' Motion to Suppress Wiretap and Cellphone Evidence [Dkt. 59] as the "Suppress Motion" and the accompanying brief as the "Suppress Br."; to defendant Person's Supplemental Memorandum of Law in Support of Defendants' Joint Motion to Suppress Wiretap and Cell Phone Evidence [Dkt. 85] as the "Person Supp. Br."; and to defendant Michel's Supplemental Memorandum of Law in Support of Defendants' Joint Motion to Suppress Wiretap and Cell Phone Evidence [Dkt. 88] as the "Michel Supp. Br."

[2] On January 9, 2017, the Honorable Lewis A. Kaplan granted an application permitting the continued interception of wire communications occurring over the target phones referenced in the December 9 Order.  On February 10, 2017, the Honorable Paul A. Engelmayer granted an application permitting further interception of wire communications occurring over those same phones.  On April 27, 2017, the Honorable J. Paul Oetken granted an application permitting the interception of wire communications occurring over the phone referenced in the December 9 Order that was being used by defendant Rashan Michel.  Separately, on January 26, 2017, the Honorable Richard M. Berman granted an application permitting interception of wire and electronic communications occurring over a cellular telephone used by defendant Chuck Connors Person, not referenced in the December 9 Order.

*additional* conduct by Mr. Person or Mr. Michel." (*Id.* at 14.)  Moreover, the defendants contend

that a wiretap was clearly unnecessary because the Government had the ability to record

conversations of the defendants through its cooperating witness ("CW-1").  (*Id.* 12-15.)  As

explained in more detail below, these claims lack merit and should be denied.

A.       **Background Relevant to the Necessity of the December 9 Order**

During the course of the investigation, the Government sought and obtained judicial

authorization on several occasions to intercept communications occurring over cellular

telephones associated with the defendants.  The Government's initial application for an order of

interception was approved by the Honorable Jed S. Rakoff on December 9, 2016.  Subsequent

applications followed, all of which referenced the December 9 Application, resulting in the

approval of five orders of interception by five different District Court judges.  The December 9

Application included, among other things, a sworn affidavit from an FBI agent involved in the

investigation.  The affidavit set forth the objectives of the interception, details of the

investigation, and an analysis of over a dozen methods of investigation that had either failed to

achieve the goals of the investigation or were not likely to be effective, among other information.

With respect to the normal investigative methods, the affidavit discussed the use, or lack thereof,

of undercover officers, cooperating witnesses, physical surveillance, geolocation information,

telephone records and pen registers, the grand jury process, search warrants, arrests, witness

interviews, trash searches, the results of prior interceptions, pole cameras, and parallel and

related investigations.  (Defs.' Exhibit 1 (00008637-00008652).)  To the extent the agent

believed that the use of a particular investigative method would be futile, not feasible, or

insufficient to accomplish the goals of the investigation, the agent's reasoning was explained in

detail in the December 9 Application.

B.    **Applicable Law**

Title 18, United States Code, Section 2518, sets out the procedures governing the interception of oral and electronic communications.  In particular, Section 2518(1)(c) requires that an application for the interception of telephonic communications include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Similarly, Section 2518(3)(c) requires the judge reviewing a wiretap application to determine, as a condition of authorizing the wiretap, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."

These requirements ensure that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime."  *United States* v. *Kahn*, 415 U.S. 143, 153 n.12 (1974).  This Court explained the significance of these statutory requirements:

> [T]he purpose of the statutory requirements of § 2518 is not to preclude the Government's resort to wiretapping until after all other possible means of investigation have been exhausted by investigative agents; rather, the statute only requires that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods.

*United States* v. *Diaz*, 176 F.3d 52, 111 (2d Cir. 1999) (citing *United States* v. *Torres*, 901 F.2d 205, 231 (2d Cir. 1990)).  Thus, the statute's "alternative investigative techniques" provisions do not establish a requirement "'that any particular investigative procedure [must] be exhausted before a wiretap may be authorized.'" *United States* v. *Miller*, 116 F.3d 641, 663 (2d Cir. 1997) (*quoting United States* v. *Young*, 822 F.2d 1234, 1237 (2d Cir. 1987)).  Rather, the Government's application must only "provide some basis for concluding that less intrusive investigative procedures are not feasible."  *United States* v. *Lilla*, 699 F.2d 99, 103 (2d Cir. 1983).

The legislative history of the statute further makes clear that Section 2518(1)(c) is not designed to force the Government to exhaust all "other investigative techniques."  As the Senate Report concerning the statute explained:

> Merely because a normal investigative technique is theoretically possible, it does not follow that it is likely.  What the provision envisions is that the showing be tested in a practical and commonsense fashion.

S. Rep. No. 1097, 90th Cong., 2d Sess., *reprinted* in 1968 U.S.C.C.A.N. 2190 (citations omitted); *see also Torres*, 901 F.2d at 231-32 (quoting legislative history); *United States* v. *Ruggiero*, 726 F.2d 913, 924 (2d Cir. 1984) (explaining that affidavits in support of wiretap applications are viewed in common sense and realistic fashion); *see also United States* v. *Torres*, 901 F.2d at 231-232 (quoting legislative history).

Once wiretapping authority has been granted, significant deference is owed to the issuing court by any reviewing court.  *See*, *e.g.*, *United States* v. *Ruggiero*, 726 F.2d 913, 924 (2d Cir. 1984) (noting the "deference properly accorded to the issuing judge").  *Cf. United States* v. *Concepcion*, 579 F.3d 214, 217 (2d Cir. 2009) (noting that "considerable deference" should be granted to the district court's decision whether to allow a wiretap, "ensuring only that the facts set forth in the application were minimally adequate to support the determination that was made").  (Internal citations and quotations omitted).

4

### C.    Discussion

The defendants claim that the December 9 Application failed to explain "in any meaningful way" why normal investigative procedures were inadequate to investigate the alleged scheme.  (Suppress Br. at 14).  They contend that the "*only* justification provided" in the application for the use of a wiretap was that it was necessary to "uncover *additional* conduct by Mr. Person or Mr. Michel" – conduct separate from that described in the application concerning the steering of Auburn University basketball players to Michel and CW-1.  That claim is false.

