**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA | 17-CR-683 (LAP) |
| -against- | |
| CHUCK CONNORS PERSON and RASHAN MICHEL, | Oral Argument Requested |
| Defendants. | |

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**THEIR JOINT MOTION TO SUPPRESS WIRETAP AND CELL PHONE EVIDENCE**

**SHER TREMONTE LLP**
Theresa Trzaskoma
Michael Tremonte
Michael W. Gibaldi
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600
ttrzaskoma@shertremonte.com

*Counsel for Chuck Connors Person*

**COOLEY LLP**
Jonathan Bach
Reed Smith
Kaitland Kennelly
1114 Avenue of the Americas
New York, New York 10036
(212) 479-6000
jbach@cooley.com

*Counsel for Rashan Michel*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................................................ii

ARGUMENT ................................................................................................................... 1

I.     THE WIRETAP INTERCEPTIONS OF DEFENDANTS' PRIVATE TELEPHONE
COMMUNICATIONS WERE UNLAWFUL AND SHOULD BE SUPPRESSED ......... 1

     A.     The December 9 Wiretap Application Did Not Allege a Wire Fraud .................... 1

     B.     The Wiretaps Were Unnecessary and Unlawful ...................................................... 2

     C.     Even if the First Wiretap Order Had Been Premised on a Wire Fraud Theory,
That Theory Was Defective .................................................................................. 5

     D.     Title III's Statutory Exclusionary Rule Contains No Good Faith Exception ......... 7

II.    THE WARRANTS TO SEIZE AND SEARCH DEFENDANTS' CELL PHONES
WERE UNCONSTITUTIONALLY OVERBROAD ......................................................... 8

     A.     The Warrants Were Facially Overbroad ................................................................ 8

     B.     All Evidence Derived from the Unlawful Searches of Defendants' Cell Phones
Must Be Suppressed ............................................................................................ 10

# TABLE OF AUTHORITIES

**Cases**

*Porcelli v. United States*,
    404 F.3d 157 (2d Cir. 2005)........................................................................ 6

*Riley v. California*,
    134 S. Ct. 2473 (2014) ............................................................................... 9

*United States v. Bershchansky*,
    788 F.3d 102 (2d Cir. 2015)...................................................................... 10

*United States v. Cirillo*,
    499 F.2d 872 (2d Cir. 1974)........................................................................ 2

*United States v. Clark*,
    638 F.3d 89 (2d Cir. 2011) ......................................................................... 8

*United States v. Concepcion*,
    579 F.3d 214 (2d Cir. 2009)........................................................................ 3

*United States v. Finazzo*,
    850 F.3d 94 (2d Cir. 2017) ......................................................................... 6

*United States v. Galpin*,
    720 F.3d 436 (2d Cir. 2013)........................................................................ 8

*United States v. Gatto*,
    295 F. Supp. 3d 336 (S.D.N.Y. 2018).......................................................... 6

*United States v. Leon*,
    468 U.S. 897 (1984)............................................................................... 7, 8

*United States v. Lilla*,
    699 F.2d 99 (2d Cir. 1983) ...................................................................... 4, 5

*United States v. Males*,
    459 F.3d 154 (2d Cir. 2006)........................................................................ 6

*United States v. Porcelli*,
    865 F.2d 1352 (1989)................................................................................. 7

*United States v. Rice*,
    478 F.3d 704 (6th Cir. 2007) ...................................................................... 7

*United States v. Ross*,
    456 U.S. 798 (1982)................................................................................... 9

*United States v. Ulbricht,*
 858 F.3d 71 (2d Cir. 2017) ............................................................................................ 8, 9

*United States v. Ulbricht,*
 No. 14-CR-68 KBF, 2014 WL 5090039 (S.D.N.Y. Oct. 10, 2014) ......................................... 8

*United States v. Walters,*
 997 F.2d 1219 (7th Cir. 1993) ................................................................................... 5, 6, 7

*United States v. Wey,*
 256 F. Supp. 3d 355 (S.D.N.Y. 2017) ................................................................................ 10

Defendants Chuck Connors Person and Rashan Michel respectfully submit this reply memorandum of law in support of their motion to suppress all communications intercepted pursuant to the Wiretap Orders, all material obtained from the search of their cell phones pursuant to the Warrants, and all evidence derived therefrom.

