UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

UNITED STATES OF AMERICA         :

    -v.-                                :       17 Cr. 683 (LAP)

RASHAN MICHEL,             :

                   Defendant.     :

------------------------------------------------------------------x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York

Robert L. Boone
Aline R. Flodr
Noah Solowiejczyk
Eli J. Mark
Assistant United States Attorneys

- Of Counsel -

**PRELIMINARY STATEMENT**

The Government writes in advance of the sentencing of defendant Rashan Michel, which is currently scheduled for October 17, 2019, at 10:00 a.m.  On May 7, 2019, the defendant pled guilty to conspiracy to commit federal funds bribery in violation of Title 18, United States Code, Section 371.  The defendant pled guilty pursuant to a plea agreement, which contained a stipulated Guidelines range of 12 to 18 months' imprisonment.  For the reasons discussed below, the Government respectfully submits that a sentence that includes a term of incarceration is appropriate in this case and would be sufficient but not greater than necessary to promote the legitimate ends of sentencing.

**BACKGROUND**

**A.  The Defendant's Offense Conduct**

As detailed in the Presentence Investigation Report ("PSR"), the Complaint, and the Indictment,  Michel, an Atlanta-based clothing business owner, facilitated cash bribes to his co-defendant Chuck Connors Person, a college basketball coach at Auburn University, in exchange for Person agreeing to steer players he coached to retain the services of Michel and a financial advisor.  Michel participated in the charged scheme from in or about September 2016 to in or about September 2017, and, in return for his role in facilitating the payment of bribes to Person, received approximately $24,000 in payments himself during that time period.  In particular, and consistent with the corrupt agreement described above, Michel told Martin Blazer,[1] the Government's cooperating witness who was posing as a financial advisor in the scheme, that Michel could introduce Blazer to several college basketball coaches, including Person, who would be willing to accept cash bribes from Blazer.  In particular, Michel took the following

---

[1] Referred to in the Complaint as CW-1.

specific steps:  (1) Michel, who had a preexisting relationship with Person, arranged a meeting to introduce Blazer to Person and to facilitate the ability of Blazer to provide cash bribes to Person; (2) Michel and Blazer met with a basketball player from Auburn University ("Player-1"), in connection with Person's attempt to influence that player to retain the services of Michel and Blazer; (3) Michel arranged for Blazer to meet a member of the athletics department of a NCAA Division I basketball program (referred to in the Complaint as, "Staff Member-1"), to engage in a similar bribery arrangement whereby in exchange for cash bribes, Staff Member-1 would attempt to influence student-athletes from Staff Member-1's university to retain the services of Blazer; (4) Michel arranged for Blazer to meet Staff Member-1 and the father of a highly regarded incoming freshman ("Father-1") at Staff Member-1's university, in connection with Staff Member-1's attempt to influence Father-1 to retain the services of Blazer for his son; and (5) Michel encouraged and facilitated the payment of bribes by Blazer to Person and Staff Member-1.

In 2016, Blazer was introduced to Michel through a mutual friend who was a sports agent ("Sports Agent-1").  Before being introduced to Michel, Blazer had told Sports Agent-1 that Blazer was willing to pay college coaches who, in exchange, would use their influence over student-athletes to cause those student-athletes to retain Blazer's services as a financial advisor, and Sports Agent-1 told Blazer that Michel had a connection to a basketball coach at Auburn. (Compl. ¶ 31.)  Following their introduction, Blazer and Michel engaged in a series of recorded telephone calls, in which Michel ultimately told Blazer that he had a relationship with Person, who was an associate head basketball coach for Auburn at the time, that Person needed money, and that in exchange for receiving money from Blazer, Person would agree to steer student-athletes from Auburn's basketball team to retain the services of Michel and Blazer.  (Compl. ¶

