

Jonathan P. Bach
jbach@shapiroarato.com
Direct: 212-257-4897

October 15, 2019

<u>VIA ECF</u>

The Honorable Loretta A. Preska
United States District Court
  for the Southern District of New York
500 Pearl Street
New York, NY 10007

Re:   <u>United States v. Rashan Michel, 17 Cr. 683 (LAP)</u>

Dear Judge Preska:

      In its Sentencing Memorandum of October 11, 2019, the Government undertakes to describe various aspects of the conduct underlying the crime to which our client, Rashan Michel, has pleaded guilty. Rashan has accepted full responsibility for such conduct and regards it with shame and regret. He understands that there is no excuse for it, and he offers none. Moreover, as his lawyers, we understand that the Government is a respectable and formidable advocate, and that, consistent with its understanding of its obligations, it has submitted a sentencing memorandum that attempts to highlight what may be viewed as some of the more disturbing aspects of his conduct. Nevertheless, we are concerned that the image presented by the Government may obscure some of the facts of this case. We therefore wish to make the following points in brief reply to the Government's memorandum:

- This is not a case in which the Government received a tip that the defendants were engaged in bribery and then set up a covert operation to catch the criminals. Rather, the Government's cooperating witness, Martin Blazer, reached out to Rashan and introduced the prospect of committing the crimes at issue.

- Rashan and Coach Chuck Person had never previously exchanged funds in any illicit manner. It is true that Coach Person owed Rashan a debt, and that Rashan was interested in finding a means to have that debt paid down. But the financial relationship between the two men had, until this point, been based on nothing less than above-board business dealings concerning the sale of clothes.

- Blazer, who was seeking to make cases for the Government in an effort to obtain leniency for his own recent crimes, spent hours on the phone with Rashan – over a period of months – to enlist him in the scheme. He also dangled the prospect of money as an enticement for Rashan, to which Rashan – who had never received a coach's salary –

inexcusably and unfortunately succumbed.

- During the course of their tape-recorded conversations, it is clear that it was Blazer, not Rashan, who pushed Rashan to reveal his relationship with Coach Person. And it was Blazer who introduced the concept of offsetting the loan to Coach Person in return for Coach Person's steering of student-athletes to Blazer's (purported) financial advisory business. There is no doubt that Michel eventually agreed.

- Along the way, Michel made clear that he did not want Blazer's proposed offset to be reflected in any document to be signed by Coach Person. He explained that his desire was, to the extent possible, to have his friend spared from any exposure that could result in the loss of his job. Michel's hope to spare his friend was no doubt naïve, and, among Mr. Michel's many regrets, is his regret that he played a role in getting Coach Person involved. Once Rashan had introduced Blazer to Coach Person, Blazer and Coach Person proceeded largely on their own. Indeed, Coach Person told Blazer to communicate with him directly, and not through Rashan. Blazer's real object had been to ensnare an NCAA coach and Rashan had been a means to that end.

- Blazer kept Rashan in his employ, providing him with a modest amount of money, in the hope that other NCAA coaches or personnel would be implicated in similar schemes. In its Sentencing Memorandum, the Government emphasizes Rashan's conduct in relation to an individual identified as "Staff Member-1." Rashan does not deny and accepts full responsibility for his dealings with Blazer and Staff Member-1. It should be noted, however, that the Government filed no charges against Staff Member-1 and that the focal point of this prosecution has been Rashan's role as a facilitator in Blazer's relationship with Coach Person.

- On the basis of all of his conduct, the Government has acknowledged that Rashan had at most a "minor role" in the scheme.

In its Sentencing Memorandum, the Government also emphasizes the concept of general deterrence. We agree that general deterrence is an important consideration. We believe that, even absent a term of incarceration, the hardships that Rashan has had to endure as a result of this prosecution, and will continue to endure, will deter others in his position from committing similar offenses. We also submit that the concept of general deterrence should be understood within the context of the overall prosecution: this investigation was undertaken to preserve the integrity of the NCAA and aspects of its program that have been designed to remain free from commercial interference. An argument can be made that the need for general deterrence is at its strongest when sentencing persons who work for or do business with NCAA-affiliated institutions. That does not mean that the concept of general deterrence does not apply to Rashan. It simply means that, in applying it, it should be kept in mind that Rashan was a seller of clothes with no NCAA affiliation and no contractual obligation to comply with its rules. In its memorandum, the Government does not address the sentences received by other defendants, including NCAA coaches who have received non-custodial sentences, notwithstanding the need for general deterrence.

Hon. Loretta A. Preska  
October 15, 2019

Page 3

      As the Government notes, the Probation Department has recommended a non-custodial sentence. We believe that – given the financial amounts involved, his otherwise law-abiding life, and his minor role as a facilitator with no NCAA affiliation – such a sentence would be consistent with that imposed on other offenders in these prosecutions and would serve the ends of justice in this case.

      Respectfully submitted,

      /s/ Jonathan P. Bach

      Jonathan P. Bach

cc: Counsel of Record (via ECF)