In nearly 15 pages, the December 9 Application set forth in exacting detail why a wiretap was necessary and why over a dozen typical methods of investigation would either be futile, not feasible, or insufficient to fully investigate the alleged scheme.  (*See* Defs.' Exhibit 1 (00008637-8652).)  For example, it explained, among other things, how physical surveillance is of limited utility without wire and electronic communication to assist in understanding the purpose of various meetings, (Defs.' Exhibit 1 (00008641-8642)), how geolocation information without contemporaneous wire and electronic communications is not helpful in differentiating between criminal and non-criminal movement, (Defs.' Exhibit 1 (00008644-8645)), and how even with the use of telephone records and pen registers, it is only possible to determine the identities of the participants in the scheme and the role that various participants in the scheme play in the scheme through the use of electronic or wire surveillance, and other investigative techniques.  (Defs.' (Exhibit 1 00008645).)  The application's detailed explanation as to why a wiretap was necessary, and why other investigative methods were insufficient, provided more than enough support for Judge Rakoff's decision to issue the order of interception.  As the Second Circuit has repeatedly explained, "the statute only requires that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." *United States* v. *Diaz*, 176 F.3d 52, 111 (2d Cir. 1999);

*accord United States* v. *Lilla*, 699 F.2d at 103 (application only must "provide some basis for concluding that less intrusive investigative procedures are not feasible').

Indeed, the Second Circuit has routinely rejected challenges to wiretap applications on necessity grounds where the applications clearly explained the difficulties in employing normal investigative techniques.  *See United States* v. *Young*, 822 F.2d at 1237 (approving wiretap because surveillance would have been impractical and telephone toll records would not have uncovered target's partners in crime); *United States* v. *Martino*, 664 F.2d 860, 868 (2d Cir. 1981) (rejecting challenge to wiretap because, among other things, "telephone toll records and use of pen registers . . . do not identify the participants to a telephone conversation, and hence would be unlikely to uncover [defendant's] partners in crime"); *see also United States* v. *Wagner*, 989 F.2d 69, 74 (2d Cir. 1993) (upholding the issuance of a wiretap where the supporting affidavit cited the difficulty of conducting surveillance and infiltrating the criminal organization).

In any event, the defendants argue, a wiretap was unnecessary because the Government had the ability to record conversations of the defendants through its cooperating witness.  (*See* Suppress Br. at 14.)  This argument, however, ignores an obvious point – CW-1 could not record conversations to which he was not a party.  A wire was needed to capture criminal conversations the defendants were engaged in that did not involve CW-1.  For example, while CW-1 could assist in capturing conversations in which Person discussed the acts he intended to take – steering players and their family members to CW-1 – he could not have as easily captured Person speaking to some of those family members to fulfill his end of the bargain, critical evidence of the scheme.  And that is precisely what happened, as the wire resulted in the interception of Person speaking to family members, while uncovering other evidence of the crimes under investigation.  (*See, e.g.,* Compl. ¶ 44 (Person directing Mother-1 to retain CW-1's services);

Compl. ¶¶ 50-52 (Person seeking to recruit another financial advisor, Advisor-1, into the scheme); Compl. ¶53 (Person directing Mother-2 to retain CW-1's services).)

Indeed, the wiretap here was particularly warranted because the conspiracy was itself unfolding over the phone, due in no small part to the fact that the defendants lived in different states. (*See* Compl. ¶¶ 29, 30 (Explaining that Person was based in Alabama while Michel was based in Georgia)); *United States* v. *Steinberg*, 525 F.2d 1126, 1130 (2d Cir. 1975) ("[W]iretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation"); *United States* v. *Young*, 822 F.2d at 1237 (same). And where there is a conspiracy at work, the necessity of a wiretap is even more compelling: "the clandestine nature of alleged conspiracies makes them relatively less susceptible to normal investigative techniques." *United States* v. *Feola*, 651 F. Supp. 1068, 1105 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir. 1989).

Finally, the December 9 Affidavit stands in stark contrast to the facts in *United States* v. *Lilla*, 699 F.2d 99 (2d Cir. 1983), on which the defendants rely. In *Lilla*, an undercover officer worked with a confidential informant to buy one pound of marijuana. *Lilla*, 699 F.2d at 100-101. After buying the marijuana, the undercover officer discussed purchasing cocaine from the defendant. *Id*. at 101. The defendant told the undercover officer that his brother was out-of-state, making arrangements to deliver a shipment of cocaine and marijuana, and that the drugs should be available in a week or two. *Id*. Despite these successes, the affidavit for a wiretap offered only general statements as to why further investigation would fail. *Id*. "[T]he affidavit merely asserted that 'no other investigative method exists to determine the identity' of individuals who might have been involved with Lilla." *Id*. at 104. The affidavit did not specify the facts upon which that conclusion was based, did not indicate why simple surveillance of the

defendant's home would not have been useful, and did not explain why the instant narcotics case presented problems different from any other "small-time narcotics case." *Id*. The Second Circuit concluded that the facts actually demonstrated that "the normal investigative procedures that were used were successful." *Id*.

Here, by contrast, the December 9 Affidavit used nearly 15 pages to explain in detail why over a dozen typical investigative methods would be inadequate in advancing the goals of the investigation. Moreover, unlike in *Lilla*, the December 9 Affidavit was not for a "small-time narcotics case," but for a complex white-collar investigation of corruption in the billion-dollar industry of college athletics perpetrated by sophisticated and publicly known figures. It would strain credulity to believe that all of its investigative goals could be accomplished by simply performing a stakeout, or with the assistance of a lone cooperating witness. Moreover, contrary to the defendants' contention, the December 9 Affidavit did not describe a "fully successful law enforcement operation." (Suppress Br. at 15.) At the time the December 9 Affidavit was approved, the investigation was still in its beginning stages, Person had yet to introduce Michel and the CW to any Auburn players or their family members, and only a fraction of the money the CW had agreed to give Person had been paid ($10,000 out of $50,000). As such, the need for a wiretap in the instant matter was drastically different than the need described in the *Lilla* affidavit. Accordingly, as the December 9 Application was more than "minimally adequate" to support the issuance of the wiretap warrant, the defendants' suppression motion on necessity grounds should be denied.

II.     **DEFENDANTS' MOTION TO SUPPRESS WIRETAP INTERCEPTIONS ON PROBABLE CAUSE GROUNDS SHOULD BE DENIED**

The defendants also move to suppress all communications intercepted pursuant to the Wiretap Orders because "[f]or substantially the same reasons discussed in Mr. Michel's and Mr. Person's memoranda of law in support of their respective motions to dismiss (ECF Nos. 46, 55), the Wiretap Orders were not supported by probable cause to believe any target subject was committing any of the target offenses." (Suppress Br. at 16.)   As explained extensively in the Government's opposition to the defendant's motion to dismiss, the allegations here are more than sufficient to establish probable cause that a crime was committed (see Dkt. #60), and this claim is meritless for the additional reasons discussed further below.