## ARGUMENT

## I.   THE WIRETAP INTERCEPTIONS OF DEFENDANTS' PRIVATE TELEPHONE COMMUNICATIONS WERE UNLAWFUL AND SHOULD BE SUPPRESSED

### A.   The December 9 Wiretap Application Did Not Allege a Wire Fraud

As set forth in Mr. Michel's supplemental memorandum, the government's original wiretap application did not set forth any factual basis to establish probable cause to suspect that any wire fraud was about to take place. Rather, the affidavit in support of the wiretap focused almost exclusively on a bribery scheme and then turned separately to wire fraud, which it treated in conclusory terms without discussing any facts. (Michel's Supp. Mem. at 3–4.) This factual deficit is particularly problematic because the wiretap application identified wire fraud, not bribery, as its sole "target offense."

In its response, the government attempts to overcome this deficit by asking the Court to consider the alleged bribery scheme spelled out in the warrant application as a proxy for honest services wire fraud. (Gov't Opp'n at 15–16.) The problem with this approach is that it departs from the plain language of the warrant application, which nowhere described the bribery scheme as a species of fraud. Indeed, the warrant application treated bribery and wire fraud separately and never once stated that it was relying on a theory of honest services wire fraud. To the contrary, the warrant application contained a footnote expressly disclaiming reliance on an

honest services theory of wire fraud. (*See* Ex. 1 at US_00008566 & n.1.[1])

The government also points to a handful of facts in the warrant application about the NCAA rules. These facts are recited solely with respect to the bribery scheme and not under the heading of wire fraud. In any event, these facts, without more, are wholly insufficient to establish probable cause that Defendants intended to defraud Auburn or that defrauding Auburn was ever the object of the supposed scheme. The inclusion of certain facts regarding the NCAA certification process did not, for example, establish that a scheme to defraud Auburn was afoot.

### B.     The Wiretaps Were Unnecessary and Unlawful

The December 9 Affidavit set forth a single scheme: payments by the government's cooperator Marty Blazer to Mr. Person supposedly in exchange for Mr. Person introducing Auburn basketball players to Mr. Blazer. That bribery scheme was devised by the government and implemented by Mr. Blazer. At the government's direction, Mr. Blazer surreptitiously recorded all his communications with Mr. Michel and Mr. Person, and the December 9 Affidavit described at length the content of these phone calls, text messages, and an in-person meeting.[2] Collectively, the recordings painted a complete picture of the relevant dealings among Mr. Blazer, Mr. Michel, and Mr. Person. Likewise, future acts related to the supposed bribery scheme, including any future payments to Mr. Person or any introductions of players to Mr. Blazer, would be subject to similar surveillance through the government's cooperator. Under these circumstances, where the government had a willing cooperator who was able to obtain sufficient information regarding the alleged offense, tapping Defendants' cell phones was wholly

---

[1]     The exhibits cited herein were filed under seal as attachments to the Notice of Joint Motion to Suppress Wiretap and Cell Phone Evidence, ECF No. 58.

[2]     Defendants focus on the December 9 Affidavit because defects in the government's original application taint all subsequent applications. *See United States v. Cirillo*, 499 F.2d 872, 878 n.3 (2d Cir. 1974).

gratuitous and therefore unlawful. *See, e.g.*, *United States v. Concepcion*, 579 F.3d 214, 220 (2d Cir. 2009) ("A wiretap is not a device to be turned to as an initial matter, but only where the circumstances demonstrate that it is necessary.").