32.)  Michel also generally spoke with Blazer about other college basketball coaches who would be willing to engage in a similar bribery scheme.  For example, on or about September 8, 2016, Michel told Blazer that he could introduce Blazer to several basketball coaches who would accept bribes to steer their athletes to Blazer's services, including a college basketball coach at Auburn, who was later identified as Person.  In particular, Michel explained that "the good thing about it is, I got all the college coaches right now because, guess what, I'm the one that's with them. . . . I make all their suits," and that "the fucking basketball guys [get] way more money than these fucking football guys. . . . we can get us God damn 10 basketball players in the next 5 years and we gonna . . . have to sit back and do absolutely nothing."  (Compl. ¶ 33(a).)  During that same call, Michel informed Blazer that Person[2] was in need of a $60,000 loan and that in exchange for the loan, that coach could "give us 2 or 3 kids that's all coming out of his program."  (Compl. ¶ 33(b).)

Following that initial call about Person in September 2016, Michel and Blazer continued to discuss the purported loan payment to Person.  Michel and Blazer further discussed forgiving the purported loan by allowing Person to "offset" the amount he owed to Blazer each time Person successfully directed a student-athlete to retain Blazer's services as a financial advisor and business manager, and Michel's services a clothier.  (Compl. ¶ 34.)  Over the course of their discussions, Michel emphasized to Blazer that the bribes needed to be concealed to protect Person "because [PERSON's] got a chance of being a head coach and I don't need nothing to come back to haunt."  (Compl. ¶ 35(b).)  Michel elaborated that in order to conceal the true nature of their bribery scheme with Person, they would need to reduce the loan terms to writing

---

[2] Person was subsequently identified as the basketball coach Michel was referring to during the call on September 8, 2016.

in the form of a promissory note, but that the "only part that won't be in writing is [] that if he delivers . . . delivers a kid, you know, what we willing to do for him."  Michel advised Blazer that, by reducing the loan to writing, they would make the transaction appear "the right way" and "clean," so that "it don't hurt nobody."  (Compl. ¶ 35(d).)  Michel further noted, however, that the unwritten terms of the loan would be "understood" among the parties because "why would I give [Person] the money if that's not understood?  I don't need to put 50,000 thousand dollars out just to be, to put it out and make 10%. I can do that anyway."  (*Id.*)

On or about November 29, 2016 (the "November 29th meeting"), Person, Michel, and Blazer, met at a restaurant near the campus of Auburn University.  (Compl. ¶ 36.)  The purpose of the meeting was for Michel to introduce Person to Blazer so Blazer could begin making bribe payments to Person.  (*Id.*)  At the November 29th meeting, Michel explained to Person the general parameters of the "loan," including that the purported loan payments would be "offset" by the basketball players that Person steered to them.  (Compl. ¶ 36(c).)  Specifically, Michel discussed how the purported loan payments would be "offset" by the student-athletes that Person steered to them in noting that "what we gonna do is, every time you send me a kid, I'm gonna offset some of that money I gave you. . . . You good with that?"  (*Id.*)  Person confirmed that he agreed with the arrangement, stating he was "good with it."  (*Id.*)  At the conclusion of the November 29th meeting, Person asked if he could receive $10,000 that day, rather than an initial payment of $5,000 that had been previously discussed by Michel and Blazer.  Michel provided Person with an envelope containing $5,000,[3] and Blazer agreed to wire an additional $5,000 to Person's bank account.  (Compl. ¶¶ 36(d) and 37.)  Person, Michel and Blazer also agreed that

---

[3] Prior to the meeting, Blazer had provided the envelope containing $5,000 in cash to Michel at the direction of law enforcement.

Person would receive the balance of the bribe payments in three $15,000 increments, payable on the 15th of each month.  (*Id.*)

Almost immediately following the November 29th meeting, Person began touting his ability to steer players to Blazer in exchange for cash.  Indeed, just one day after the November 29th meeting, Person talked to Blazer on a recorded telephone call about setting up a meeting between Blazer and the mother of Player-1.  (Compl. ¶ 38.)  Person told Blazer that he met with Player-1 every week at his mother's house, and that Player-1 "listens to one person.  He listens to one person . . . That's me, yep."  (*Id.*)  Person suggested that Blazer meet with Player-1's mother after an upcoming game in New York City.  (*Id.*)  Person then confirmed that Blazer was going to pay him the next installment of the bribe payment on the agreed upon schedule, asking "you're gonna – you're gonna give me 10 today, and then 15, 15, 10, correct?"  (*Id.*)