A.     **Applicable Law**

Title 18, United States Code, Section 2518(3) requires that to issue a wiretap, a reviewing judge must find probable cause that: (i) an individual is committing, has committed, or is about to commit an enumerated offense; (ii) particular communications concerning that offense will be obtained through the requested interception; and (iii) the facilities subject to interception are being used in connection with the offense.  18 U.S.C. § 2518(3); *see United States* v. *Yannotti*, 541 F.3d 112, 124 (2d Cir. 2008); *United States* v. *Diaz*, 176 F.3d 52, 110 (2d Cir. 1999).

Probable cause requires that the totality of the circumstances reflect a fair probability of finding evidence of a crime.  *Illinois* v. *Gates*, 462 U.S. 213, 238 (1983); *see United States* v. *Diaz*, 176 F.3d 52, 110 (2d Cir. 1999) (probable cause standard for wiretap is same as probable cause standard for search warrant).  The issuing judicial officer must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that . . . evidence of a crime will be found in a particular place."  *Gates*, 462 U.S. at 238.  Probable cause "is not an especially demanding standard in this context.  '[O]nly the

9

probability, and not the prima facie showing, of criminal activity is the standard of probable cause.'" *United States* v. *Bellomo*, 954 F. Supp. 630, 636 (S.D.N.Y. 1997) (quoting *Gates*, 462 U.S. at 235). Probable cause "to issue a wiretap order exists when the facts made known to the issuing court are sufficient to warrant a prudent [person] in believing that evidence of a crime could be obtained through the use of electronic surveillance." *United States* v. *Ruggiero*, 824 F. Supp. 379, 398 (S.D.N.Y. 1993), *aff'd*, 44 F.3d 1102 (2d Cir. 1995) (quotation and footnote omitted).

In ruling on a motion to suppress wiretap evidence, the reviewing court must grant "considerable deference" to the issuing court's probable cause findings. *United States* v. *Concepcion*, 579 F.3d 214, 217 (2d Cir. 2009); *see also United States* v. *Gangi*, 33 F. Supp. 2d 303, 306 (S.D.N.Y. 1999) ("[T]he issuing judicial officer's decision to authorize wiretaps 'should be paid great deference by reviewing courts.'" (quoting *Spinelli* v. *United States*, 393 U.S. 410, 419 (1969))). The subsequent court's review is limited to whether the issuing judicial officer had a "substantial basis" for the finding of probable cause. *See, e.g.*, *Gates*, 462 U.S. at 236; *United States* v. *Wagner*, 989 F.2d 69, 72-74 (2d Cir. 1993). "[W]iretap orders are entitled to a presumption of validity." *United States* v. *Ambrosio*, 898 F. Supp. 177, 181 (S.D.N.Y. 1995) (citing *United States* v. *Fury*, 554 F.2d 522 (2d Cir. 1977)). Accordingly, the defendants bear the burden of proving that probable cause was lacking. *See United States* v. *Magaddino*, 496 F.2d 455, 459-60 (2d Cir. 1974). Any doubts as to the existence of probable cause should be resolved in favor of upholding the authorization. *See United States* v. *Labate*, No. 00 Cr. 632 (WHP), 2001 U.S. Dist. LEXIS 6509, at *50 (S.D.N.Y. May 18, 2001). Although without "the insights of adversarial scrutiny, the issuing judge may not readily perceive every question that might legitimately be raised" regarding the requested wiretap, "so long as fundamental constitutional

rights are preserved, the issuing court's determination should not be subjected to gratuitous 'Monday morning quarterbacking.'"  *United States* v. *Gigante*, 979 F. Supp. 959, 963 (S.D.N.Y. 1997).

In assessing probable cause, a reviewing court must read a wiretap affidavit as a whole and in a common-sense manner.  Defendants may not "dissect each piece of information in the [agent's] affidavit to show that each fact taken alone does not establish probable cause."  *Gangi*, 33 F. Supp. 2d at 306; *accord United States* v. *Salas*, No. 07 Cr. 557 (JGK), 2008 U.S. Dist. LEXIS 92560, at *12 (S.D.N.Y. Nov. 5, 2008) (same).  Put another way, "a court must look at the snowball, not the individual snowflakes."  *United States* v. *Scala*, 388 F. Supp. 2d 396, 402 (S.D.N.Y. 2005).

### B.    Discussion

Person and Michel argue that the Wiretap Orders lack probable cause because the agent affidavits failed to establish that Person and Michel were involved in wire fraud and/or conspiracy to commit the same for substantially the same reasons advanced in their motion to dismiss the indictment.  (Suppress Br. at 16-17.)  This is wrong.  As described below, the Wiretap Affidavits contained more than sufficient probable cause to support the Wiretap Orders.

To begin, the December 9 Affidavit, and each subsequent one, established probable cause to believe that the defendants participation in the Target Offense of wire fraud in violation of Title, United States Code, Section 1343, and conspiracy to commit the same, in violation of Title 18 United States Code, Section 1349.  Subsequent affidavits, in addition, referred to additional Target Offenses, including the Travel Act.  Each Wiretap Affidavit detailed the FBI's investigation into corruption in college basketball, including "payments by sports agents and athlete advisors to college coaches … in return for providing access to and influence over their student-athletes [] in direct violation of applicable NCAA rules and in breach of the college coaches' duties to their

employer, the university," and Person and Michel's involvement in such schemes. (Dec. 9 Aff. ¶ C(1).)  Further, the affidavits set forth that "[s]uch conduct by a coach can expose that coach's university to numerous harms," and that the "coaches are required under NCAA rules to annually certify that they have reported all known violations of NCAA rules to their universities."  (*Id.*) The affidavits detailed that CW-1 provided information that Michel and Person had agreed with CW-1 "to accept payments in exchange for using Person's influence as the student-athletes' associate head coach to direct the student-athletes to retain CW-1's business management services."  (*Id.* ¶(C)(2)(b).)  The affidavits further explained that universities are responsible for compliance with the NCAA rules, including by their coaches and student-athletes, and these sorts of payments violated NCAA rules both by the coach and player and could render the student-athlete ineligible to play for the university.  (*Id.* ¶C(3) (describing relevant NCAA Regulations).) Further, the affidavits explained that NCAA rules required that a coach's contract include a stipulation that a coach in violation of the rules "shall be subject to disciplinary or corrective action … including suspension without pay or termination of employment."  (*Id.* ¶(C)(3)(6)(d)(ii).)  The cooperating witness's information was corroborated by numerous recorded conversations detailed in the affidavits, totaling almost 30 pages, and physical surveillance, among other things.  (*Id.* ¶C(1) n.2.)  As a result, the affidavits were more than sufficient to demonstrate probable cause to believe that the defendants were engaged in a scheme to defraud Person's university by soliciting and receiving bribes that violated Person's duties to the university, i.e., private honest services fraud, and by causing false certifications to be made regarding compliance with NCAA rules. Lastly, the Wiretap Affidavits also set forth sufficient probable cause showing that Person and Michel each used a cellular telephone to communicate with co-conspirators about the target

offenses.  As a result, the defendants' contention that the Wiretap Orders failed to state probable cause must fail.