In its opposition brief, the government attempts to justify its serious invasion of Mr. Michel's and Mr. Person's privacy by arguing (1) that the wiretaps of Defendants' phones were "needed to capture criminal conversations the defendants were engaged in that did not involve [Mr. Blazer]" (Gov't Opp'n at 6); (2) that other investigative methods were insufficient; and (3) that relevant, on-point precedent from the Second Circuit is distinguishable because "the December 9 Affidavit was not for a 'small-time narcotics case,' but for a complex white-collar investigation of corruption in the billion-dollar industry of college athletics perpetrated by sophisticated and publicly known figures" (*id.* at 8). None of these arguments is persuasive. Instead they confirm the obvious: the government tapped Mr. Michel's and Mr. Person's phones, not because it needed additional evidence of the arrangements between its cooperator and Mr. Person, but because the government wanted to obtain evidence of *other* potential offenses.

First, nothing in the wiretap application supports the notion that the government had cause (much less probable cause) to believe that Mr. Michel and Mr. Person were engaged in "criminal conversations" unrelated to the government's cooperator or that Defendants were committing the so-called "Chuck Person Bribery Scheme" in conversations that excluded the government's cooperator (an allegation that would be difficult to fathom given the nature of the supposed scheme). To the contrary, the only stated justification for the highly intrusive use of a wiretap on Defendants' cell phones, notwithstanding Mr. Blazer's cooperation, was that wiretaps would be necessary to uncover *additional* conduct by Defendants. Thus, the December 9 Affidavit claimed: "while the use of CW-1 has been successful in uncovering valuable evidence

regarding the scheme to pay bribes to CHUCK PERSON, the use of cooperating witnesses and confidential informants is unlikely to be sufficient to achieve the full objectives of the investigation with respect to additional schemes that PERSON and/or MICHEL are engaged in." (Ex. 1 at US_00008641.) As Defendants noted in their opening brief, the December 9 Affidavit included no factual support for this conclusory assertion of "additional schemes," and the government's opposition does not contest that position. Using a wiretap to detect *other* offenses is unlawful, and in this regard the December 9 Affidavit is no different than the defective affidavit considered in *United States v. Lilla*, 699 F.2d 99 (2d Cir. 1983). That the government can now point to evidence from the wiretaps that it may rely on in proving its bribery scheme case against Mr. Michel and Mr. Person, such as communications between Mr. Person and certain players' parents, is beside the point. The question is whether the government *needed* the wiretaps to investigate its bribery scheme – it plainly did not.

Second, there is no merit to the government's contention that the December 9 Affidavit proved necessity because it "used nearly 15 pages to explain in detail why over a dozen typical investigative methods would be inadequate in advancing the goals of the investigation." (Gov't Opp'n at 8.) The Court should not credit these boilerplate, self-serving statements regarding the insufficiency of certain other investigative methods where one particular investigative method – a cooperator taking direction from law enforcement and consensually recording every communication – was thoroughly successful. *See Lilla*, 699 F.2d at 104.

Finally, the government's efforts to distinguish this case from *Lilla* are unavailing. Just as the investigation in *Lilla* could be viewed as occurring in the multi-billion-dollar narcotics industry, so too can the supposed scheme involving Mr. Person be viewed as taking place within the "billion-dollar industry of college athletics." The principal problem in both cases is the same:

the wiretap applications alleged a single, narrow scheme already known to the government. The only additional evidence the wiretaps would reveal was evidence of other potential crimes that the government suspected might exist but did not have probable cause to believe in fact occurred or were occurring. Likewise, the investigation related to Mr. Person was hardly "a complex white-collar investigation" requiring the government to unravel a labyrinthine paper trail. To the contrary, the investigation of this case more closely resembled the narcotics investigation described in *Lilla*, in that the government relied primarily on cooperating witnesses and recorded conversations. In any event, the comparative significance of a particular case does not warrant relaxation of the stringent requirements of the Wiretap Act.