Ultimately, Person did set up a meeting between Blazer, Michel and Player-1 and used his influence to steer that player to retain the services of Blazer and Michel.  On December 12, 2016, Person, Blazer, Michel, and Player-1 met in a hotel room in Manhattan, New York.  (Compl. ¶ 42.)  Auburn's basketball team was in New York City that day to play a basketball game at Madison Square Garden.  (*Id.*)  During the meeting, Person explained that he had told Player-1 and his mother that Blazer was a financial advisor.  (Compl.  ¶ 42(a).)  Person then told Player-1 that he and Blazer would ultimately "sit down with your mom and we'll come up with something.  We can help you out."  (*Id.*)  Person concluded their discussion by cautioning Player-1 against telling others about what they discussed and the fact that Player-1 would be receiving money from Blazer.  Person stated, "most important part is that you . . . don't say nothing to anybody . . .  that's very important cause this is a violation  . . . of rules, but this is how the NBA players get it done, they get early relationships, and they form partnerships, they

form trust, you get to know [Blazer], you get to know Rashan [Michel] a lot and like Rashan can

get you suits and stuff . . . you'll start looking like an NBA ball player, that's what you are."

(Compl.  ¶ 42(c).)  During the December 12, 2016, meeting, outside the presence of Player-1,

Blazer gave Person approximately $15,000 in cash at the direction of law enforcement.  (Compl.

¶ 42(d).)

       In addition to brokering the bribery scheme with Person, Michel solicited payments for

himself from Blazer for introducing Blazer to other basketball coaches at NCAA Division I

universities who were interested in accepting bribe payments in exchange for steering their

players to retain Blazer upon becoming a professional.  For example, on or about January 5,

2017, Michel and Blazer met at a restaurant in Atlanta, Georgia and discussed, among other

things, Michel's proposal that Blazer pay him on a monthly basis in exchange for which Michel

would introduce Blazer to additional college coaches who wished to accept bribes from Blazer.

(Compl. ¶ 54.)  On or around May 3, 2017, Michel arranged for Blazer to meet Staff Member-1,

an individual who at the time was a member of the athletics department's basketball program at

an NCAA Division I university.  (Compl. ¶ 55.)  During that meeting, Blazer asked Staff

Member-1 whether Staff Member-1 had the ability to influence college basketball players at

Staff Member-1's university to retain Blazer's services, and Staff Member-1 responded that "if

access and relationships and leading to where you need to be and, you know, helping with that . .

. yeah, I can absolutely do that.  . . . but at the same time . . . I have to be very conscious of all

things that I do touch, not to put me in certain things and be in a position where we jeopardize

that as well, because the moment that happens, there's no access."  (Compl. ¶ 55(a).)  Before the

conclusion of their meeting, Blazer made a $5,000 payment to Staff Member-1 and a $2,000

payment to Michel.

After meeting with Staff Member-1, on or about July 24, 2017, Michel met with Blazer and a law enforcement agent working in an undercover capacity ("UC-1"), who was posing as Blazer's business partner, in Manhattan, New York.  At the meeting, UC-1 provided Michel with $10,000 intended for Staff Member-1, and also paid Michel $12,500 for his continued recruitment of Staff Member-1 and others to receive bribes in exchange for directing student-athletes to Blazer and UC-1.  (Compl. ¶ 55(b).)