Nevertheless, the defendants contend that the affidavits were insufficient for several reasons.  First, they argue that the Wiretap Orders "did not establish probable cause" because "the theory of wire fraud in this case suffers from the same defects" as in *United States v. Walters*, 997 F.2d 1219 (7th Cir. 1993) in that the "potential gain" to the defendants in the scheme "did not depend upon Auburn University (the alleged victim in the Indictment) suffering any deprivation of money or property, even if Auburn was harmed inadvertently."  (Suppress Br. at 16.)  As an initial matter this case, and more aptly, the wiretap applications – which alleged a scheme by sports agents and advisors to *bribe* NCAA coaches – is completely distinguishable from *Walters*, which involved a scheme by an agent to pay student-athletes to sign with him.  Moreover, the law of *Walters* is not the law of this Circuit, as recently recognized by Judge Lewis Kaplan in rejecting a similar argument in the related case of *United States* v. *Gatto*, 17 Cr. 686 (LAK).   A defendant in this circuit, "does not need to literally obtain money or property to violate the mail and wire fraud statutes." *United States* v. *Gatto*, 295 F. Supp. 3d 336, 344 (S.D.N.Y. 2018) (quoting *United States* v. *Finazzo*, 850 F. 3d 94, 106 (2d Cir. 2017) (internal quotations omitted).   Regardless, the affidavits sufficiently established that there was probable cause to believe that the bribery scheme participants depended on Auburn University being subjected to a substantial risk of loss of money or property, because, in order from the scheme to succeed, Person would have to falsely certify compliance with NCAA rules, in violation of his contract, thus subjecting the university to the risk of numerous harms from the NCAA, as detailed above.  Furthermore,  the affidavits established probable cause that the defendants were engaging in a wire fraud scheme to deprive Auburn

University of an intangible property right – the right of coach Person's honest services – through bribery.  (*See, e.g*., December 9 Aff. at 15-16.)

Second, the defendants argue that the applications for the Wiretap Orders did not establish probable cause that the defendants committed honest services wire fraud, citing to their motion to dismiss and to *United States* v. *Rybicki*, 354 F.3d 124 (2d Cir. 2003) (en banc) (Suppress Br. at 18).   This argument fundamentally misconstrues *Rybicki*, as explained in the Government's opposition to the defendants' motion to dismiss the Indictment.  (*See* Dkt. 60 at 26-29.)   The Wiretap Affidavits sufficiently alleged that Person solicited and received bribes in exchange for violating a fiduciary duty to the university and using his official position as a coach to take steps directly adverse to the university that could cause it harm (and which were concealed from it). This conduct falls well within the solid core of honest services fraud described in *Skilling*. Similarly, for the reasons addressed in the Government's opposition to the motion to dismiss the Indictment, the defendants' argument that the applications for the Wiretap Orders did not establish probable cause to support a violation of the Travel Act fail.[3]

Third, in the defendants' respective supplemental memoranda of law in support of their motions to suppress the wiretap affidavits, they argue that the Government has "abandoned" its theory of wire fraud because the Superseding Indictment includes a revised theory of wire fraud against Person and no longer charges Michel with that crime, or conspiracy, and that this is somehow an admission that the allegations in the wiretap failed to establish probable cause to support wire fraud as a Target Offense in the wiretaps.  As an initial matter, the Government's charging decisions, made months after the Wiretap Affidavits were submitted, are completely irrelevant to whether the Wiretap Affidavits established probable cause to believe the defendants

---

[3] The Government also notes that the Travel Act was not initially a Target Offense of the Wiretap Orders, so this argument would only apply to the later Wiretap Orders.

were engaged in the Target Offenses, and here five different Southern District Judges independently determined that the Wiretap Orders were supported by probable cause. More fundamentally, there is no rule that if the Government obtains a wiretap and establishes that there is probable cause to believe a specific offense is being committed that the Government is later under any obligation to include said charge in an indictment. Moreover, contrary to the defendants' claims, the Government has not "abandoned" its theory of wire fraud that was established in the Wiretap Affidavits. The Superseding Indictment charges that the defendants engaged in an honest services wire fraud, and conspired to commit the same – which was amply alleged in the Wiretap Affidavits, beginning with the first on December 9, and was always listed as a Target Offense – and that the scheme contemplated that Person would defraud Auburn University in connection with false certifications to the University – which was also alleged in the Wiretap Affidavits. (*See* December 9 Aff. at 15 (noting that NCAA coaches are "required under NCAA rules to annually certify that they have reported all known violations of NCAA rules to their universities."); December 9 Aff. at 20 ("all staff members of athletics departments of NCAA member institutions are required to complete a certification annually in which they certify, among other things, that they 'have reported through the appropriate individuals . . . any knowledge of violations of NCAA legislation involving [their] institution.'")

Lastly, the defendants' attempts to argue that the initial Wiretap Affidavits did not allege an honest services theory of wire fraud because they did not cite to 18 U.S.C. § 1346 is unavailing. (*See, e.g.*, Michel Supp. Suppress Br. at 4-5.) The Wiretap Affidavits plainly alleged, from the get go, the honest services fraud theory – indeed a whole section of the initial wiretap was titled "The CHUCK PERSON Bribery Scheme." (December 9 Aff. at 21.) The defendants' novel argument that the Government should not be permitted to rely on the honest services theory of

wire fraud because 18 U.S.C. § 1346 was initially cited in a footnote as not being a target offense is absurd.  (*See, e.g.*, Michel Supp. Suppress Br. at 4-5.)  Section 1346 was not listed as a target offense because Section 1346 is not in and of itself an offense at all.  Rather, Section 1346 is a statute that provides a definition of the term "scheme or artifice to defraud" under the wire and mail fraud statutes.  Section 1346 is not a stand-alone criminal statute, and is, accordingly, not listed as a predicate offense for a wiretap under 18 U.S.C. § 2516, which, to the contrary, the wire fraud statute is.  It was plainly obvious to the reviewing district judges that the Government's wiretap applications were not disclaiming reliance on the honest services fraud theory of wire fraud based on the bribery scheme alleged here, but instead were merely recognizing that Section 1346 is not in and of itself a statute for which a wiretap may be authorized.  Accordingly, because the Affidavit asserted that wire fraud and conspiracy to commit the same were target offenses, it necessarily included the definitions of the term "scheme or artifice to defraud" that are incorporated within the meaning of that statute, which includes Section 1346.