### C.   Even if the First Wiretap Order Had Been Premised on a Wire Fraud Theory, That Theory Was Defective

Defendants have already explained at length the legal deficiencies in the government's wire fraud, honest services fraud, and the Travel Act charges in their separate motion to dismiss papers.[3] For brevity's sake, we focus here on the government's now-discarded theory of wire fraud, which was the only target offense even conceivably identified in the first wiretap application.[4] (*See* Ex. 1 at US_00008565 (describing target offenses as "wire fraud, and conspiracy to do the same".)

The government's old wire fraud theory hinged on alleged payments to players and the theory that Auburn was deprived of its intangible right to control the allocation of its scholarships to men's basketball players. This was the very same theory of wire fraud that the Seventh Circuit rejected in *United States v. Walters*, a case that involved a defendant's effort to

---

[3]      Mr. Person and Mr. Michel adopt all arguments set forth in those memoranda of law to the extent applicable to this motion. (*See* ECF Nos. 46, 55, 84, 89.)

[4]      The application contained no facts that could have supported the new theory of wire fraud premised on Mr. Person's receipt of a salary.

5

sign college football players to agency contracts (in violation of NCAA rules). *See* 997 F.2d 1219, 1224–27 (7th Cir. 1993). In the wiretap applications, as in *Walters*, the connection between Defendants' alleged gain and Auburn University's purported loss of control over its scholarship money was far too attenuated to establish probable cause to believe a wire fraud was being committed. The government's opposition does not meaningfully grapple with the issue of attenuation discussed in *Walters*.

Instead, the government attempts to dismiss *Walters* out of hand by citing to Judge Kaplan's recent decision in one of the companion NCAA cases and asserting that "a defendant in this circuit does not need to literally 'obtain' money or property to violate the mail and wire fraud statutes." *United States v. Gatto*, 295 F. Supp. 3d 336, 344 (S.D.N.Y. 2018) (brackets, citations, and quotation marks omitted). (*See* Gov't Opp'n at 13.) Judge Kaplan's opinion in *Gatto* cites a trio of Second Circuit decisions in its discussion of wire fraud: *Porcelli v. United States*, 404 F.3d 157 (2d Cir. 2005) ("*Porcelli IV*"); *United States v. Males*, 459 F.3d 154 (2d Cir. 2006); and *United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017).[5] *Walters* is entirely consistent with these decisions. Notably, the Second Circuit discussed the import of *Walters* in its *Males* decision: "without a showing of the defendant's intent to obtain money or property from the universities or the NCAA, the necessary connection between his actions and his victims' property was too attenuated to establish mail fraud." 459 F.3d at 159. While the Second Circuit held that such attenuation did not exist in the case before it, the Second Circuit in no way

---

[5]     At oral argument on the defendants' motions to dismiss in *Gatto*, Judge Kaplan speculated that, in the context of the sorts of recruiting violations alleged in that case, the government could potentially prove a wire fraud by establishing that the coach was motivated by a bonus he stood to earn if his team performed well. *See* Tr. of Oral Argument at 4:11–25, *United States v. Gatto*, No. 17 Cr. 686 (LAK) (S.D.N.Y. Feb. 15, 2018), ECF No. 109. In that case, then, Judge Kaplan could see a way for the government to prove an intent to obtain money or property from the relevant universities. This case is not a recruiting case, and there is no conceivable theory under which the scheme alleged in this case involved any effort to obtain money or property from Auburn.

rejected the logic of *Walters*. Additionally, the Second Circuit has consistently held that, to prove mail or wire fraud, the government must prove "that a defendant's scheme was intended to deprive another of property rights." *Id.* at 158; *see also United States v. Porcelli*, 865 F.2d 1352, 1361 (1989) ("*Porcelli I*") (affirming mail fraud conviction where "Porcelli's conduct, in short, was aimed at depriving the State of its property"). This element cannot be satisfied where the Defendants' alleged gain is completely separate from the university's purported loss of control over its scholarship money.

It is within this context – a vulnerable wire fraud theory expressly rejected by the Seventh Circuit – that the government's abandonment of its original wire fraud theory in the Superseding Indictment carries significance. If the original wire fraud theory is fatally flawed, the original wiretap was unlawful.