Ultimately, Michel did set up a meeting between Blazer, Michel, Staff Member-1 and the father of a highly regarded incoming freshman basketball player at Staff Member-1's university ("Father-1") in order to influence Father-1 to retain the services of Blazer for his son.  On August 31, 2017, Michel, Blazer, Staff Member-1 and Father-1 met at a restaurant in Atlanta, Georgia. (Compl. ¶ 55(c).)  During that meeting, Michel texted Blazer that they should leave the table and go to the bathroom, so that Staff Member-1 could speak to Father-1 about retaining Blazer. Once inside the restaurant bathroom, Blazer gave Michel approximately $10,000 in cash to give to Staff Member-1 for his efforts to steer Father-1's son to retain Blazer's financial services. (*Id.*)

During the course of the charged scheme, Michel received approximately $49,000 in total from Blazer.  (Compl. ¶ 57.)  Of the total amount he received, Michel claimed to Blazer to have given approximately $20,000 to Staff Member-1 and approximately $5,000 to the mother of another student-athlete.[4]  (*Id.*)

**The Charges and The Defendant's Guilty Plea**

Indictment S1 17 Cr. 683 (LAP) charged Person and Michel in multiple counts with participation in the bribery scheme described above.  On May 7, 2019, the defendant pleaded

---

[4] Referred to in the Complaint as Mother-2.

guilty to Count One of the Indictment, which charged conspiracy to commit bribery, in violation of 18 U.S.C. § 371, and he also agreed to forfeiture of $24,000.

### B.  The Applicable Guidelines

As set forth in the parties' plea agreement and by the Probation Office, the base offense level is 12; a two level increase is warranted pursuant to U.S.S.G. § 2C1.1(b)(1) because the offense involved more than one bribe; a four-level increase is warranted pursuant to § 2C1.1(b)(2) because the value of the payments made as part of the offense exceeded $15,000 but was less than $40,000; a two-level decrease was warranted because the defendant was a minor participant in the offense pursuant to U.S.S.G. § 3B1.2(b); and a three-level decrease is warranted pursuant to U.S.S.G. § 3E1.1(a) and (b) due to the defendant's acceptance of responsibility, resulting in a total offense level of 13.  (PSR ¶ 66-76).  The defendant has zero criminal history points and is in Criminal History Category I.  (PSR ¶ 81).  Accordingly, the applicable Guidelines range is 12 to 18 months' imprisonment. (PSR ¶ 126).

The Probation Department has recommended that Michel be sentenced to time served.

### DISCUSSION

As the Court is aware, the Sentencing Guidelines still provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).  Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings.  *Id*. at 49. After that calculation, however, the Court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the history and characteristics of the defendant, the need to adequately deter criminal conduct

and promote respect for the law, and the need to protect the public from further crimes of the defendant. *Id.* at 50 & n.6.

Here, the Government respectfully submits that a sentence that includes a term of incarceration is appropriate and would meet the objectives set forth in 18 U.S.C. § 3553(a), given (1) the nature and circumstances of the offense; and (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and (B) to afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(1), (2)(A)-(B).

A.  The Nature and Seriousness of the Offense

With respect to the nature and circumstances of the offense, Michel's conduct was undoubtedly serious.  Michel facilitated and attempted to facilitate bribe payments to Person and other basketball coaches at NCAA Division I universities who were interested in accepting bribe payments from Blazer in exchange for influencing their young players to sign with Blazer. Given his extensive experience in college basketball,[5] Michel knew that the bribery schemes he was facilitating were clear cut and serious NCAA rules violations and, most importantly, that young student-athletes were being exploited as a result.  Receiving any single payment in furtherance of a bribery scheme in and of itself is serious and merits punishment.  In this case, Michel received multiple payments, over time, as part of an ongoing corrupt arrangement in which he was expected to – and manifested a clear willingness to – facilitate meetings among coaches and student-athletes in order to inappropriately pressure those student-athletes to accept

---

[5] As detailed in the PSR, from 2006 to 2017 Michel served as "a part-time, independently contracted, college referee."  (PSR ¶ 116).  Moreover, from 1993 to 1997, Michel officiated college and National Basketball Association ("NBA") minor league games, and from 1997 to 2001, Michel was a full-time referee for the NBA.  (*Id.* ¶¶ 116-117; *see also* Def. Br. 3-4).

the services of unsavory advisors.  Moreover, Michel himself benefited directly and substantially

from the conduct, soliciting $24,000 in personal payments from Blazer for his role in the scheme.

That conduct, and the ease with which Michel engaged in it – merits serious punishment.