Furthermore, the Government has not conceded that the crimes of wire fraud alleged in the initial Indictment, which involved payments to student-athletes that were not known as of the time of the first Wiretap Affidavit, and were only fully uncovered by the wiretap investigation, failed to state a crime.  On the contrary, when informing the Court that the Government planned to supersede, we noted that "multiple courts have affirmed fraud charges brought on substantially similar fact patterns."  (Dkt. 60 at 32 (citing *United States* v. *Gray*, 96 F.3d at 769; *Piggie*, 303 F.3d at 923).  Indeed, as noted before, Judge Kaplan recently rejected substantially similar arguments to those advanced here. *See Gatto*, 295 F. Supp. 3d 326.  Simply put, the Government's ultimate charging decisions have no bearing on whether the Wiretap Affidavit stated probable cause to believe that the offense of wire fraud was being committed.  That the Government made

16

certain decisions about which charges to pursue well after seeking the Wiretaps is entirely irrelevant.    As a result this argument should be rejected as well.

## III.    DEFENDANTS' MOTION TO SUPPRESS THE WIRETAP SHOULD ALSO BE DENIED BECAUSE THE GOVERNMENT ACTED IN GOOD FAITH

Even if the District Judges' independent findings of necessity and probable cause in issuing the Five Wiretap Orders were somehow flawed — which they were not — suppression is not an appropriate remedy because the FBI relied upon those orders in good faith.  *See United States* v. *Leon*, 468 U.S. 897, 922 (1984).  Under *United States* v. *Leon*, evidence collected pursuant to a judicial order authorizing a search that is later found to have been issued without probable cause will be suppressed only if (1) the issuing judge abandoned her detached, neutral role; (2) the agent was dishonest or reckless in preparing the supporting affidavit for the order; or (3) the agents' reliance on the order was not reasonable.  *United States* v. *Bellomo*, 954 F. Supp. 630, 638 (S.D.N.Y. 1997).  While the Second Circuit has not directly addressed the question of whether *Leon* applies in the context of wiretaps, other Circuits and courts within the Second Circuit have found that it does.  *See, e.g.*, *id.*; *United States* v. *Gotti*, 42 F. Supp. 2d 252, 267 (S.D.N.Y. 1999) (Parker, J.) (collecting cases); *United States* v. *Tomero*, 462 F. Supp. 2d 565, 572 (S.D.N.Y. 2006) (Kaplan, J.) (holding that the "good-faith exception to the exclusionary rule applies in Title III cases").

Here, the defendants make no suggestion that this Court abandoned its neutral role, and, as discussed above, the defendants have not argued the Agents made any dishonest or reckless statements in their affidavits, or that the FBI's reliance on the Wiretap Orders was unreasonable. Accordingly, the good faith exception counsels against suppression of any evidence gathered as a

result of the Wiretap Orders, and the defendants' motions to suppress any evidence obtained from the Wiretap Orders should be denied.

## IV.   DEFENDANTS' MOTION TO SUPPRESS EVIDENCE OBTAINED FROM THEIR CELL PHONES SHOULD BE DENIED

The defendants jointly move to suppress all evidence obtained from cell phones seized from each of them incident to their arrests and searched pursuant to judicially authorized search warrants (collectively, the "Cell Phones"). The defendants principally contend that the search warrants issued were "overbroad" because the Government "provided no basis, let alone probable cause, to believe that contraband or evidence of a crime was likely to be found in other applications" on the defendants' Cell Phones beyond "phone records and text messages." (Suppress Br. at 9, 21-23).

The motion should be denied.  As the reviewing magistrate judge properly concluded, the search warrant applications articulated probable cause to believe that evidence of specific crimes would be found on the Cell Phones, and each warrant clearly and specifically described the items to be seized.  Moreover, even assuming a subsequent court were to disagree with the approving magistrate's determination, the defendants identify no basis for concluding that the law enforcement agents acted in anything short of good faith reliance in executing those warrants. *See generally United States* v. *Leon*, 468 U.S. 897 (1984).[4]

### A.     Facts Relevant to the Searches of the Cell Phones

#### 1. *The Search Warrants*

The defendants were each arrested in September 2017 pursuant to a complaint.  A cell phone was recovered from each of the defendants at the time of their arrest, *i.e.*, the Cell Phones.

---

[4] The defendants do not seek an evidentiary hearing on any aspect of their motion.

The Government subsequently sought and obtained judicial authorization to search the Cell Phones.  In particular, on November 3, 2017, the Honorable Barbara C. Moses approved a search warrant for a cell phone recovered incident to the arrest of defendant Person (the "Person Cell Phone" and "Person Warrant," respectively).   On November 6, 2017, Magistrate Judge Moses approved a search warrant for a cell phone recovered incident to the arrest of defendant Michel (the "Michel Cell Phone" and the "Michel Warrant," respectively).

In support of those warrants, an FBI agent involved in the investigation submitted detailed affidavits, which also attached and incorporated the contents of the *Person* criminal complaint, and set forth facts intended to establish: (1) probable cause to believe that the primary user of each phone had engaged in the charged criminal offenses; and (2) that the Cell Phones contained or constituted evidence, fruits or instrumentalities of those crimes. (*See* Person Search Warrant Affidavit, Ex. 7 to Suppress Br. [Dkt. No. 58, Ex. 7] at CP_00000105-108, hereinafter "Person SW Aff."; and Michel Search Warrant Affidavit, Ex. 8 to Suppress Br. [Dkt. No. 58, Ex. 8] at RM_0000078-82, hereinafter "Michel SW Aff.," collectively the "Supporting Affidavits".).

With respect to the former, the Supporting Affidavits attached and incorporated by reference the *Person* complaint, which set forth at some length probable cause to believe that each of the defendants was engaged in the charged crimes.  The Affidavits also summarized the content of the complaint, highlighting the general nature of the criminal charges, the roles played by each defendant and some of the evidence against each of them.  (*See, e.g.*, Person SW Aff. at CP_00000106-07 ¶¶ 8-10; Michel SW Aff. at RM_00000080-82 ¶¶ 8-11.)

With respect to the latter, the Supporting Affidavits highlighted the defendants' use of the Cell Phones as a part of, and in furtherance of, the crimes under investigation.  In particular, the Supporting Affidavits noted that the FBI had received judicial authorization to intercept calls

19

occurring over the seized Cell Phones.  (*See* Person SW Aff. at CP_00000108 ¶¶ 12-13; Michel

SW Aff. at RM_00000082 ¶¶ 13-14.)  The Supporting Affidavits highlighted numerous specific

calls involving each defendant and one or more of the Cell Phones, substantially all of which

were intercepted or otherwise recorded during the investigation, and thus were known to be

relevant to the charged offenses.  Indeed, as the defendants themselves note, the Supporting

Affidavits identify many calls relating to the charged schemes that occurred over one or more of

the Cell Phones over a period of months leading up to the time of the arrests, including at least 7

calls involving Person, and 4 involving Michel.  (Suppress Br. at 9.)  Moreover, the attached

criminal complaints extensively detailed the content of those calls, unquestionably establishing

that they pertained directly to and helped further the charged crimes.  (*See* Person SW Aff. at

CP_00000129-146; Michel SW Aff. at RM_00000103-120.)