## D.    Title III's Statutory Exclusionary Rule Contains No Good Faith Exception

Because Title III contains its own exclusionary rule, the good faith exception to the Fourth Amendment exclusionary rule adopted in *United States v. Leon*, 468 U.S. 897 (1984), does not apply to wiretap orders that violate the statute. As the Sixth Circuit noted, the Fourth Amendment exclusionary rule "is a judicial remedy"; thus, it falls within the judiciary's power to balance the social costs and benefits of the exclusionary rule in fashioning a good faith exception. *See United States v. Rice*, 478 F.3d 704, 712 (6th Cir. 2007). Title III, by contrast, is statutory, and both "[t]he language and legislative history of Title III strongly militate against engrafting the good-faith exception into Title III warrants." *Id.* Moreover, the legislative history of Title III suggests that Congress intended to codify the exclusionary rule *as it existed in 1968 –*

well before *Leon* created the good faith exception. *See id.* at 713. Critically, the Second Circuit

has *never* held that a good faith exception should be imported into Title III.[6]

## II.   THE WARRANTS TO SEIZE AND SEARCH DEFENDANTS' CELL PHONES WERE UNCONSTITUTIONALLY OVERBROAD

### A.   The Warrants Were Facially Overbroad

The government contends that authorization to seize and search the entirety of

Defendants' cell phones was appropriate because there was probable cause to believe that

Defendants' cell phones contained evidence of a crime. (*See* Gov't Opp'n at 22–25.) The

government claims support for its position in case law holding that it is "'perfectly appropriate to

search the entirety of a premises or object as to which a warrant has issued based on probable

cause, for specific evidence as enumerated in the warrant, which is then to be seized.'" (*Id.* at 23

(quoting *United States v. Ulbricht*, No. 14-CR-68 KBF, 2014 WL 5090039, at *14 (S.D.N.Y.

Oct. 10, 2014), *aff'd*, 858 F.3d 71 (2d Cir. 2017)).)

The government misapprehends the overbreadth doctrine. It is axiomatic that the scope of

a warrant's authorization to search a particular place may not exceed the probable cause upon

which the warrant is based. *See, e.g.*, *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013).

Of course, the government correctly observes that probable cause may exist to search a large

area, such as the entirety of a home. *See, e.g.*, *United States v. Ulbricht*, 858 F.3d 71, 102 (2d

Cir. 2017) (noting that "a warrant may allow the government to search a suspected drug dealer's

entire home *where there is probable cause to believe that evidence relevant to that activity may

be found anywhere in the residence*" (emphasis added)). But probable cause always limits the

---

[6]       Even if the good faith exception did apply to unlawful wiretaps, the government would bear the burden "'to demonstrate the objective reasonableness of the officers' good faith reliance' on an invalidated warrant." *United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011) (quoting *United States v. George*, 975 F.2d 72, 77 (2d Cir. 1992)). The government's superficial treatment of the good faith exception does not come close to meeting that burden.

area to be searched; thus, "probable cause to believe that a stolen lawnmower may be found in a garage will not support a warrant to search an upstairs bedroom." *United States v. Ross*, 456 U.S. 798, 824 (1982). By analogy, probable cause to believe that evidence of a crime may be found in the phone or text message applications of a cell phone cannot support a warrant to search the cell phone's internet browsing history, photographs, videos, or personal notes.

The Warrants at issue here were unconstitutionally overbroad under the relevant standard. The warrant applications established at most probable cause to believe that evidence of a crime would be found in the phone and text message applications of Defendants' cell phones. The applications did *not* establish probable cause to believe that evidence of a crime would be found in Defendants' internet browsing history, photographs, videos, personal notes, or any place other than their phone and text message applications.[7] Nevertheless, the Warrants themselves did not limit law enforcement's review to those places of Defendants' cell phones, but instead authorized broad searches of Defendants' entire phones.