      In his submission, Michel tries to minimize the seriousness of his conduct in multiple

respects.  For example, Michel claims, among other things, that (1) Blazer was the one who

initiated Michel's offense conduct (Def.'s Br. 1, 8); (2) Michel initially expected that Blazer

would make "Person a *bona fide* loan and that Person would repay his debt to Rashan out of the

loan" (*id.* at. 8); (3) Michel's role in the scheme was limited and ultimately not essential (*id.* at

9); and (4) Michel was not bound by the NCAA Rules, did not owe a duty of loyalty to an

institution, nor did he have a relationship of trust and confidence with college athletes (*id.*).

      First, as the Complaint makes clear, the idea of loaning Person money in exchange for

Person referring Auburn basketball players to retain Blazer's services originated from Michel.

Indeed, prior to Michel introducing Blazer to Person at the November 29th meeting, Blazer had

never spoken to Person before.  As stated earlier, just prior to the November 29th meeting,

Michel informed Blazer that he knew a college basketball coach, later identified as Person, who

was in need of a $60,000 loan and that in exchange for the loan, that coach could "give us 2 or 3

kids that's all coming out of his program."  (Compl. ¶ 33(b).)  As Michel emphasizes in his

submission, Michel "had sold suits to Person on credit and Person owed [Michel] a substantial

debt," and Michel used the opportunity with Blazer to recoup a preexisting debt and make money

from the student-athletes that Person would pressure to use the services of Blazer and Michel.

(Def.'s Br. 8.)  As Michel himself explained to Blazer, his motivation for facilitating their

bribery scheme was the profitable return he expected from the student-athletes that Person would

steer toward Blazer and Michel.  Indeed, according to Michel, through their scheme, they would

be able to get "10 basketball players in the next 5 years and we gonna . . . have to sit back and do absolutely nothing." (Compl. ¶ 33(a).)  Accordingly, any claim that the Government initiated Michel's criminal actions or that Michel agreed to participate in the scheme only to recoup his loan to Person is false.

Second, it was abundantly clear, that Michel's greed and disregard for the student-athletes that he would affect through his actions extended beyond facilitating Blazer's meeting with Person.  Indeed, soon after Michel stopped being the intermediary between Blazer and Person, Michel solicited payments from Blazer for introducing Blazer to other basketball coaches at NCAA Division I universities who were interested in accepting bribe payments from Blazer.  In particular, Michel proposed that Blazer pay him on a monthly basis in exchange for which Michel would introduce Blazer to additional college coaches who wished to accept bribes from Blazer.  (Compl. ¶ 54.)  Michel did not just agree to do this—he actually took action for the money he received, including by arranging a meeting for Blazer to meet Staff Member-1, an individual who at the time was a member of the athletics department's basketball program at an NCAA Division I university, and brokering a bribery scheme with Staff Member-1 that was of the same ilk as the one with Person.  (Compl. ¶ 55.)  As with Person, the arrangement, as brokered and facilitated by Michel, was that Blazer would be giving bribe payments to Staff Member-1 in exchange for Staff Member-1 agreeing to influence players at Staff Member-1's school to retain Blazer.  Ultimately that bribery scheme that Michel was paid to arrange bore fruit as weeks before Michel's arrest, Michel arranged a meeting between Blazer, Michel, Staff Member-1 and the father of a highly regarded incoming freshman basketball player at Staff Member-1's university in order to influence Father-1 to retain the services of Blazer for his son. (Compl. ¶ 55(c).)  During that meeting, Michel texted Blazer that they should leave the table and

go to the bathroom, so that Staff Member-1 could speak to Father-1 about retaining Blazer. Once inside the restaurant bathroom, Blazer gave Michel approximately $10,000 in cash to give to Staff Member-1 for his efforts to steer Father-1's son to retain Blazer's financial services. (*Id.*). As such, any argument that Michel's role was not essential to both the corrupt schemes with Person and with Staff Member-1 is without merit.[6]

Finally, any suggestion that Michel deserves leniency because he did not owe a duty of loyalty to any of the victim universities nor did he have a relationship of trust and confidence with the student-athletes who Michel intended to exploit for his own personal profit is beside the point. As Michel admits, during the course of the bribery scheme at issue, he was an experienced and knowledgeable actor in the world of basketball (Def. Br. 3-4.), and as such he was well aware that the bribery schemes that he facilitated exposed the universities to significant sanctions from the NCAA and these student-athletes to serious eligibility issues, which could have jeopardized their careers in basketball. Motivated by personal profit and the potential for future business success, Michel chose to engage in these bribery schemes in spite of the significant risks to the universities and these student-athletes and such conduct merits significant punishment.