     Further, the Supporting Affidavits and attachments detailed Person's and Michel's use of

text messages in furtherance of the charged offenses.[5]  Based on the agent's familiarity with all

of those facts, as well as his training and experience, the agent further told the issuing judge that

the Cell Phones were likely to contain additional forms of electronic evidence of the defendants'

involvement in the charged crimes.  (*See* Person SW Aff. at CP_00000106 ¶¶ 5-6; Michel SW

Aff. at RM_00000080 ¶¶ 5-6.)

     Finally, the Supporting Affidavits requested that the court issue warrants allowing for the

search of the Cell Phones for specified material, namely: "evidence, fruits, and instrumentalities

of" the charged crimes and further focused that request by listing specific, enumerated categories

---

[5] For example, the Person Affidavit described a text message chain between Person and CW-1 regarding bribe payments that CW-1 had wired to Person as a part of the charged conduct. (Person SW Aff. at CP_000000135 ¶ 39.)  Similarly, the Michel Affidavit described a text message wherein Michel sent CW-1 all of Person's bank information for purposes of wiring the above-referenced bribe payments as part of the charged scheme. (Michel SW Aff. at RM_00000108-09 ¶ 38.)

of the types of information that would come within the scope of the search warrants.  Those categories included, for example, evidence of communications regarding, (i) payments, favors or other benefits to NCAA players and/or their families, (ii) requests from any NCAA coach for payments in exchange for those coaches using their influence with NCAA players to convince those players and/or their families to retain certain agents or financial advisors, and (iii) the identity of any entity or individuals either requesting or providing such payments.  (*See* Person SW Aff. at CP_00000112-113; Michel SW Aff. at RM_00000086-87.)

As noted above, and based upon those applications, a reviewing judge in this District authorized each application and approved a search warrant for each of the Cell Phones.

### 2. *The Instant Motion*

The defendants move to suppress the evidence from the search of the Cell Phones on a few bases, each of which is meritless.  *First*, the search of the defendants' cell phones was amply supported by probable cause and was not overbroad, as there was probable cause to believe that the defendants engaged in the charged criminal scheme and that evidence of that criminal scheme would be found on the defendants' cell phones.  *Second*, in any event, the good faith exception applies, because agents relied in good faith on the search warrants issued by the United States Magistrate Judge.

### B. The Search Warrants Were Properly Issued and Relied Upon in Good Faith

### 1. *Applicable Law*

The Fourth Amendment provides that a search warrant "describe with particularity the place to be searched and the persons or things to be seized."  *United States* v. *Rosa*, 626 F.3d 56, 61 (2d Cir. 2010) (quoting *Maryland* v. *Garrison*, 480 U.S. 79, 84 (1987)).  In considering a request for a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit . . . , there is

a fair probability that contraband or evidence of a crime will be found in a particular place."
*Illinois* v. *Gates*, 462 U.S. 213, 238 (1983).  It is, of course, well established that "probable cause
is a flexible, common-sense standard."  *Texas* v. *Brown*, 460 U.S. 730, 742 (1983).  Moreover,
probable cause requires "'only [a] probability, and not a prima facie showing, of criminal
activity'" *United States* v. *Wagner*, 989 F.2d 69, 72 (2d Cir. 1993) (quoting *Gates*, 462 U.S. at
235), and it is entirely appropriate for the reviewing judge to rely upon "'the factual and practical
considerations of everyday life on which reasonable and prudent men, not legal technicians,
act,'" *Walczyk* v. *Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (quoting *Gates*, 462 U.S. at 231).

Moreover, once a search warrant has issued, "the finding of an issuing judicial officer
that probable cause exists" must be "accord[ed] substantial deference."  *Wagner*, 989 F.2d at 72
(internal citations omitted); *see also United States* v. *Nichols*, 912 F.2d 598, 602 (2d Cir. 1990)
(same); *Bellomo*, 964 F. Supp. at 636 (same).  Provided there is a "substantial basis for finding
probable cause," *Wagner*, 989 F.2d at 72 (internal citations omitted), the issuing judge's
determination cannot be disturbed.  Moreover, "any doubt about the existence of probable cause
will be resolved against the challenge to [the issuing judicial officer's] determination."  *Bellomo*,
964 F. Supp. at 636 (citing *Illinois* v. *Gates*, 462 U.S. 213, 237 n.10 (1983)).

### 2. <u>The Search Warrants Were Supported by Probable Cause and Were Not Overbroad</u>

The defendants argue that the search warrants were general warrants because the
information in the respective supporting affidavits did not establish probable cause that
"evidence of a crime was likely to be found" on the Cell Phones in other applications beyond
"phone records and text messages."  (Suppress Br. at 9.)  This argument does not withstand even
basic scrutiny.  As detailed above, the applications for each warrant, which attached detailed
criminal complaints specifically alleging each defendant's involvement in the charged crimes

and use of their cellular phones as a part and in furtherance of those offenses, specifically identified calls and text messages relevant to the charged crimes and made using one or more of the Cell Phones.  Those facts alone defeat the instant motion as they establish a "fair probability that contraband or evidence of a crime" would be found in the defendants' cell phones.  *Gates*, 462 U.S. at 238.

The defendants assert that the search warrants were "overbroad" because they permitted law enforcement agents to review the full contents of phone for data and information within the scope of the Search Warrants based on "affidavits that tied Mr. Person's cell phone to seven phone calls and two text messages and Mr. Michel's cell phone to four phone calls and one text message."  (Suppress Br. at 9, 21-22.)  The argument ignores the extensive body of law establishing that "[i]t has long been perfectly appropriate to search the entirety of a premises or object as to which a warrant has issued based on probable cause, for specific evidence as enumerated in the warrant, which is then to be seized."  *United States* v. *Ulbricht*, No. 14 Cr. 68 (KBF), 2014 WL 5090039, at *14 (S.D.N.Y. Oct. 10, 2014), *aff'd*, 858 F.3d 71 (2d Cir. 2017) (approving search of entire computer for material specified in the search warrant).  This general rule applies with equal force to searches of cell phones and other electronic media.[6]  *See United*

---

[6] Indeed, the procedure employed here – reviewing the full contents of the phone – was not only fully disclosed to the issuing judge, but is expressly permitted by Rule 41(e)(2)(B), which provides that agents should seize or copy the "electronic storage media" to be searched such that review of that media can occur at a later date. *See* Fed. R. Crim. P. 41(e)(2)(B); *see also United States* v. *Ganias*, 824 F.3d 199, 213 (2d Cir. 2016) (en banc) ("[I]n assessing the reasonableness, for Fourth Amendment purposes, of the search and seizure of digital evidence, we must be attuned to the technological features unique to digital media as a whole and to those relevant in a particular case—features that simply do not exist in the context of paper files.").