FBI Special Agent Anthony Lupinacci's affidavit describing how he "and other law enforcement agents" executed the Warrants is irrelevant. (*See* Lupinacci Aff. ¶ 6, ECF No. 97-1.) Defendants have challenged the facial validity of the Warrants, not their execution. *See, e.g.*, *Ulbricht*, 858 F.3d at 103. If anything, Special Agent Lupinacci's affidavit demonstrates the danger of an overbroad warrant; it confirms that, pursuant to the Warrants, law enforcement

---

[7]     The government asserts without any explanation that "[t]he existence of numerous calls in furtherance of the charged schemes made over the Cell Phones certainly supports the 'practical, commonsense decision' that phones could contain evidence of those crimes, including in mediums beyond records of the phone calls and text messages themselves." (Gov't Opp'n at 25.) But the government does not – because it cannot – explain why the mere existence of phone calls in furtherance of the charged scheme necessarily means that photographs or videos, among other plainly irrelevant materials found on a modern cell phone, would also contain evidence of a crime. The government's simplistic assessment of a cell phone's contents betrays (or feigns) shocking ignorance about the nature of modern cell phones, which are more akin to minicomputers than traditional telephones. *See Riley v. California*, 134 S. Ct. 2473, 2489 (2014).

agents have searched Mr. Person's internet history and photographs, among other categories of information stored on Mr. Person's cell phone.[8] (*See* Lupinacci Aff. ¶ 11.) Yet the search warrant applications contained no facts, let alone probable cause, to believe that contraband or evidence of a crime would be found in Mr. Person's internet browsing history or personal photographs. Without probable cause to search those places, the government had no business conducting even cursory searches of those private areas of Mr. Person's cell phone.

**B.    All Evidence Derived from the Unlawful Searches of Defendants' Cell Phones Must Be Suppressed**

Because the Warrants in this case were patently overbroad, law enforcement could not reasonably have relied upon them, and the good faith exception to the exclusionary rule cannot apply. *See, e.g.*, *United States v. Wey*, 256 F. Supp. 3d 355, 396–409 (S.D.N.Y. 2017). The existence of the Wiretap Orders, which the government cites as support for law enforcement's reasonable reliance on the Warrants, has no bearing on this inquiry. (*See* Gov't Opp'n at 30 n.7.) While law enforcement may have been aware that Wiretap Orders issued upon a finding of probable cause, the existence of probable cause to tap Defendants' phones could not, on its own, justify the search of Defendants' internet browsing history, pictures, and personal notes, among other personal items stored on their cell phones.

Accordingly, all evidence seized pursuant to the unconstitutional Warrants, as well as all evidence derived from such evidence, must be suppressed. *See, e.g.*, *United States v. Bershchansky*, 788 F.3d 102, 112 (2d Cir. 2015) ("Exclusion extends to both physical evidence and indirect products of unlawful searches . . . .").

---

[8]    Apparently, law enforcement has been unable to open Mr. Michel's cell phone. (*See* Lupinacci Aff. ¶ 7.) Nevertheless, Mr. Michel moves to suppress any evidence obtained from his cell phone to the extent the government has already obtained, or obtains in the future, any such evidence.

**CONCLUSION**

For the foregoing reasons, and for the reasons set forth in their initial memorandum of law and supplemental memoranda of law, Defendants Chuck Connors Person and Rashan Michel respectfully move for an order suppressing all communications intercepted pursuant to the Wiretap Orders, all material obtained from the searches of their cell phones, and all evidence derived therefrom.

Dated:  New York, New York
        September 14, 2018

<div style="margin-left: 50%;">

Respectfully submitted,

*/s/ Theresa Trzaskoma*

SHER TREMONTE LLP
Theresa Trzaskoma
Michael Tremonte
Michael W. Gibaldi
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600
ttrzaskoma@shertremonte.com

*Counsel for Chuck Connors Person*

COOLEY LLP
Jonathan Bach
Reed Smith
Kaitland Kennelly
1114 Avenue of the Americas
New York, New York 10036
(212) 479-6000
jbach@cooley.com

*Counsel for Rashan Michel*

</div>

11