B. <u>Deterrence</u>

Beyond the seriousness of the offense, deterrence militates in favor of a Guidelines sentence. While the Government is prepared to accept Michel's representation that further specific deterrence is unnecessary, general deterrence, in particular, is an important factor that the Court should consider in imposing sentence. With respect to deterrence, in imposing a

---

[6] Moreover, his relative status in the scheme compared to his co-defendant Person has already been taken into account in the Guidelines calculation as Michel was given a 2-level reduction for his status as a "minor participant" in the offense pursuant to U.S.S.G. § 3B1.2(b). (PSR ¶ 70.)

Guidelines sentence, the Court will send a clear message that bribing college basketball coaches to pressure their student-athletes to engage the services of bribe-paying advisors is not only wrong, but will carry significant consequences.  The series of cases, this one among them, charged by the Government in 2017 makes clear that such a message is necessary if the justice system is to have any impact on corruption in college athletics.  And it is particularly necessary to deter individuals from preying on student-athletes and their families for their own personal gain.  The non-incarceratory sentence sought by the defendant would simply be inadequate to promote the interests of general deterrence in an industry in need of a clear message to the contrary.

With respect to deterrence, Michel argues that his own public humiliation, his loss of income from his role as a college basketball referee, and the loss of goodwill and revenue for his clothing business are sufficient punishment in light of his role in the offense conduct. (Def. Mem. at 12).  While the Government does not dispute that Michel has suffered collateral consequences as a result of this prosecution, those collateral consequences are more relevant to specific as opposed to general deterrence and, in any event, the collateral consequences for white-collar defendants like Michel are commonplace and do not, in and of themselves, justify a non-custodial sentence.  *See United States v. D'Amico*, 496 F.3d 95, 107 (1st Cir. 2007) (vacating former city councilor's four-month sentence for Hobbs Act extortion and false statements offenses, which sentence varied downwardly 88% from a Guidelines range of 31 to 44 months, where the variance was premised significantly on the collateral consequences of conviction faced by the defendant), *vacated on other grounds by* 552 U.S. 1173 (2008); *id.* at 106-07 (noting that giving substantial variances in sentencing to white collar defendants who "often have achieved more tangible successes than other defendants . . . will inevitably lead to

13

sentencing courts treating white collar defendants more leniently (in the relative sense) simply because of their societal status -- a result that would be contrary to one of Congress' primary objectives in enacting the current federal sentencing scheme"); *United States v. Rattoballi*, 452 F.3d 127, 135 (2d Cir. 2006) (noting that "[e]very convicted felon suffers from the indignity and ill-repute associated with a criminal conviction," and that reliance on such so-called "collateral consequences is contrary to 18 U.S.C. § 3553(a)(6), which calls for a reduction in unwarranted disparities among similarly situated defendants"). Accordingly, although the Court should take into account the collateral consequences Michel has had to endure due to his criminal prosecution, these factors do not diminish the seriousness of his offense conduct or justify a non-incarceratory sentence.

## CONCLUSION

For the aforementioned reasons, the Government respectfully submits that a sentence that includes a term of incarceration is appropriate in this case and sufficient but not greater than necessary to promote the legitimate ends of sentencing.

Dated: New York, New York
   October 11, 2019

            Respectfully submitted,

            GEOFFREY S. BERMAN
            United States Attorney

      By:  s/ Aline R. Flodr
            Robert L. Boone
            Aline R. Flodr
            Noah Solowiejczyk
            Eli J. Mark
            Assistant United States Attorneys
            (212) 637-2208/1110/2473/2431