While the Government believes that the use of such a technique would often be appropriate and is thus properly included in both the Search Warrants and underlying applications, in this case no such "complete review" of "all of the seized data" actually occurred.  Instead, as detailed in an affidavit from FBI Special Agent Anthony Lupinacci and attached hereto as Exhibit A (the "Lupinacci Affidavit"), which addresses in relevant respect how law enforcement agents executed

*States* v. *Gatto*, 17-cr-0686 (LAK), 2018 WL 2465379, at *6 (S.D.N.Y. June 1, 2018) (holding

that cell phone search warrants based in part on the content of wiretap phone calls were not

"rendered invalid by virtue of their having authorized searches of the entirety of the cell phones

for data responsive to the warrants"); *United States* v. *Vilar*, No. 05 Cr. 621 (KMK), 2007 WL

1075041, at *38 (S.D.N.Y. Apr. 4, 2007) (noting it "should not be surprising that a person who

uses a computer, or any electronic device, as an instrumentality of crime might discover that a

magistrate judge would find probable cause to search that computer, just as it should not shock

the user of a telephone that a judge would approve interceptions of calls over that telephone or

the home owner that a judge would approve a search throughout a house believed to contain

evidence of a crime"); *United States* v. *Juarez*, No. 12-CR-59 (RRM), 2013 WL 357570, at *6

---

or attempted to execute the Search Warrants, law enforcement agents used more focused and targeted search techniques identified in the Search Warrants in an effort to pinpoint material likely to be relevant and within the scope of the Search Warrants.

As the Lupinacci Affidavit makes clear, law enforcement agents used a program known as "Cellebrite" on the Person Cell Phone, which (1) extracts data from the cell phone, and (2) automatically divides that data into searchable categories, such as "SMS Messages" or "Contacts." (Lupinacci Aff. ¶¶ 8-9.) By contrast, given that the Michel Cell Phone is password protected, law enforcement agents have not yet been able to execute the Michel Search Warrant. (*Id.* ¶ 7.) For the Person Cell Phone, with the Cellebrite extraction, agents were able to focus their search on areas of the Person Cell Phone most likely to contain relevant material – including, for example, SMS Messages, MMS Messages, Chats, and Contacts – and to then further focus their search by using search terms intended to specifically locate and identify material likely to be within the scope of the Search Warrants. (*Id.* ¶¶ 10-11.) By contrast, with respect to areas of the Person Cell Phone that were less likely to contain relevant material, such as "Device Location," "Web History," or "Images," law enforcement agents conducted only "cursory reviews" sufficient to satisfy themselves that nothing in that category of data was likely to be within the scope of the Search Warrant. (*Id.* ¶ 11.) Consistent with this approach, the material that law enforcement agents have actually identified as within the scope of the Person Search Warrant consists almost exclusively of text message and related communications between scheme participants, as well as related contact information (*id.* ¶ 12), *i.e.*, material for which there can be no serious question the Government had probable cause to search at the time it obtained the Person Search Warrant. As such, there is simply no basis to conclude that the Government's search was improper or in any way exceeded the probable cause established in its applications for the Search Warrants.

(E.D.N.Y. Jan. 29, 2013) (concluding that cell phone warrant satisfies the particularity requirement when it constrains agents to search for evidence related to the specific criminal activity being investigated).

The issuing judge's determination was particularly appropriate here given that the Supporting Affidavits and attachments provided specific information to support a conclusion that the Cell Phones were being extensively used in furtherance of the charged schemes.  As noted above, this wiretap investigation revealed that the defendants regularly used the Cell Phones in furtherance of the charged crimes for extended periods of time, placing dozens of calls to co-conspirators, necessarily implying that the Cell Phones would contain, among other things, call logs, contact lists, information about the identities of and numbers used by co-conspirators, and strongly suggesting more than "a fair probability" that the phones would contain other communications with co-conspirators, including text messages, voice mails, and other types of communicative data.  The existence of numerous calls in furtherance of the charged schemes made over the Cell Phones certainly supports the "practical, commonsense decision" that phones could contain evidence of those crimes, including in mediums beyond records of the phone calls and text messages themselves.  *See, e.g.*, *Gates*, 462 U.S. at 238; *United States* v. *Travisano*, 724 F.2d 341, 345 (2d Cir. 1983) (issuing judge need only find "probable cause to believe that evidence of such crime is located [in the place to be searched]."); *United States* v. *Singh*, 390 F.3d 168, 182 (2d Cir. 2004) (noting that the nexus between the items sought and the particular place to be searched "may be based on 'reasonable inference' from the facts presented based on both common sense and experience.") (internal citations and quotation marks omitted); *Gatto*, 2018 WL 2465379, at *5 (finding that "the magistrate judge was entitled to infer from the fact that the defendant used a cell phone to make calls and send text messages related to the alleged

25

scheme that other communications and evidence pertaining to that scheme also would have been made on that cell phone").

Indeed, it was based on these facts, the agent's participation in the investigation, and the agent's "training and experience," that the agent correctly represented to the magistrate judge that the Cell Phones would likely contain additional various forms of other evidence of the charged crimes. *Accord Walczyk*, 496 F.3d at 156 (noting it is entirely appropriate for the reviewing judge to rely upon "'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act'") (quoting *Gates*, 462 U.S. at 231); *cf. United States* v. *Romain*, No. 13 Cr. 724 (RWS), 2014 WL 6765831, at *4 (S.D.N.Y. Dec. 1, 2014) (warrant for search of cell phones seized in drug trafficking conspiracy supported by probable cause even though application did not tie particular cell phone number to the offense); *United States* v. *Barret*, 824 F. Supp. 2d 419, 448-49 (E.D.N.Y. 2011) (warrant for search of cell phone affirmed with no direct tie to the phone because warrant relied on recitation of events leading to defendant's arrest and agent's training and experience). That is particularly true when viewed in light of the "deferential" review afforded to the finding of the magistrate judge who independently concluded that the Government had established probable cause to search the full contents of the Cell Phones for the material specifically identified in the warrants.

The two out-of-district, non-binding cases principally relied upon by the defendants are no different. In *United States* v. *Winn*, 79 F. Supp. 3d 904 (S.D. Ill. 2015) the defendant, who was charged with public indecency based upon a complaint that he had used his cell phone to photograph young girls without their permission, *id.* at 909, challenged the search warrant itself on the ground that it permitted agents to search the entire phone for "any and all files" relating generally to the crime of public indecency. The Court, noting that the charged conduct was a

"misdemeanor" for which it was "difficult to fathom why the police would ever need" to search

the entire phone, found that the application in that case focused squarely on photos and videos,

and "did not offer any basis – *such as facts learned during the investigation or [the affiant's]*

*training and expertise* – to believe that" the rest of the phone was "connected with [the

defendant's] act of public indecency."  *Id.* at 919-20 (emphasis added).

Here, by contrast, the crime was not an isolated incident charged as a misdemeanor but a

long running felony fraud scheme, one in which the Supporting Affidavits alleged, with

specificity, the Cell Phones' extensive use over a substantial period of time, up to the date of the

defendants' arrests.  In particular, the Supporting Affidavits here *do* allege "facts learned during

the investigation," namely, numerous recorded communications occurring over the Cell Phones

regarding the charged schemes, all of which informed the affiant's view, based on his "training

and expertise," that the phones were likely to contain additional categories of evidence.

Moreover, here, unlike in *Winn*, the warrant itself did not simply cite a statute and authorize the

seizure of anything arguably related to it, but instead described with particularity the type of

content on the phone that was within the scope of the warrant.  (*See* Person Search Warrant, Ex.

9 to Suppress Br. [Dkt. No. 58, Ex. 9] at CP_00000149-50, hereinafter "Person SW"; Michel

Search Warrant, Ex. 10 to Suppress Br. [Dkt. No. 58, Ex. 10] at RM_00000123-124, hereinafter

"Michel SW," specifically describing several illustrative categories of material to be seized as

evidence of the specified offenses.)  As such, the facts here are readily distinguishable from

those in *Winn* in every material respect.  *Cf. United States* v. *Shi Yan Liu*, 239 F.3d 138, 140 (2d

Cir. 2000) (reasoning that warrant is "sufficiently specific" if "permit[s] the rational exercise of

judgment by the executing officers in selecting what items to seize") (brackets and internal

quotation marks omitted); *Lustyik*, 57 F. Supp. 3d at 228 (finding that the inclusion in a warrant

of an illustrative "list providing examples of the items to be seized, albeit a list modified by the phrase 'including, but not limited to,' offers sufficient guidance to law enforcement officers to pass constitutional muster.").

In *In re Nextel Cellular Telephone*, No. 14 MJ 8005, 2014 WL 2898262, at *1-2 (D. Kan. June 26, 2014), a magistrate judge concluded that the Government's search warrant for various digital media lacked "particularity" principally because it failed to specify the methodology the Government would use to review the contents of media.  *See id.* at *11-12 (noting the application failed to specify "*how* the government intends" to review the data and "whether or not [the Government's search] procedures are 'computer-assisted,'" and "what kinds of third party software are used and how they are used to search for particular types of data").  But there is no requirement in the Second Circuit for setting out such a search protocol to meet the particularity requirement under the Fourth Amendment.  *See, e.g.*, *Galpin*, 720 F.3d at 451 (2d Cir. 2013) ("Unlike the Ninth Circuit, we have not required specific search protocols or minimization undertakings as basic predicates for upholding digital search warrants, and we do not impose any rigid requirements in that regard at this juncture."); *Vilar*, 2007 WL 1075041, at *38 ("[W]hile the warrant must state with particularity the materials to be seized from a computer, the warrant need not specify *how* the computers will be searched. This is the view of the vast majority of courts to have considered the question.").  Moreover, the Search Warrants did identify some of the methods that law enforcement might use to search the defendants' cell phones, which is "far more than the Constitution require[s]," and thus sufficient to uphold the Search Warrants.  *Vilar*, 2007 WL 1075041, at *38.

Accordingly, the defendants' claim that the Search Warrants lacked probable cause to support the breadth of the Search Warrants is without merit.

3.   *Law Enforcement Agents Relied in Good Faith on the Warrant*

Even assuming that the Search Warrants could be deemed overbroad or unsupported by probable cause, suppression would still be improper because the agents relied upon them in good faith.  *See generally Leon*, 468 U.S. at 922 (holding that where evidence is "obtained in objectively reasonable reliance on a subsequently invalidated search warrant," the Fourth Amendment exclusionary rule does not apply).  Accordingly, and as detailed above, the fruits of a search warrant later deemed to be insufficient will be suppressed only if "(1) the issuing judge abandoned his detached, neutral role; (2) the agent was dishonest or reckless in preparing the supporting affidavit for the wiretap order; or (3) the agents' reliance on the warrant was not reasonable."  *Bellomo*, 954 F. Supp. at 638 (citing *Leon*, 638 U.S. at 922-925).  By contrast, if "a reasonably trained officer would" not "have known that the search was illegal despite the magistrate's authorization," *Leon*, at 922 n.23, then suppression is improper.  *See also Herring* v. *United States*, 555 U.S. 135, 144 (2009) (finding that to trigger the exclusionary rule, law enforcement "conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system").

Here, there is no serious suggestion that the agents lacked a good faith belief that the warrants they sought were proper and could be relied upon to execute searches of the Cell Phones.  Nor could there be.  First, there is no suggestion that the agents misled any of the issuing judges in any respect.  Nor is there any suggestion that the issuing judge "wholly abandoned [her] judicial role."  Finally, and for substantially the same reasons, there is no basis to conclude that the warrants here "so lacked probable cause" that the agents' "reliance upon them was unreasonable."  As noted, the Supporting Affidavits and attachments in question were not only thorough and accurate, but they were approved by a magistrate judge, all facts that belie the notion that it was "unreasonable" for the agents to conclude the warrants were lawfully

issued and could be lawfully executed.[7]

As such, even assuming this Court were to find fault with the Search Warrants, there is no basis to conclude that the agents acted in "bad faith" in executing those warrants and thus no reason to suppress the fruits of those searches. *Tomero*, 462 F. Supp. 2d at 572.

## V.    CONCLUSION

For the reasons set forth above, the defendants' motions to suppress should be denied.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____/s/_____
    Robert L. Boone/Noah Solowiejczyk/
    Eli J. Mark/Aline R. Flodr
    Assistant United States Attorneys
    (212) 637-2208/2473/2431/1110

---

[7] Indeed, the reasonableness of that belief is only bolstered by the fact that the agent further knew that the Government had sought and obtained judicial authorization to intercept calls occurring over each of the defendants' Cell Phones, applications which themselves required additional and substantial probable cause findings.